UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| MURRAY MAYER, Individually and on Behalf of All Others Similarly Situated,<br><br>                            Plaintiff,<br><br>v.<br><br>APOGEE ENTERPRISES, INC., JOSEPH F. PUISHYS and JAMES S. PORTER,<br><br>                            Defendants. | Case No. _____<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Murray Mayer ("Plaintiff"), by his attorneys, except for his own acts, which are based on knowledge, alleges the following based upon the investigation of counsel, which included a review of United States Securities and Exchange Commi andssion ("SEC") filings by the Company Apogee Enterprises, Inc. ("Apogee" or the "Company"), as well as regulatory filings and reports, securities analyst reports and advisories by the Company, press releases and other public statements issued by the Company, and media reports about the Company. Plaintiff believes that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery:

### NATURE OF THE ACTION

1.      This is a federa1 securities class action on behalf of all investors who purchased or otherwise acquired Apogee common stock between June 28, 2018 and September 17, 2018 inclusive (the "Class Period"), seeking remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

**JURISDICTION AND VENUE**

2.      The federal law claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 27 of the Securities Act (15 U.S.C. §78aa.). This Court has jurisdiction over each Defendant named herein because each Defendant is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

4.      Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b) because certain of the acts alleged herein, including the preparation and dissemination of material false and/or misleading information, occurred in this District.

**PARTIES**

5.      Plaintiff Murray Mayer purchased the Company common stock within the Class Period and, as a result, was damaged thereby. Plaintiff's certification evidencing his transactions is attached hereto as Exhibit A.

6.      Defendant Apogee is incorporated in Minnesota and maintains its principal executive offices at 4400 West 78th Street, Suite 520, Minneapolis, Minnesota**.** Its stock trades on the NASDAQ under the ticker symbol "APOG."

7.      Defendant Joseph F. Puishys ("Puishys") is and was the Chief Executive Officer ("CEO") of Apogee at all relevant times.

8.      Defendant James S. Porter ("Porter") is and was the Chief Financial Officer ("CFO") and Executive Vice President of Apogee at all relevant times.

9.      Defendants in paragraphs 7-8 are collectively referred to herein as the "Individual Defendants."

10.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(d)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(e)     was aware of or deliberately recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(f)     approved or ratified these statements in violation of the federal securities laws.

11.     Because of the Individual Defendants' positions within the Company, they had access to undisclosed information about the Company' business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations and performance), conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection

therewith.

12.     As officers of a publicly held company whose securities were, and are, registered with the SEC pursuant to the federal securities laws of the United States, the Individual Defendants each had a duty to disseminate prompt, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

13.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of the Company' reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

14.     Each of the Individual Defendants are liable as a participant in a fraudulent

scheme and course of business that operated as a fraud or deceit on purchasers of the Company common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding the Company' business, operations, management and the intrinsic value of its securities and (ii) caused Plaintiff and other shareholders to purchase the Company securities at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

### A.    Company Background

15.    Apogee purports to be an industry leader in architectural products and services. It operates nine companies, 15 fabrication and manufacturing locations in the United States, and nine international locations. The Company claims to generate most of its revenue through its architectural glass, metal and installation businesses.

### B.    Material Misstatements and Omissions during the Class Period

16.    The Class Period begins on June 28, 2018, when the Apogee issued a press release, also attached as exhibit 99.1 to the Form 8-K filed with the SEC announcing the Company's financial and operating results for the first fiscal quarter ended June 2, 2018 ("Q1 2018 Press Release"). For the quarter, the Company reported an operating income for its glass segment of $1.6 million, compared to an operating income of $9.3 million for the previous year's comparable quarter. Therein, Defendants touted Apogee's growth, margins and profitability, stating in relevant part:

> "In the first quarter, we executed our plan for a solid start to fiscal 2019: revenues rose significantly, backlogs continued to grow across the business, we saw on-going productivity gains and excellent cash conversion. ***We also continued to make progress positioning the company for long-term, stable earnings and cash flow growth, regardless of the economic cycle***," said Joe Puishys, Apogee's chief executive officer.

"Robust 60% year-over-year top-line growth in the company's largest segment, Architectural Framing Systems, as well as substantial increases in Architectural Services demonstrate how we are executing our plan to build a larger, more stable and more diversified - by geography, project size and market segment - revenue base. ***On this strong foundation, we continued making investments and process improvements to increase efficiencies in project selection, manufacturing and delivery to raise long-term operating margins and drive earnings***. We're especially focused on the opportunity to leverage the best practices, technology and scale of our legacy businesses to raise long-term operating margins in recent acquisitions to those same levels of profitability. In fact, we're seeing quarter-over-quarter improvements in margins at EFCO, and remain on track to achieve our synergy goals by fiscal 2020."

Emphasis added.

17.     During a conference call to discuss the Company's financial and operating results for the first fiscal quarter ended June 2, 2018 ("Q1 2018 Conf. Call"), Apogee's CEO, Defendant Puishys assured investors of the glass business' margin growth for the fiscal year, stating in relevant part:

**Joe Puishys**

"The architectural glass segment was the only segment to decline in the quarter. But this was as expected and purely due to timing of project work. Importantly this business is in very solid competitive shape. Order activity was very strong especially toward the end of the quarter and we continue to win in the midsize market and regained large project work. We now have the majority of fiscal 2019 revenues in hand as firm awards significantly further ahead than where we were for the same metric a year ago. ***This gives us confidence that the glass business will grow in the remainder of the year. The second quarter will reflect strong sequential growth in glass in Q3 and Q4 will reflect a solid year-over-year growth***."

*             *             *

***Hey I want to remind everyone that our visibility which is critical to our forecast here goes well beyond our nearly $1 billion in book backlog***. It also includes awards that are not yet in backlog. It includes commitments and wins, bidding activity and architectural calls. All of these indicators continue to be very positive in supporting outlook for at least two plus years of end market growth.

Industry fundamentals also remain encouraging. We're seeing favorable lending in the non-resi construction market, office vacancy rates remain stable and

relatively low and job growth continues in the office occupying sectors education healthcare and hospitality, which are all vitally important to Apogee.

Emphasis added.

18.     During the call, Apogee's CFO, Defendant Porter affirmed the upcoming growth

of the glass business, stating in relevant part:

**Jim Porter**

As Joe described segment backlog increased to $427 million from $406 million a quarter ago and the project pipeline and bidding continue to be solid. In architectural glass, revenues declined approximately 20% from a year ago largely as expected on soft volumes early in the quarter based on the timing for customer orders. We have this visibility coming into the year as we had previously discussed.

Operating income and margins also were down as a result of a lower volume. ***As Joe pointed out, order activity for Architectural Glass grew substantially during the quarter and we continue to expect higher revenues sequentially in Q2 and year-over-year revenue in operating income growth for the remainder of the year.***

Emphasis added.

19.     During the Q&A session of the call, when asked about the progress and success in

the mid high market by Tieton Capital Management's analyst, Defendant Puishy emphasized that

Apogee "***only***" meets short lead times deadlines in the glass segment "***because***" of the

automation of the process and the people "***put in place***" stating in relevant part:

"I've often stated that as a company we are way too vulnerable to that. What is in fact the lumpiest piece of non-resi construction for commercial towers, they have the highest peaks and the lowest valleys that was more than two-thirds of our glass business -- and glass was more than half of Apogee when I arrived. That chart I showed the area chart shows we're far less depending on glass as a company although we love the business. And within that now we're more like half and half small and medium projects. ***We move downstream in the medium project just the margin profiles are the same if not better. But you have to be able to deliver in more consistent and reliable lead times. And we were only able to do that because of the processes and the automation investments we've made in our glass segment and the people we put in place that had allowed us to consistently meet the shorter lead times demanded in the mid-segment. And we***

*continue to make those improvements.* So we're capable of continuing our journey to grow share in that segment and we are under represented in the smaller projects in the mid segment and the small market itself.

So I'm confident that those investments we've made will allow us to continue to do well in this segment within glass."

Emphasis added.

20.     The statements in paragraphs ¶17-20 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants failed to disclose that: (i) Apogee lacked the required labor force in place to ramp-up its production; (ii) Apogee was unable to hire, train and retain new employees; (iii) Apogee's productivity and margins would be negatively impacted; and (iv) as a result of the foregoing, Defendants' statements about the Company' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

## C.     The Truth Emerges

21.     On September 18, 2018, Apogee issued a press release, also attached as exhibit 99.1 to the Form 8-K filed with the SEC announcing the Company's financial and operating results for the second fiscal quarter and six month ended September 1, 2018 ("Q2 2018 Press Release"). For the quarter, the Company reported an operating income for its glass segment of $1.7 million, compared to an operating income of $10.3 million in the previous year's comparable quarter, and reduced the guidance for the fiscal year. Therein, Apogee stated in relevant part:

**MINNEAPOLIS, MN, September 18, 2018 - Apogee Enterprises, Inc. (Nasdaq: APOG)**, a leader in the design and development of value-added glass

and metal products and services for enclosing commercial buildings, framing and displays, today announced its fiscal 2019 second-quarter results.

### Second-Quarter Highlights
• Second-quarter revenue grew 5.3 percent to $362.1 million, driven by strong growth in Architectural Services, partially offset by lower revenue in Architectural Glass.

• Operating income was $28.7 million, compared to $27.8 million a year ago. Adjusted operating income was $29.7 million, compared to $34.1 million in the prior year, primarily due to lower margins in Architectural Glass, partially offset by continued margin improvements in Architectural Services.

• Adjusted EBITDA was $42.1 million, compared to $47.8 million in last year's second quarter.

• Earnings per diluted share grew to $0.72, compared to $0.60 in the prior year period.

• Adjusted earnings were $0.75 per diluted share, in-line with the prior year.

• Year-to-date cash provided by operating activities was $47.9 million, up 17 percent over $40.8 million in the prior year.

• See Reconciliation of Non-GAAP financial measures at the end of this press release.

*       *       *

### Architectural Glass
Architectural Glass had second quarter revenue of $88.1 million, down 9.5 percent from the prior year quarter. Order activity grew substantially during the quarter, with the segment recording its highest quarterly order volume in 15 years. Sequentially, Architectural Glass revenue grew 15 percent, compared to $76.9 million in the first quarter of fiscal 2019.

Operating income was $1.7 million in the second quarter and operating margin was 2.0 percent, down from $10.3 million last year and 10.5 percent in the prior year, respectively. *The lower operating margin was primarily driven by significantly increased labor costs, lower productivity, and higher cost of quality, as the segment was challenged to efficiently ramp-up production to meet the higher than expected, short lead-time customer demand*.

Emphasis added.

22.     During a conference call to discuss the Company's financial and operating results for the second fiscal quarter and six month ended September 1, 2018 ("Q2 2018 Conf. Call"), Apogee's CEO, Defendant Puishys ultimately admitted that (i) Apogee was never ready to ramp-up production and meet the previously announced growth and margins, (ii) Defendants were

aware of the labor market trends (iii) Defendants failed to action any action to overcome said

trends. In pertinent part:

> "At the root of the issues was the challenge of hiring and training qualified new employees in an extremely tight labor market.
>
> ***To put some detail behind this, during the quarter, we added over 300 new employees in our Glass factories, a 20% increase to the workforce within the quarter.*** It's taken longer than expected to recruit, hire, train, and retain the new staff and to bring them up to targeted productivity levels in our complex custom manufacturing operation. As we worked through this ramp up, we experienced the drop-off in margins and higher scrap rates, lower throughput, and more expedited orders, all related to the influx of new employees.
>
> ***Should we have been better prepared for these challenges? The simple answer is, yes.*** We've successfully managed through fluctuations in our Glass business before. However, the magnitude of the order ramp up we experienced and the preceding drop-off over the prior four quarters was much greater than expected, and we were surprised by the difficulty we faced recruiting and hiring new staff in the current labor market."

*       *       *

> Should we have been better prepared for these challenges? The simple answer is, yes. We've successfully managed through fluctuations in our Glass business before. However, the magnitude of the order ramp up we experienced in the preceding drop-off over the prior four quarters was much greater than expected, and we were surprised by the difficulty we faced recruiting and hiring new staff in the current labor market.
>
> ***And as I said, should we've been better prepared? We knew we had a tight labor market. That was not a surprise.***

Emphasis added.

23.      On this news, the price of the Company's common stock declined $6.46 over the

course of two trading days from a close on September 17, 2018 at $48.22 per share of Apogee

common stock, to a close on September 19, 2018 at $41.76 per share of Apogee common stock,

***a drop of approximately 13.40 percent.***

## ADDITIONAL SCIENTER ALLEGATIONS

24.     As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding the Company, their control over, and/or receipt and/or modification of the Company' allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

## LOSS CAUSATION AND ECONOMIC LOSS

25.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the Company's stock price, and operated as a fraud or deceit on acquirers of the Company's common stock. As detailed above, when the truth about the Company' misconduct and its lack of operational and financial controls was revealed, the value of the Company's common stock declined precipitously as the prior artificial inflation no longer propped up its stock price. The decline in the Company' common stock price was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the common stock price decline negates any inference that the loss suffered by Plaintiff and other members of the Class was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct. The economic loss, i.e., damages,

suffered by Plaintiff and other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the Company's stock price and the subsequent significant decline in the value of the Company's share, price when Defendants' prior misrepresentations and other fraudulent conduct was revealed.

26.     At all relevant times, Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by the Plaintiff and other Class members. Those statements were materially false and misleading through their failure to disclose a true and accurate picture of the Company' business, operations and financial condition, as alleged herein. Throughout the Class Period, Defendants publicly issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, causing the Company' common stock to be artificially inflated. Plaintiff and other Class members purchased the Company' common stock at those artificially inflated prices, causing them to suffer the damages complained of herein.

**PRESUMPTION OF RELIANCE; FRAUD-ON-THE-MARKET**

27.     At all relevant times, the market for the Company common stock was an efficient market for the following reasons, among others:

> (a) the Company common stock met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient market;
>
> (b) During the Class Period, the Company common stock were actively traded, demonstrating a strong presumption of an efficient market;
>
> (c) As a regulated issuer, the Company filed with the SEC periodic public reports during the Class Period;
>
> (d) the Company regularly communicated with public investors via established

market communication mechanisms;

(e) the Company was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(f) Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

28.     As a result of the foregoing, the market for the Company common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in the Company' stock price. Under these circumstances, all purchasers of the Company common stock during the Class Period suffered similar injury through their purchase of the Company' common stock at artificially inflated prices and a presumption of reliance applies.

29.     Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security. Here, the facts withheld are material because an investor would have considered the Company's financials and adequacy of internal controls over financial reporting when deciding whether to purchase and/or sell stock in the Company.

## NO SAFE HARBOR; INAPPLICABILITY OF BESPEAKS CAUTION DOCTRINE

30.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint.

31.     To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

32.     Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of the Company who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by the defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

33.     Plaintiff brings this action on behalf of all individuals and entities who purchased or otherwise acquired the Company common stock on the public market during the Class Period,

and were damaged, excluding the Company, the defendants and each of their immediate family members, legal representatives, heirs, successors or assigns, and any entity in which any of the defendants have or had a controlling interest (the "Class").

34.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. Upon information and belief, these shares are held by thousands if not millions of individuals located geographically throughout the country and possibly the world. Joinder would be highly impracticable.

35.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by the defendants' respective wrongful conduct in violation of the federal laws complained of herein.

36.     Plaintiff has and will continue to fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

37.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by the defendants'

respective acts as alleged herein;

(b)     whether the defendants acted knowingly or with deliberate recklessness in issuing false and misleading financial statements;

(c)     whether the price of the Company securities during the Class Period was artificially inflated because of the defendants' conduct complained of herein; and

(d)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

38.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I
### *Violation of Section 10(b) and Rule 10b-5 Against All Defendants*

39.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

40.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (2) cause Plaintiff and other members of the Class to purchase the Company common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, each of the Defendants took the actions set forth herein.

16

41.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for the Company securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

42.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of the Company as specified herein.

43.     These Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of the Company' value and performance and continued substantial growth, which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about the Company and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of the Company common stock during the Class Period.

44.    Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (1) Individual Defendants were high-level executives, directors, and/or agents at the Company during the Class Period and members of the Company's management team or had control thereof; (2) each Individual Defendant, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's financial condition; (3) each Individual Defendant enjoyed significant personal contact and familiarity with the other Individual Defendant and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (4) each Individual Defendant was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

45.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the Company' operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and misstatements of the Company's financial condition throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

46.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of the Company' securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company' publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired the Company' common stock during the Class Period at artificially high prices and were or will be damaged thereby.

47.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the Company' financial results, which was not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their the Company securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

48.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

49.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

50. This action was filed within two years of discovery of the fraud and within five years of each plaintiff's purchases of common stock giving rise to the cause of action.

## COUNT II
### *The Individual Defendants Violated Section 20(a) of the Exchange Act*

51. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

52. The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. The Individual Defendants provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

53. In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

54.     As set forth above, the Company, the Individual Defendants each violated Section 10(b), and Rule 10b-5 promulgated thereunder, by their acts and omissions as alleged in this Complaint.

55.     By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

56.     This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's purchases of common stock giving rise to the cause of action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

(a)     Determining that this action is a proper class action, certifying Plaintiff as class representative under Federal Rule of Civil Procedure 23 and Plaintiff's counsel as class counsel;

(b)     Awarding compensatory damages in favor of Plaintiff and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of the defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

(d)     Granting extraordinary equitable and/or injunctive relief as permitted by law; and

(e)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a jury trial.

**REINHARDT WENDORF & BLANCHFIELD**

Dated: November 5, 2018

*s/ Garrett D. Blanchfield*
Garrett D. Blanchfield, #209855
Roberta A. Yard, #322295
332 Minnesota Street, Suite W1050
St. Paul, MN  55101
Tel: (651) 287-2100
Fax: (651) 287-2103
Email:  g.blanchfield@rwblawfirm.com
          r.yard@rwblawfirm.com

*Liaison Counsel*

**LEVI & KORSINSKY, LLP (Trial Counsel)**
Eduard Korsinsky
55 Broadway, 10th Floor
New York, NY 10006
Tel: (212) 363-7500
Fax: (212) 363-7171
Email:ek@zlk.com
 (*Pro hac vice application forthcoming*)

*Counsel for Plaintiff and Proposed Lead Counsel
for the Class*



55 Broadway, 10th Floor
New York, NY 10006
T:212-363-7500
F:212-363-7171
www.zlk.com

**CERTIFICATION OF NAMED PLAINTIFF PURSUANT TO FEDERAL SECURITIES LAWS**

I, Murray Mayer, duly certify and say, as to the claims asserted under the federal securities laws, that:

1. I have reviewed the complaint and authorized its filing.

2. I did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3. I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. My transaction(s) in Apogee Enterprises, Inc. which are the subject of this litigation during the class period set forth in the complaint are set forth in the chart attached hereto.

5. Within the last 3 years, I have not sought to serve nor have I served as a class representative in any federal securities fraud case.

6. I will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this October 25, 2018.


Name: Murray Mayer

Signed: