## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| MURRAY MAYER, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Civ. No. 0:18-cv-03097-NEB-SER |
| Plaintiff, | ) ) | <u>CLASS ACTION</u> |
| vs. | ) ) ) | AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| APOGEE ENTERPRISES, INC., et al., | ) ) | |
| Defendants. | ) ) | |
| | ) | <u>DEMAND FOR TRIAL BY JURY</u> |

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ..................................................................................... 1

II.  NATURE OF THE ACTION ................................................................... 1

III.  JURISDICTION AND VENUE ............................................................. 11

IV.  PARTIES ............................................................................................... 11

V.  FACTUAL BACKGROUND TO THE SUBSTANTIVE ALLEGATIONS ........ 16

    A.  Apogee's Reporting Segments and Fiscal Quarters .................................... 16

    B.  Defendants' Comprehensive "4 Levels of Visibility" into Apogee's Businesses ................................................................................. 18

    C.  Apogee Announces Acquisition of EFCO Corporation in May 2017 ........ 22

    D.  Undisclosed Problems with Apogee's Glass Segment ................................ 32

VI.  DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS ...................................................................................... 33

    A.  Apogee Acquires EFCO While Concealing Material Problems with the Business ...................................................................................... 33

        1.  May 1, 2017 Conference Call and Press Release ............................. 33

        2.  June 12, 2017 Press Release ............................................................. 39

        3.  June 22, 2017 Earnings Call and Press Release ............................... 40

        4.  July 12, 2017 Form 10-Q for 1Q18 ................................................. 45

    B.  Defendants Begin to Partially Reveal the Truth Regarding the EFCO Acquisition, but Continue to Conceal and Misrepresent the Full Extent of EFCO's Problems with its Legacy Projects ............................... 45

        1.  August 23, 2017 Guidance Conference Call and Press Release ...... 45

        2.  September 19, 2017 Earnings Call and Press Release ..................... 53

        3.  December 21, 2017 Earnings Call and Press Release ...................... 56

    C.  Additional Revelations Regarding the True Nature of the Problems with EFCO Legacy Projects Trickle Out ...................................................... 60

**Page**

        1.      April 12, 2018 Earnings Call and Press Release .............................. 60

D.     Defendants Conceal Material Problems with Apogee's Glass
        Segment Operations, While Continuing to Conceal the Full Extent of
        the Problems with EFCO's Legacy Projects ................................................. 66

        1.      June 28, 2018 Earnings Call and Press Release ............................. 66

        2.      July 12, 2018 Form 10-Q for 1Q19 .................................................. 74

E.     Defendants Reveal the Truth Regarding the Existence of Material
        Problems with Apogee's Glass Segment, While Continuing to
        Conceal the Full Extent of the Problems with EFCO's Legacy
        Projects ......................................................................................................... 75

        1.      September 18, 2018 Earnings Call and Press Release .................... 75

F.     Apogee Continues to Reveal Additional Details Regarding the True
        Nature of the Impact from the Legacy EFCO Projects .............................. 81

        1.      December 20, 2018 Earnings Call and Press Release ..................... 81

G.     The Full Truth Regarding EFCO's Legacy Projects Is Revealed
        When the Company Takes a $42.6 Million Charge on EFCO's
        Legacy Projects and "Adjust[s]" Certain Income Apogee Previously
        Recognized on EFCO's Legacy Projects ..................................................... 84

        1.      April 11, 2019 Earnings Call and Press Release ............................. 84

VII.   DEFENDANTS ISSUED FALSE FINANCIALS AND VIOLATED
      GAAP .................................................................................................................... 87

A.     Apogee's Financial Accounting and Disclosures for EFCO Legacy
        Contract Costs Violated GAAP .................................................................... 88

        1.      GAAP Required that Apogee Estimate, Track and Update
             Current and Future Contract Costs in an Accurate,
             Dependable Manner ......................................................................... 89

        2.      The EFCO Legacy Project Cost Overruns and Losses Were
             Known to Defendants ...................................................................... 91

**Page**

        3.     The Company Violated GAAP When It Failed to Recognize
Losses on the Legacy EFCO Contracts When the Losses
Were Known or Knowable by 1Q19 ................................................. 93

        4.     The Misstatements Described Above Were Material to
Apogee's Financial Statements ........................................... 96

  B.    SOX Certifications and Representations Regarding Apogee's
Compliance with GAAP ................................................................... 99

VIII.  ADDITIONAL EVIDENCE OF SCIENTER ....................................... 100

  A.    The Individual Defendants Investigated and Actively Participated in
the EFCO Acquisition ..................................................................... 101

  B.    Defendants' Own Statements Support Scienter ....................................... 102

        1.     Defendants Admitted to Employing "4 Levels of Visibility" ........ 102

        2.     Defendants Admitted to Learning of Problems with EFCO's
Legacy Projects During Due Diligence ........................................ 104

        3.     Defendants Admitted to Knowing of Problems in Its Glass
Segment ....................................................................................... 105

  C.    Defendants' Misstatements Concerning the Company's Core
Operations Support Scienter ...................................................... 106

IX.    CLASS ACTION ALLEGATIONS .................................................... 107

X.     LOSS CAUSATION ......................................................................... 109

  A.    August 23, 2017 Disclosure ...................................................... 110

  B.    April 12, 2018 Disclosure ........................................................ 112

  C.    September 18, 2018 Disclosure ................................................. 114

  D.    December 20, 2018 Disclosure .................................................. 116

  E.    April 11, 2019 Disclosure ........................................................ 118

XI.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON
THE MARKET DOCTRINE .............................................................. 120

**Page**

COUNT I ............................................................................................................. 122

    Violations of Section 10(b) of the Exchange Act and Rule 10b-5
        Promulgated Thereunder (Against All Defendants) ................................. 122

COUNT II ........................................................................................................... 123

    For Violations of Section 20(a) of the Exchange Act (Against Defendants
        Puishys and Porter) .................................................................................. 123

JURY DEMAND ................................................................................................. 125

## I.       INTRODUCTION

By and through the undersigned counsel, Lead Plaintiffs City of Cape Coral Municipal Firefighters' Retirement Plan and the City of Cape Coral Municipal Police Officers' Retirement Plan ("Plaintiffs" or "Lead Plaintiffs") allege the following against Apogee Enterprises Inc. ("Apogee" or the "Company"), Joseph F. Puishys ("Puishys"), and James S. Porter ("Porter") (collectively, "Defendants"), upon personal knowledge as to those allegations concerning Plaintiffs and, as to all other matters, upon the investigation of counsel, which included, without limitation: (a) review and analysis of public filings made by Apogee with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain Defendants and other related non-parties; (c) review of news articles, securities analyst reports, and shareholder communications; (d) review of other publicly available information concerning Defendants; (e) consultation with consultants; and (f) information readily obtainable on the internet.  Many of the facts supporting the allegations contained herein are known only to Defendants named herein or are exclusively within their custody and control.  Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## II.      NATURE OF THE ACTION

1.      This securities class action is brought on behalf of those who purchased or otherwise acquired Apogee common stock between May 1, 2017 and April 10, 2019 (the "Class Period"), and were damaged thereby (the "Class"), seeking to pursue remedies under

§§10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act" or "Exchange Act") and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

2.      Apogee is the self-proclaimed "world leader in the design and development of value-added glass and metal products and services for enclosing commercial buildings and framing and displays."   The Company designs, engineers, and manufactures aluminum storefront entrance, window and wall products, and architectural glass products for value-added non-residential buildings, including differentiated products that provide aesthetic differentiation and distinction, and high-energy performance.   The Company operates through four reporting segments, described further below, including Architectural Framing, Architectural Glass, Architectural Services, and Large-Scale Optical Technologies.

3.      Throughout the Class Period, Defendants engaged in a fraudulent scheme by repeatedly misrepresenting the current status and true nature of its business.   These materially false and misleading statements and/or omissions served to artificially inflate the Company's stock price which, once revealed, caused serious harm to investors.

4.      In early 2017, with a goal of accelerating its growth strategies and expanding its geographic presence across the United States, Apogee acquired construction product manufacturer EFCO Corporation ("EFCO") – an acquisition that would increase Apogee's Architectural Framing Segment (one of four segments) to 51% of the Company's net sales from the segment's 35% share the year prior.   According to Apogee, the Company engaged in an "intense" due diligence process prior to completing the acquisition, but unbeknownst to investors, Defendants realized at that time that EFCO suffered from significant problems. Among those problems was a substantial weakening in EFCO's sales pipeline during the

months leading up to the acquisition. Another was that EFCO was experiencing increasing costs of various projects Apogee would ultimately inherit in the acquisition that would result in lower profitability.

5.      Rather than disclose these problems in May 2017, when Apogee formally announced the acquisition, Defendants engaged in a fraudulent scheme to conceal the full extent of the problems during the Class Period. But Defendants could only conceal the truth for so long, as the problems associated with the EFCO acquisition began to have an undeniable impact on the Company's financial results.

6.      The truth was ultimately revealed in a series of partial disclosures during the Class Period, causing a series of sharp declines in the Company's common stock price. In August 2017, as financial reporting of EFCO's results became imminent, Defendants admitted they were aware of these problems, while at the same time falsely assuring investors they had their arms around the problems, the costs of EFCO's legacy projects were under control, and the risks were reflected in Apogee's guidance and publicly issued financial disclosures. From August 2017 through the end of 2018 – citing their comprehensive "visibility" into Apogee's current and future results – Defendants continuously and repeatedly misrepresented the scope of the problems with EFCO's legacy projects and the actual impact those problems were having on Apogee. In a similar vein, during the summer of 2018, Apogee concealed substantial problems in another of its operating segments, its Architectural Glass Segment ("Glass Segment").

7.      Apogee finally disclosed the full impact regarding EFCO's troubled legacy projects at the end of the Class Period when, on April 11, 2019, Apogee revealed it was

taking *$45.7 million* of pre-tax charges relating to EFCO, including a *$42.6 million charge on EFCO's legacy projects*.  Apogee also revealed it was making "adjustment[s]" to *profits* Apogee had recognized on EFCO contracts going back to the beginning of fiscal year 2019 ("FY19").  Apogee's stock tumbled further on this disclosure, capping the two-year saga of the failed acquisition and causing losses of millions of dollars to Apogee investors.

8.      The Class Period begins on May 1, 2017, when the Company announced it had signed an agreement to purchase EFCO for approximately $195 million.   Apogee substantially funded the acquisition by nearly doubling its revolving credit facility from $175 million to $335 million.

9.      EFCO, originally owned by Pella Corporation ("Pella"), was described as a growing and profitable U.S. manufacturer of architectural aluminum window, curtainwall, storefront and entrance systems for small and mid-size commercial construction projects – a target Apogee growth sector – with annual revenues of more than $250 million.  EFCO joined Apogee's Architectural Framing segment following the acquisition.  By comparison, during the fiscal year preceding the EFCO acquisition, the Architectural Framing segment had recognized $385 million in revenue.

10.      The Company touted the benefits the acquisition was anticipated to provide, including that it would "'complement[] and accelerate[] Apogee's'" growth strategies, expand Apogee's "presence in the midsized commercial buildings," broaden the Company's product offering, and increase Apogee's geographic presence across the United States. Importantly, the EFCO acquisition – in addition to a smaller acquisition Apogee conducted in 2016 – would help increase Apogee's Architectural Framing Systems Segment ("Framing

Segment") to account for 51% of the Company's net sales in fiscal year 2018 ("FY18"), a nearly ***46% increase*** from the segment's 35% share of Apogee's total net sales in fiscal year 2017 ("FY17").

11.     Further, Apogee led investors to believe that the acquisition would be virtually seamless.  Defendant Puishys extolled the similarities and "incredible" overlap between the two companies' operations, stating EFCO "virtually do[es] everything we do" and describing EFCO as a "mini Apogee."  He praised the strength of EFCO's management team, calling it a "great management team with a great leader," and stating that it would stay with the Company post-acquisition.  He also justified Apogee's decision to make the acquisition, assuring investors:

> [W]e do not buy companies that are broken or have a weak management team or have poorly run factories, we're not that pompous to think we're going to turn something like that around.  This is a great company.  It belongs in a – I think aside from the Pella organization, this is the best home, and frankly, it's a better home because of our commercial DNA.

12.     As for EFCO's contribution to Apogee's top and bottom lines in FY18, the Company initially stated it anticipated EFCO would: (1) contribute $200 to $225 million to Apogee's total revenues; (2) generate cash and be accretive to Apogee's EBITDA and earnings per share; and (3) achieve operating margins in the mid-single-digits.  Defendants reiterated their FY18 guidance following Apogee's acquisition of 100% of EFCO's stock on June 12, 2017.

13.     Unfortunately for investors, however, Defendants initially concealed, and thereafter misrepresented the scope of problems with EFCO that Defendants had learned about during their due diligence process.  As Defendants admitted on Apogee's August 23,

2017 earnings call, one of the problems Defendants learned about ***during their due diligence*** concerned a substantial weakening in EFCO's order activity during the months leading up to the Class Period.  Moreover, Defendants admitted on Apogee's April 12, 2018 earnings call, that they "***learned in due diligence***" of another problem in which EFCO had substantially underestimated the costs and thus the profitability of certain projects Apogee acquired in the EFCO transaction.  The problems at EFCO would materially affect EFCO's and Apogee's financial results in FY18 and FY19.

14.     As alleged herein, Defendants repeatedly issued material misstatements and omissions of fact, false financial statements, and false and misleading guidance that failed to disclose and account for the known risks that EFCO's problems posed to Apogee.  Through a series of partial disclosures during the Class Period, Defendants revealed previously concealed information concerning EFCO, often pairing their partial disclosures with guidance downgrades and further misstatements that continued to conceal the full truth regarding EFCO.

15.     On August 23, 2017, just two months after the Company completed this "great acquisition," Apogee lowered its FY18 outlook due to a substantially weakened EFCO sales pipeline, and "revised cost estimates" on legacy projects "EFCO will be delivering in the second half of fiscal 2018."  Nevertheless, Defendants concealed the full truth regarding EFCO's legacy projects, and encouraged investors by issuing preliminary FY19 guidance for Apogee of "'double-digit revenue growth and triple-digit operating margin improvement, based on our order pipeline, bidding and backlog already booked for fiscal 2019.'"  As a result of these misstatements, investors were unable to fully appreciate the true extent of the

issues surrounding the EFCO acquisition, the true nature of the Company's financial condition, and the actual status of its business overall.  Despite Defendants' misstatements, Apogee's stock price fell 12.76% on this news, but would have fallen further had the Company disclosed the full scope of the EFCO legacy projects' financial impact.

16.    Defendants continued to make public statements and issue guidance that misrepresented and failed to take into account the truth regarding EFCO's legacy projects. For example, on December 21, 2017, the Company reported disappointing results for the third quarter of 2018 ("3Q18"), once again reducing its FY18 guidance, attributing these failures to a "'slower than expected second half for our architectural glass segment,'" "'higher than expected health care costs,'" and "'competitive pressures'" in the Glass Segment.  Notwithstanding the negative news, investors received assurances that EFCO was "off to a great start" and that Apogee "continue[d] to anticipate double-digit revenue organic growth and triple-digit basis point improvement in operating margin" for FY19.  Defendants made these assurances even though they knew or should have known from their self-proclaimed "visibility" into Apogee's future performance, that EFCO's legacy projects would cause it to incur a ***$5.3 million loss***, and operate at a ***negative 12.9% operating margin***, in the fourth quarter of 2018 ("4Q18").

17.    On April 12, 2018, the Company reported its 4Q18 and FY18 results, disclosed further information regarding EFCO, and retracted its prior guidance of a triple-digit increase in Apogee's operating margin in FY19.  The Company admitted on that day that Apogee was actually "18 months behind and starting from a lower point" on improving EFCO's operating margins than Defendants had previously disclosed, and that the EFCO business unit was

expected to "***breakeven in fiscal 2019***."  The stock reacted accordingly, dropping another 8.86% on that day to a new Class Period low of around $38 per share.

18.     Nonetheless, the Company continued to paint a rosy picture of EFCO's financial future and conceal the EFCO legacy projects' actual financial impact on Apogee. For instance, Defendants assured investors on April 12, 2018 that they had "now identified everything" regarding EFCO, and their newly issued FY19 guidance "***reflects the full risk that . . . [EFCO] had***."  The FY19 guidance, together with the Company's positive statements, served to limit the damage to Apogee's stock price, such that analysts commented they were "cautiously optimistic that [FY19] guidance is now appropriately set." And for each quarter that followed this revelation, with respect to EFCO, the Company continued to assure investors that "the problematic projects" it had inherited "are behind us," and that it had "effectively surpass[ed]" "the problem contracts at EFCO," which served to maintain artificial inflation in the stock.

19.     On June 28, 2018, the Company reported its first quarter of 2019 ("1Q19") earnings and, for the first time in four quarters, raised its FY19 guidance, reporting that both the Framing Segment and Glass Segment were "experiencing significant strength in orders" and that it continued to "consistently meet the shorter lead times" the glass market demanded.  This news, together with the Company's positive statements that the Glass Segment was in "solid competitive shape" and "very strong," among its other assurances that the Company was "substantially completed through the hurdles" related to the legacy EFCO projects, instilled confidence in the Company's investors that Apogee was finally back on track.

20.     Unbeknownst to investors, however, the Glass Segment's workforce was grossly insufficient to handle the segment's order activity, and an "avalanche" hit the Company in June prior to Defendants' June 28, 2018 statement, that would cause Apogee to miss its second quarter of 2019 ("2Q19") results.

21.     That news was finally revealed on September 18, 2018, when the Company reported that it had faced "significant challenges" during 2Q19, which included significantly increased product scrap rates, lower throughput, and increased shipping and other operating costs that "hit" the Company in June.  As Defendants would disclose, the Glass Segment's workforce, which grew by 20% in 2Q19 as a result of Apogee's frantic hiring, was still insufficient as of September 18, 2018 – the date Apogee disclosed its 2Q19 results – and needed to grow by an additional 100 employees.  These undisclosed problems "caused the business to fall well short of [Apogee's] expectations for the quarter and to impact our full year outlook."  Accordingly, the Company announced it was lowering its FY19 guidance it had just reaffirmed two months prior in its Form 10-Q filed on July 12, 2018.  On this news, Apogee's stock price dropped $5.74 per share, or approximately 11.9%, on September 18, 2017.

22.     Then, on December 20, 2018, following the Company's April 12, 2018 projection that EFCO was expected to "breakeven in fiscal 2019," and repeated assurances each quarter thereafter that Apogee had overcome the hurdles associated with the legacy projects that had plagued EFCO's (and the Company's) earnings, Apogee announced that EFCO would be "a little bit negative in earnings for this fiscal year" due to "lower volumes."  That news, together with the related reduction in its FY19 guidance "to reflect lower

volumes in Architectural Framing Systems and operational improvement efforts in Architectural Glass," caused the stock to plummet another $4.09 per share, or approximately 13.2%, on extremely high trading volume that same day.

23.     Apogee disclosed the full truth regarding EFCO's legacy projects Apogee had acquired in 2017 at the end of the Class Period on April 11, 2019.  On that date, Apogee revealed it was taking ***$45.7 million*** of pre-tax charges relating to EFCO, including a ***$42.6 million charge on EFCO's legacy projects***.  Defendants also revealed the $45.7 million in charges included "adjustment[s]" relating to ***reversing profits*** Apogee had recognized on troubled EFCO contracts ***during the first three quarters of FY19***.

24.     To put the $42.6 million charge in context, while EFCO was one component of the Framing Segment, the fourth quarter $42.6 million charge roughly equaled the ***entire Framing Segment's operating income during the first three quarters of FY19*** ($43.5 million).  The charge was also ***53 times*** the size of EFCO's total operating income ***during all of fiscal year 2018*** ($0.3 million).

25.     Defendants' disclosures of the full truth regarding EFCO, including the massive charges on EFCO's legacy projects, and that certain of Apogee's previously reported financial results for 1Q19 through the third quarter of 2019 ("3Q19") had been inflated, sent Apogee's stock tumbling 6.25% on April 11, 2019.

26.     Defendants' materially false and misleading statements and omissions caused Apogee's shares to trade at artificially inflated prices during the Class Period, reaching a high of over $58 per share on June 9, 2017.  Apogee's stock price collapsed to $36.40 per share by the end of the Class Period.

### III.    JURISDICTION AND VENUE

27.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j (b) and 78t (a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

28.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1391(b).  The Company's principal place of business is located in this District at 4400 West 78th Street, Suite 520, Minneapolis, MN 55435, and many of the false and misleading statements and omissions giving rise to the violations of law complained of herein were made in or issued from this District.

29.    In connection with the challenged conduct, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities markets.

### IV.    PARTIES

30.    Lead Plaintiffs are defined benefit pension plans organized to provide retirement, termination, disability and death benefits to plan members and their families. They were appointed to serve as Lead Plaintiffs in this action by Order of this Court dated February 26, 2019.  ECF No. 21.  As shown in their certifications filed with the Court herewith, Plaintiffs purchased or otherwise acquired Apogee common stock at artificially inflated prices during the Class Period and suffered economic losses when true facts about

the Company's operating and financial conditions were disclosed and artificial inflation was removed from the price of Apogee stock.

31.     Defendant Apogee is incorporated in Minnesota and maintains its principal executive offices at 4400 West 78th Street, Suite 520, Minneapolis, MN. Apogee's common stock trades on the NASDAQ Stock Market under the ticker symbol "APOG."

32.     Defendant Puishys was at all relevant times the Chief Executive Officer ("CEO") and President of Apogee. He has served in this role since August 22, 2011. Defendant Puishys has over 32 years of experience in the manufacturing businesses. He has served as President of Honeywell's Environmental and Combustion Controls division since 2008. Prior to that, he led Honeywell Building Solutions, a global leader in the installation and service of integrated building solutions. He also held leadership positions in companies that were eventually bought by Honeywell, including Bendix Friction Materials and Garrett Engine Boosting System. He has also served in numerous executive and financial positions across Honeywell's businesses. As president of Honeywell Building Solutions, Defendant Puishys received several awards from Honeywell for the turnaround of the commercial construction business. He received his Bachelor's degree in Accounting and Finance from Bryant University and his Master's in Business Administration from Providence College.

33.     Defendant Porter was at all relevant times the Chief Financial Officer ("CFO") and Executive Vice President of Apogee. He has served in these capacities since October 13, 2005 and 2015, respectively. Prior to that, Defendant Porter served as a Vice President of Strategy and Planning at Apogee from 2002 to 2005 and served as its Interim CFO from July 12, 2005 to October 13, 2005. Defendant Porter joined Apogee in 1997 as Assistant

Controller, was promoted to Controller in 1998 and to Vice President of Finance and Planning in 2000.  His prior experience includes six years with Rollerblade, a consumer products company based in Minneapolis, where Defendant Porter last served as Vice President of Finance and Controller; and four years at Ecolab, a manufacturer and distributor of specialty chemicals based in St. Paul, Minnesota, where he last served as Financial Analyst in the institutional division.  He holds a Master's in Business Administration from the University of Iowa, Iowa City and a Bachelor's in finance from the University of Wisconsin, Madison.

34.    Defendants Puishys and Defendant Porter are collectively referred to herein as the "Individual Defendants."

35.    During and prior to the Class Period, the Individual Defendants, as senior executive officers of Apogee, were privy to confidential and proprietary information concerning Apogee, its operations, finances, financial condition, and present and future business prospects.  The Individual Defendants also had access to material adverse non-public information concerning Apogee, as discussed in detail below.  Because of their positions with Apogee, the Individual Defendants had access to non-public information about the Company's business, finances, products, markets, and present and future business prospects via access to internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual

- 13 -

Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

36.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers, were "controlling person[s]" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to, and did, directly or indirectly, control the conduct of the Company's business.

37.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various public statements complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.  Because of their executive and managerial positions with Apogee, each of the Individual Defendants had access to the adverse undisclosed information about the Company's business prospects, financial condition, and performance as particularized herein, and knew or recklessly disregarded that these adverse facts rendered the positive representations made by or about Apogee and its business issued or adopted by the Company materially false and misleading.

38.     The Individual Defendants, because of their positions of control and authority as senior executive officers of the Company, were able to, and did, control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period.  Each Individual Defendant was provided with copies of the

- 14 -

documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, the Individual Defendants are responsible for the accuracy of the public reports and releases detailed herein and are therefore primarily liable for the representations contained therein.

39.     Each of the above officers of Apogee, by virtue of his high-level position with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels, and was privy to confidential proprietary information concerning the Company and its business, operations, and financial condition, as alleged herein.  These Defendants were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein, were aware or recklessly disregarded that these false and misleading statements were being issued regarding the Company and omitted material adverse facts regarding the Company, and approved or ratified these statements and failed to disclose these facts, in violation of the federal securities laws.

40.     As senior executive officers and controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the NASDAQ and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements

- 15 -

that had become materially misleading or untrue so that the market price of the Company's securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

41. The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of the Company's publicly traded securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme deceived the investing public regarding the Company's operating and financial condition and the intrinsic value of Apogee common stock, causing Plaintiffs and other members of the Class to purchase Apogee common stock at artificially inflated prices.

42. Defendants are liable for: (a) making false and misleading statements; and/or (b) failing to disclose adverse facts known to them about Apogee. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Apogee common stock was a success, as it: (i) deceived the investing public regarding the Company's operating and financial condition; (ii) artificially inflated the price of Apogee common stock; and (iii) caused Plaintiffs and other members of the Class to purchase Apogee common stock at artificially inflated prices.

## V. FACTUAL BACKGROUND TO THE SUBSTANTIVE ALLEGATIONS

### A. Apogee's Reporting Segments and Fiscal Quarters

43. Apogee has four reporting segments from which it derives its net sales, with three of those segments serving the commercial construction market.

- 16 -

44.     The Framing Segment designs, engineers, fabricates and finishes aluminum frames used in customized window, curtainwall, storefront and entrance systems comprising the outside skin of buildings.  The Framing Segment accounted for approximately 51% of Apogee's net sales in FY18.

45.     The Glass Segment fabricates coated, high-performance glass used in customized window and wall systems.  The Glass Segment accounted for approximately 26% of Apogee's net sales in FY18.

46.     The Architectural Services Segment (the "Services Segment") provides building glass and curtainwall installation services.  The Services Segment accounted for approximately 16% of Apogee's net sales in FY18.

47.     The Large-Scale Optical Technologies Segment (the "LSO Segment") manufactures coated glass and acrylic products for framing and display applications.  The LSO Segment accounted for approximately 7% of Apogee's net sales in FY18.

48.     Apogee's fiscal year ends on the Saturday closest to the last day of February, or as determined by Apogee's Board of Directors.  Apogee's fiscal quarters overlapping with the Class Period are as follows:

| Fiscal quarter | Start date | End date |
|:---:|:---:|:---:|
| 1Q18 | March 5, 2017 | June 3, 2017 |
| 2Q18 | June 4, 2017 | September 2, 2017 |
| 3Q18 | September 3, 2017 | December 2, 2017 |
| 4Q18 | December 3, 2017 | March 3, 2018 |
| 1Q19 | March 4, 2018 | June 2, 2018 |
| 2Q19 | June 3, 2018 | September 1, 2018 |
| 3Q19 | September 2, 2018 | December 1, 2018 |
| 4Q19 | December 2, 2018 | March 2, 2019 |

**B.     Defendants' Comprehensive "4 Levels of Visibility" into Apogee's Businesses**

49.     During the Class Period, Defendants periodically issued revenue, operating margin, and earnings per share forecasts for Apogee's consolidated FY18 and FY19 results, as well as its individual reporting segments and business units (such as EFCO). Defendants assured investors these forecasts were supported by Apogee's various internal metrics and sources of information, including Defendants' comprehensive so-called "4 levels of visibility" into Apogee's project pipeline.

50.     The "first" level of visibility, and the most "concrete" according to Defendants, was provided by Apogee's order "backlog." Apogee's backlog represents "the dollar amount of signed contracts or firm orders, generally as a result of a competitive bidding process, which is expected to be recognized as revenue primarily in the near-term."

51.     Apogee's backlog provided Defendants with various data points regarding the projects in backlog.  For example, as Defendant Porter claimed during a pre-Class Period conference call, the contracts for the Framing Segment's projects in backlog set forth the full value of the products and services Apogee is to provide under those contracts.  Defendants also claimed many times they had knowledge of the margins of the work in Apogee's backlog.  For instance, during one pre-Class Period analyst call, Defendant Porter represented he was "able to see the improved margins that are in our backlog."  During the same analyst call, Defendant Porter represented that "[e]verything that we are adding into backlog today is in better margins than work we added into backlog a year ago, and being able to see that continue to flow through."  During another pre-Class Period earnings call, Defendant Puishys remarked on the particularly high nature of the margins on the "work that's currently in backlog."

52.     Defendants made similar assurances during the Class Period that they possessed knowledge of the margins of work in Apogee's backlog.  For example, during Apogee's December 21, 2017 earnings call, Defendant Puishys represented that Defendants had "visibility" of the "margins" of "work that's entered into backlog."  During the same call, Defendant Puishys assured investors that certain projects that entered Apogee's "backlog" during 3Q18 "went into backlog at normal margins."  During another earnings call on April 12, 2018, Defendants stated that certain work Apogee would perform in the future would be performed at "no-margin."

53.     The "second" level of Defendants' visibility consisted primarily of work that had been awarded to Apogee, was in contract negotiations, and would soon enter Apogee's

backlog.  Defendants also described this second level of visibility as "concrete," and periodically assured the market that this second level of visibility supported Defendants' guidance.  For example, during a June 28, 2018 earnings call, Defendant Porter claimed Defendants "have visibility in terms of [the Glass Segment's] work much greater than what's specifically in the backlog."

54.    The "third" level of Defendants' visibility primarily includes work that has been verbally awarded or committed to Apogee, but which has not yet entered the "second level."  Finally, the "fourth" level of visibility consists of Apogee's bidding activity on projects not yet awarded or committed to Apogee.

55.    Defendants' "visibility" purportedly extended to all of Apogee's segments.  In addition to the "4 levels of visibility" described above, Defendants also stated publicly that Apogee's ongoing feedback, analysis and data from its customers, architects and building owners, provided further visibility into Apogee's near- and medium-term future.  For example, Defendant Porter stated during a September 21, 2018 industry call that "we are in the architects' offices every week around the country.  So what we see in our business is as strong as we have seen in terms of the activity forward-looking in supporting the nonresidential construction market."  Meanwhile, Defendant Puishys stated during a December 20, 2018, earnings call that "[o]ur Glass people have probably the longest term visibility because they're in the offices of the architects."

56.    Defendants also assured investors that they regularly and closely monitored specific metrics on which Apogee publicly reported.  For example, on September 19, 2017, Defendant Puishys stated he and Defendant Porter examined EFCO's order activity "literally

every day." During a September 18, 2018 earnings call, Defendant Puishys told investors that "every week" he "monitor[ed]" the Glass Segment's operating margin.

57.     Defendants also stated publicly that they gained visibility into their businesses' operations and operating metrics based on the project schedules Apogee tracked. For example, during a pre-Class Period earnings call, Defendants claimed their guidance for the Glass, Framing, and Services Segments' results was "based on the visibility of project schedules we have." During another earnings call on April 12, 2018, Defendant Porter issued guidance for the Glass and Framing Segments "based on visibility that we have from the projects schedules that we service." Furthermore, during a June 28, 2018 earnings call, Defendant Porter stated Apogee's guidance was "[b]ased on the visibility of our project schedules [in the Services Segment]." Defendant Puishys claimed during the same call that Apogee "*know[s]" ahead of time* when the Glass Segment's customers will be submitting purchase orders, based on its customers' "production schedules":

> [A]ll of fiscal 2019's revenues for glass are in hand. Only a fraction of that is actually in the backlog. The rest is in the category, awards and wins. *It's good as gold, but the customer won't literally give us the purchase order until 8 to 12 weeks before they want the product. And so we know when that is. We have the production schedules reserved for them*.

58.     With regard to project budgets, Defendants claimed they began to create and refine budgets on projects "*years*" before the projects were expected to revenue. For example, Defendant Puishys claimed during an industry conference call that Apogee was "aware of every project in our segment that is being considered by developers, owners and being worked on at the architectural offices *where we're budgeting those projects that probably won't even be a hole in the ground for two years and revenue for three*."

- 21 -

59.     Defendants Puishys and Porter publicly represented that they considered the four levels of visibility described above, as well as other internal metrics, when making public statements about Apogee's outlook.  Defendants consistently stated publicly that their forecasts were supported by Defendants' comprehensive internal visibility – various examples of Defendants' assurances to investors in this regard are alleged herein, including in ¶¶121-122, 156, 168, 171, 194-195, 222, and 271-274.

### C.     Apogee Announces Acquisition of EFCO Corporation in May 2017

60.     On May 1, 2017, the first day of the Class Period, Apogee announced it was acquiring the privately-held EFCO from EFCO's then-parent company, Pella.  Apogee funded the acquisition in large part through a 91% increase in its revolving credit facility. The May 1, 2017 press release announcing the acquisition described EFCO as "a leading U.S. manufacturer of architectural aluminum window, curtainwall, storefront and entrance systems for commercial construction projects."

61.     Following the announced acquisition, EFCO became the largest operating unit by revenue within the Framing Segment, and "report[ed] to [Defendant Puishys] directly." Defendants Puishys and Porter also managed the approval process for large projects at EFCO following the acquisition, which they historically and currently did for large projects entered into by Apogee's Framing and Services Segments.  As alleged herein, Defendants focused very closely on EFCO throughout the Class Period.

62.     Apogee performed due diligence of EFCO as part of its acquisition. Defendants Puishys and Porter, among others at Apogee, participated in Apogee's due diligence of EFCO, which Defendant Puishys publicly described on an August 23, 2017

earnings call as "intense."  Defendants Puishys's and Porter's extensive experience with, knowledge of, and familiarity with, commercial construction projects and contracts in the past informed them during their diligence of EFCO.

63.    John A. Klein ("Klein"), Apogee's then-Senior Vice President of Operations and Supply Chain Management, and later President of EFCO beginning in February 2018, also participated in Defendants' due diligence of EFCO.  According to Apogee, as Senior Vice President of Operations and Supply Chain Management, Klein's focuses included cost productivity savings, continuous improvement, and supply chain and procurement initiatives. For example, Klein "[c]onducted cost productivity audits at all [of Apogee's] business units" during fiscal years 2017 and 2018, as well as "cost productivity reconciliation" and "Lean/continuous improvement audits for all business units and factory location three-times per year" in FY18.

64.    Apogee, EFCO, and Pella executed a Stock Purchase Agreement on April 28, 2017 (the "EFCO Agreement").  Defendant Puishys signed the EFCO Agreement on behalf of Apogee.  Apogee filed a copy of the EFCO Agreement with the SEC on Form 8-K on May 2, 2017.

65.    According to the EFCO Agreement, Apogee's due diligence on the EFCO transaction included "an independent investigation, examination, analysis and verification of the business, assets, liabilities, operations and financial condition of [EFCO]."

66.    The EFCO Agreement also stated that Apogee "visit[ed] with [EFCO] and me[t] with [EFCO]'s representatives to discuss the foregoing matters" set forth in ¶65.

- 23 -

67.     Moreover, the EFCO Agreement assured investors that Apogee "performed the due diligence [Apogee] deems adequate regarding all matters relating to this Agreement and the transactions contemplated herein, including those described above" in ¶65.

68.     Among other things, Defendants analyzed the individual projects and work in EFCO's business as part of their acquisition diligence.  For example, during a May 1, 2017 conference call, Defendant Porter represented that Apogee had been analyzing the projects and work at EFCO to determine which of EFCO's work would fit into Apogee's classification of "backlog," and thus would be reported as "backlog" following the acquisition, as alleged in ¶¶50-51:

> **Samuel Heiden Eisner - Goldman Sachs Group Inc., Research Division – VP**:
>
> Got it, that's helpful there.  Is there a backlog for this business, and if so, do you have a number associated with that?
>
> **James S. Porter – Apogee Enterprises, Inc. – Executive VP & CFO**:
>
> Yes, there is a backlog.  Candidly, we're still trying to work through a little bit definition-ally.  We expect when we close that they'll have at least $100 million in backlog that they bring to the business.  But we're continuing to do the work to make sure that, definition-ally, that we're defining backlog the same way.

69.     As part of the transaction, Apogee acquired EFCO's legacy projects and contracts – *i.e.*, those projects and contracts EFCO had entered into and/or begun prior to its acquisition by Apogee.  Apogee also acquired EFCO's backlog.  As Defendant Puishys stated on Apogee's June 22, 2017 earnings call, the EFCO acquisition brought to Apogee "a backlog of more than $200 million stretching into fiscal 2020."  As of the end of the second quarter of 2018 ("2Q18") (the first full fiscal quarter following the May 1, 2017 EFCO

acquisition announcement), approximately $215 million of the Framing Segment's total reported backlog of $496 million had been acquired from EFCO.

70.     Defendants learned of multiple problems with EFCO as part of their due diligence on the transaction, which Defendants concealed and misrepresented throughout the Class Period.

71.     One of the problems Defendants learned about during their due diligence concerned a substantial weakening in EFCO's order activity during the months leading up to the Class Period.  As rumors of a potential sale of EFCO by Pella began to spread around October 2016, EFCO's pipeline began to weaken as EFCO's customers, as well as EFCO's sales organization, became apprehensive of EFCO's future in light of the rumors of an acquisition by a then-undisclosed acquirer.  By the time Apogee publicly revealed on May 1, 2017 that it was the acquirer, this apprehension had manifested into a considerably weakened EFCO sales pipeline.  As a result of this weakened sales pipeline, EFCO experienced "very, very soft" bookings for actual work orders in the months leading up to the acquisition.

72.     As Defendant Porter would later admit during the Class Period, the "most disruption" to EFCO's sales pipeline occurred "a couple of months before [Apogee] actually announced the signing of the transaction" on May 1, 2017.  Defendants knew or should have known this significant weakening in EFCO's sales pipeline would adversely affect EFCO's and Apogee's future revenue and operating results following Apogee's acquisition of EFCO.

73.     Another problem was that EFCO had substantially underestimated the costs and thus the profitability of certain projects Apogee acquired in the EFCO transaction.  As Defendants would eventually disclose during the Class Period, during the couple of years

preceding Apogee's acquisition of EFCO, Pella attempted to expand EFCO's reach into the large construction project market by contracting to perform certain large projects (including large curtainwall projects) for which EFCO had significantly underestimated the actual costs necessary to complete those projects.

74.     One of the large curtainwall projects EFCO took on prior to the acquisition was the 93-story, $70 million mixed-use "Vista Tower" in Chicago, Illinois, construction on which began in August 2016.   In a May 16, 2018, *Monett Times* article, then-EFCO President Klein discussed Pella's "'ill-advised large-project growth strategy,'" and large projects such as the Vista Tower with which EFCO "'had no experience'":

> "EFCO won the Wanda Vista project under a Pella strategy change to grow the business by breaking out of their core competencies in mid-size construction," Klein said.   "This strategy expanded EFCO's reach into large curtainwall projects, *a market with which they had no experience*.   At 93 stories and an approximate $70 million project, *Wanda is far larger than any project EFCO had pursued in its history*.   Clearly, EFCO did not fully understand the complexities of the Wanda project when it took it on, *and therefore underbid it*."

75.     As alleged in ¶177, Defendants would admit in April 2018 – *almost one year after the acquisition was announced – that they "learned in due diligence" of EFCO's problems with its legacy projects*, although Defendants would inexplicably claim at the time that they did not "realize[]" until "the second half of calendar 2017" that the "problems were more substantial."

76.     EFCO's increased project costs would adversely and significantly affect EFCO's and Apogee's financial results.   As Defendants would later disclose during the Class Period, Apogee would be forced to divert substantial financial, human, and other resources to these troublesome legacy projects of EFCO's.   These legacy projects of EFCO's would

adversely affect Apogee's and EFCO's financial results in FY18 and FY19 and ultimately result in the Company taking a $42.6 million charge against EFCO's legacy projects at the close of the Class Period.

77.     Defendants disclosed none of these issues as part of their announcement of the acquisition on May 1, 2017. Rather, Defendants lauded the acquisition, claiming the EFCO acquisition "supports our growth strategies and provides ***more revenue stability***" to Apogee. During the call, Defendants also forecasted EFCO would realize FY18 revenue of $200-$225 million and operate at operating margins in the mid-single-digits.

78.     All while remaining silent with respect to the problems with EFCO, Apogee reaffirmed this aggressive FY18 EFCO revenue and operating margin guidance on June 12, 2017, when it announced it had officially acquired 100% of EFCO's stock, and again on June 22, 2017, when Apogee announced its financial results for 1Q18 and issued Apogee's consolidated FY18 guidance. Apogee's Report on Form 10-Q for the first quarter of 2018 ("1Q18"), filed with the SEC on July 12, 2017, also reiterated the FY18 consolidated guidance issued to the market on June 22, 2017. Defendants did not disclose the true facts about EFCO, including the significant problems alleged in ¶¶71-76.

79.     Apogee's 2Q18, which ended on September 2, 2017, would mark the first fiscal quarter in which EFCO's operations would be reported as part of Apogee's consolidated results. As Defendants would later report in September 2017, EFCO was nowhere near realizing mid-single-digit operating income margins that Defendants had guided on multiple occasions. Thus, with Apogee's 2Q18 earnings release date (September 19, 2017) quickly approaching, Defendants chose to soften the beach by disclosing just a

portion of certain previously omitted information regarding EFCO, **ahead** of the 2Q18 earnings call scheduled for September 19, 2017.

80.     Accordingly, on August 23, 2017, Defendants announced they were **downgrading** the FY18 EFCO revenue and operating margin guidance they previously issued on May 1 and June 22, 2017, as well as Apogee's consolidated guidance issued on May 1, June 12 and 22, and July 12, 2017.

81.     Defendants attributed their guidance downgrade to two issues concerning EFCO.  First, Defendants stated they were reducing EFCO's FY18 revenue guidance on account of reduced order activity, caused by "market distraction and disruption related to" Apogee's acquisition of EFCO alleged above in ¶¶71-72.  According to Defendants, EFCO would realize FY18 revenue of closer to $200, not $220 or $225 million as previously guided.[1]

82.     Second, Defendants stated they were reducing EFCO's FY18 operating margin outlook as a result of "unexpected project costs" on EFCO's legacy projects it would be "deliver[ing]" in the second half of FY18.  According to Defendants, EFCO's FY18 "margins are now initially expected" to be 2%-3%, as opposed to Defendants' "mid-single-digit outlook."  However, Defendants simultaneously falsely assured investors the impact of EFCO's legacy projects would be limited to "a couple of 100 basis points of  margin headwinds" in FY18.  Defendants also downplayed the disclosure, stating only "a couple of

---

[1]   Defendants guided FY18 EFCO revenue of $200-$225 million on May 1, 2017.  On June 22, 2017, Defendants issued the slightly revised guidance of $200-$220 million.

[the] projects" would "carry through fiscal '19, but they'll become smaller, become a declining piece of the business."

83.     As alleged above in ¶¶70-75, Defendants had prior knowledge of these issues from their due diligence, including that EFCO's pipeline had significantly weakened and EFCO had underestimated costs on its projects.   Thus, Defendants were retracting their guidance *on account of issues they were aware of when they originally issued that guidance*.

84.     As alleged herein, Defendants' remarks on August 23, 2017 continued to conceal and misrepresent the truth concerning EFCO's legacy projects.   Defendants also tempered their negative announcement about *FY18* guidance with positive statements about *FY19*.   For instance, during the same August 23, 2017 earnings call on which Defendants downgraded Apogee's and EFCO's FY18 guidance, Defendants announced they "feel especially good about Apogee's top and bottom line prospects for growth in fiscal 2019, and we expect double-digit revenue growth and *triple-digit operating margin improvement for fiscal 2019*."   On September 19, 2017, Apogee again proclaimed it was "well positioned for a stronger second half and fiscal 2019," and was maintaining its FY19 guidance provided on August 23, 2017.   Meanwhile, on December 21, 2017, Defendants repeated they "continue[d] to anticipate double-digit organic revenue growth and triple-digit basis point improvement in operating margin" in FY19.

85.     Defendants, however, knew or should have known that even their revised FY18 EFCO operating margin guidance of 2%-3%, and their FY19 guidance for "triple-digit operating margin improvement for fiscal 2019" issued on August 23, 2017 was nonetheless

- 29 -

unrealistic and failed to account for the full scope of EFCO's known problems with its legacy projects. As alleged herein, Defendants repeatedly stated they possessed multiple levels of visibility into Apogee's business segments, and the margins on work in Apogee's backlog, which included EFCO's business and EFCO's backlog.

86.     Indeed, Apogee's August 23, 2017 press release – announcing "some [EFCO] projects . . . will be deliver[ed] in the second half of fiscal 2018" – confirmed Defendants' **knew when** EFCO projects would be "deliver[ed]," and what their corresponding operating margins were expected to be. Following the August 23, 2017 call, Defendants maintained their FY18 EFCO operating margin guidance of 2%-3%, and their FY19 guidance for "triple-digit operating margin improvement for fiscal 2019."

87.     On April 12, 2018, Defendants announced Apogee's 4Q18 and FY18 results. On that date, Defendants revealed that Apogee was **even further behind** on improving EFCO's operating margins than Defendants had previously disclosed, stating: "we are approximately 18 months behind and starting from a lower point in our EFCO margin improvement process. *This reality impacted Apogee's fiscal 2018 margins, and we'll [sic] do so in fiscal 2019*."

88.     Defendants also revealed for the first time that EFCO was expected to *just break even in fiscal 2019*. In fact, as Apogee would disclose in its 2018 Form 10-K, *EFCO's FY18 operating margin was just 0.3%, 85%-90% lower* than the 2%-3% operating margin guidance Defendants had issued for EFCO. EFCO also incurred a *$5.3 million loss* and operated at a *negative 12.9% operating margin* in 4Q18.

89.    Moreover, Defendants disclosed on April 12, 2018 that Apogee was *withdrawing entirely* its previous outlook for triple-digit basis point improvement in Apogee's FY19 operating margin.

90.    However, Defendants assured investors and analysts on April 12, 2018 that this time Defendants had finally "identified *everything* that we could with [EFCO]," and their updated FY19 *now "reflects the full risk that, that business [EFCO] had*." Defendants offered similar false assurances during subsequent earnings calls in calendar year 2018, to the effect that the worst was behind Apogee with respect to EFCO's legacy projects and Apogee's FY19 guidance reflected the full risk posed by the business.

91.    Investors and analysts believed Defendants' statements that the full truth regarding EFCO's legacy projects had now been disclosed. After all, Defendants had assured the market *nearly a year ago*, on May 2, 2017, that they closely "examin[ed]," "analy[zed]," and "verifi[ed]" EFCO's "business, assets, liabilities, operations and financial condition." Moreover, Defendants had been deep in the business since the Class Period had begun, and had "brought in the cavalry" to run EFCO and its legacy projects. Accordingly, investors believed Defendants when they stated the full risk of EFCO's legacy projects to Apogee had now been disclosed and was reflected in Apogee's guidance for FY19.

92.    Defendants' assurances proved false. On April 11, 2019, Apogee revealed it was taking $45.7 million of pre-tax charges relating to EFCO, including a *massive $42.6 charge on EFCO's legacy projects*. Defendants attributed the $42.6 charge to an "increased estimate of the cost to complete the projects and claims related to project delays and other

disputes."  As a result, Apogee reported a ***net loss of $0.45 per share in the fourth quarter of 2019 ("4Q19")***.

93.    But there was more.  Defendants also revealed the $45.7 million in EFCO charges included "adjustment[s]" to Apogee's previously reported operating income and earnings per share for the first three quarters of FY19 to correct for profits previously recorded on the EFCO legacy projects.  In other words, Apogee disclosed its previously reported earnings per share and operating income for the first three quarters of FY19 had been inflated.  Apogee's consolidated results, as well as the Framing Segment's results, for the first three quarters of FY19, had necessarily been inflated as well.  Defendants' disclosures of the full truth regarding EFCO sent Apogee's stock tumbling on April 11, 2019, closing 6.25% below the previous day's close.

### D.    Undisclosed Problems with Apogee's Glass Segment

94.    Around the time Apogee would release its 1Q19 results on June 28, 2018, Apogee's stock was trading approximately 25% off its Class Period high of $58 per share. Defendants' disclosures  regarding EFCO in April 2018 had taken a toll on Apogee's stock price.

95.    On June 28, 2018, Defendants announced they were ***raising*** the FY19 consolidated revenue, operating margin and earnings per share guidance they had originally issued on April 12, 2018.  In raising their guidance, however, Defendants made several material misstatements and omissions concerning Apogee's Glass Segment.  For instance, Defendants lauded the Glass Segment's "solid competitive shape," increased backlog, and

ability to "consistently meet the shorter lead times demanded" in the glass market segments Apogee served.

96.     It was not until September 18, 2018, when Apogee announced its 2Q18 results, that Defendants revealed the Glass Segment had faced "significant challenges" during 2Q19, which "caused the business to fall well short of [Apogee's] expectations for the quarter and to impact [Apogee's] full year outlook." Defendants revealed the "main issue was in June" *i.e.*, **before** Defendants announced on June 28, 2018 they were raising their FY19 guidance. The Glass Segment's insufficient workforce was unable to manage the segment's order activity, causing a "crisis" in 2Q19. As a result, the Glass Segment experienced substantially increased breakage rates, resulting in expedited shipping costs and lost revenues, as well as prolonged lead times from order to delivery. By September 18, 2018, Apogee was still months away from returning to its normal lead times.

97.     As a result of the undisclosed problems in the Glass Segment, Apogee announced on September 18, 2018 it was reducing its FY19 guidance – raised less than three months prior – sending the stock price tumbling.

## VI.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### A.     Apogee Acquires EFCO While Concealing Material Problems with the Business

#### 1.     May 1, 2017 Conference Call and Press Release

98.     The Class Period begins on May 1, 2017. That morning, Apogee issued a press release announcing it had entered into an agreement to acquire 100% of the stock of EFCO from Pella, for approximately $195 million. The press release also announced that Apogee

was to host an investor conference call that morning at 9:00 a.m., Central Time.  Apogee filed a copy of the May 1 press release with the SEC on May 2, 2017.

99.    In announcing the acquisition, the press release attributed the following statement to Defendant Puishys: "'We also see significant margin enhancement opportunities as we leverage Apogee's scale, operational excellence expertise and supply chain synergies that build on initiatives already being implemented by EFCO's strong management team.'" The press release also quoted Defendant Puishys as saying: "'We are buying a great asset that can be even greater, and we expect EFCO will contribute to Apogee's continued strong performance in the commercial construction industry.'"

100.    On May 1, 2017, Apogee hosted a conference call for analysts and investors at 9:00 a.m., Central Time, to discuss Apogee's announcement it was purchasing EFCO from Pella.  Defendants Puishys and Porter, among others, participated on the call.

101.    During the May 1, 2017 call, Defendant Puishys lauded Apogee's purchase of EFCO, stating "EFCO will complement and accelerate Apogee's growth strategies."

102.    Defendant Puishys also proclaimed that Apogee's acquisition of EFCO "supports our growth strategies and provides ***more revenue stability***.  And we are confident we can work with the leadership team to expedite their ongoing margin improvement efforts, mirroring Apogee's success over the past 5 years."

103.    During the call, Defendant Puishys also stated with respect to EFCO: "In addition, we see margin enhancement opportunity for EFCO as we leverage Apogee's scale, operational excellence and lean programs and supply chain synergies to build on initiatives

already being implemented by EFCO's strong management team, which will stay with the company."

104.    Further boosting the acquisition, Defendant Puishys assured the market that Apogee had paid "a fair prize [sic]" for EFCO and that EFCO "will continue to make [Apogee] very, very reliable."

105.    He further presented an outlook for EFCO's FY18 revenue and operating margin, stating:

> Apogee expects EFCO to add **$200 million to $225 million** to our fiscal 2018 revenues depending on the timing of the closing.  We expect this acquisition to generate cash and be accretive to Apogee's EBITDA and earnings per share this fiscal year, excluding onetime transaction costs.  We expect to generate $10 million to $15 million in annual synergies and operational efficiencies by fiscal 2020.  **We expect the operating margins of EFCO to be approximately mid-single-digit**.

106.    During the call's Q&A session, analysts focused on the Company's statements regarding EFCO's margins.  For example, an analyst from D.A. Davidson & Co. inquired about EFCO's operating margins, and whether EFCO "can operate at/or above kind of the traditional framing systems segment" at Apogee.  During FY17, which ended on March 4, 2017, the Framing Segment operated at an 11.6% operating margin.  Defendant Puishys made the following statements in response to the analyst's question:

> **Brent Edward Thielman – D.A. Davidson & Co., Research Division – VP & Senior Research Analyst**:
>
>     Okay, fair enough.  And then you guys, you talked about some of the margin enhancement opportunities.  Is this a business that can operate at/or above kind of the traditional framing systems segment, and I guess, kind of how quickly do you think you can get it there from a margin standpoint?

- 35 -

**Joseph F. Puishys – Apogee Enterprises, Inc. – CEO, President & Director**:

Well, my goal is to see it operate similar to our Framing Systems businesses. It's a very similar business. I think EFCO is in their journey to improve. They are probably where our Apogee Framing Systems business were 3 or four 4 ago. I think they will follow the same trajectory. I certainly hope we can help. . . . *I like their trajectory and where they're taking this business*. And I'm very confident we can help them. It is – Jim said, *we do not buy companies that are broken or have a weak management team* or have poorly run factories, we're not that pompous to think we're going to turn something like that around. This is a great company.

107. An analyst from Kansas City Capital Associates similarly inquired about EFCO's "margin enhancement opportunities," which Defendants' had referenced earlier in the May 1 call, to which Defendant Porter responded in relevant part:

**Jonathan Paul Braatz - Kansas City Capital Associates - Partner and Research Analyst**:

Okay, one last question. Jim, you mentioned that I think the goal on the operating margins is mid-to single digit. Is that inclusive of the amortization charges that you're expected to take with this acquisition? Or was that ex-amortization or pre?

**James S. Porter – Apogee Enterprises, Inc. – CFO and EVP**:

Yes, so Jon, not our goal. Our goal is to get to back to – get them up to Apogee's nice double-digit operating margins. *Initially, we're expecting mid-single-digit operating margins* and we believe that does includes our estimated amortization. *It may move around a little bit, plus or minus, depending on when that asset comes in*.

108. An analyst from Goldman Sachs inquired further into EFCO's operating history and operating margin (which for EFCO's fiscal year ended November 26, 2016, was reportedly 5.9%), to which Defendant Porter responded in relevant part:

**Samuel Heiden Eisner - Goldman Sachs Group Inc., Research Division – VP**:

Just a couple of housekeeping questions here, just – again, just to confirm.  The revenue growth in the margin expansion last year or the last 3 years, can you just cite those numbers again?

**James S. Porter – Apogee Enterprises, Inc. – CFO and EVP**:

For calendar '16, they had nice double-digit revenue growth.  I didn't give the specifics, but they did have nice enhancements to their operating margins and ***they're on plan for double-digit growth again this year and some improvement to their op margins***.

109.   Defendants' statements referenced above in ¶¶99-108, including those concerning EFCO's expected FY18 revenue and operating margins, were materially false and misleading because they failed to disclose and misrepresented the following adverse facts detailed herein which were known to Defendants or recklessly disregarded by them:

(a)   EFCO had substantially underestimated the actual costs of certain of EFCO's legacy projects, including large curtainwall projects EFCO had taken on in the couple of years preceding the acquisition, which projects Apogee had acquired as part of the acquisition of EFCO, as alleged in ¶¶73-76, 135, 137 and 177.  As Defendants would later admit during an April 12, 2018 earnings call, ***Defendants "learned in due diligence" of these problems with EFCO's legacy projects***;

(b)   Apogee would be forced to divert substantial financial, human, and other resources from other areas and segments within Apogee to these EFCO legacy projects, in order to complete EFCO's legacy projects, as alleged in ¶¶76, 135, 137, 140, 167, 177 and 179;

(c)   because costs had been significantly underestimated by EFCO on these legacy projects, Apogee would be required to perform substantial work on EFCO projects at zero operating margin, as alleged in ¶177;

- 37 -

(d)     these significant problems caused by EFCO's legacy projects would adversely affect EFCO's, the Framing Segment's, and Apogee's publicly reported operating metrics, including its revenue, operating margin, and earnings per share, in FY18 and FY19, as alleged in ¶¶135-137 and 175-179;

(e)     as Defendants admitted during the August 23, 2017 earnings call, ***they learned about issues with EFCO's order activity as part of their acquisition due diligence of EFCO***.  As rumors of a potential acquisition of the EFCO business unit began to circulate "back in the October [2016] time frame," EFCO's sales pipeline "weakened" considerably as EFCO's customers and sales department became apprehensive of EFCO's future in light of a potential acquisition.  The "most disruption" to EFCO's sales pipeline occurred during the months leading up to the acquisition.  By the time Apogee publicly announced the acquisition on May 1, 2017, this apprehension had manifested into a considerably weakened EFCO sales pipeline.  As a result of this weakened sales pipeline, EFCO experienced "very, very soft" bookings for actual work orders in the months leading up to the acquisition, which would adversely affect EFCO's and Apogee's post-acquisition financial results, as alleged in ¶¶71-72, 134 and 140-141; and

(f)     as a result of the foregoing, Defendants lacked a reasonable basis for their guidance of, and positive statements about, EFCO's FY18 revenue and operating margins and therefore these statements were materially false and misleading when made.

110.    Defendants lacked a reasonable basis for the statements referenced above in ¶¶103-104 and 106, that EFCO was a "great company," would make Apogee "very, very reliable," that Defendants saw "margin enhancement opportunity for EFCO," and that

Apogee did "not buy companies that are broken," which therefore were materially false and misleading when made because they failed to disclose and misrepresented the adverse facts detailed herein which were known to Defendants or recklessly disregarded by them.

### 2.      June 12, 2017 Press Release

111.      On June 12, 2017, Apogee issued a press release announcing it had officially acquired 100% of EFCO's stock from Pella (the "June 12 Press Release").  Apogee filed a copy of the press release with the SEC on June 14, 2017.

112.      The June 12 Press Release attributed the following statement to Defendant Puishys: "'EFCO is a growing and profitable company, and in fiscal 2018, we expect the acquisition will add $200 to $220 million to Apogee's revenues and be accretive to Apogee's EBITDA and earnings per share, excluding transaction-related costs.'"

113.      The June 12 Press Release also reported Defendant Puishys as saying he "'see[s] significant margin enhancement opportunities as we leverage Apogee's scale and build on initiatives already being implemented by EFCO's strong management team, which is continuing to lead the business.'"

114.      The statements referenced above in ¶¶112-113 regarding the Company's FY18 revenue guidance for EFCO, that Defendants "'see significant margin enhancement opportunities,'" and that the Company "'expect[s] the acquisition will add $200 to $220 million to Apogee's revenues'" in FY18, were materially false and misleading because they failed to disclose and misrepresented the following adverse facts detailed herein which were known to Defendants or recklessly disregarded by them: (a) the problems alleged in ¶¶71-76 concerning EFCO would adversely affect EFCO's and Apogee's financial results in FY18;

- 39 -

(b) the guidance range was unrealistic, lacked a reasonable basis, and failed to account for the full risk of EFCO's undisclosed problems with its weakened sales pipeline and troublesome legacy projects; and (c) as a result of the foregoing, Defendants lacked a reasonable basis for their guidance and positive statements and therefore these statements were materially false and misleading when made.

### 3.      June 22, 2017 Earnings Call and Press Release

115.    On June 22, 2017, prior to the start of trading on the NASDAQ, Apogee issued a press release announcing its financial results for 1Q18.  The press release also announced that Apogee was to host an investor conference call that morning at 8:00 a.m., Central Time.

116.    The press release announced Apogee had officially acquired 100% of EFCO's stock from Pella and was updating its FY18 guidance to reflect the EFCO acquisition:

> Completed acquisition of EFCO Corporation on June 12.  ***EFCO has annual revenues of more than $250 million*** and will be reported in the architectural framing systems segment.
>
> *      *      *
>
> "Early in the second quarter, we closed on the acquisition of EFCO, which will accelerate our product and geographic growth strategies," Puishys said.  "We are already pursuing operational best practices to capture $10 to $15 million in annual synergies at EFCO by fiscal 2020.
>
> "In the last six months we've made significant progress in our journey to deliver consistently solid performance regardless of economic conditions," he said.  "We've completed acquisitions of EFCO and Sotawall, while growing our position in the mid-size building and retrofit sectors.  We also continue to introduce new products and our existing businesses have been further penetrating newer geographies.
>
> "Our end markets remain strong based on visibility from our businesses and external metrics, giving us confidence in fiscal 2018 and beyond," said Puishys.  "Our updated fiscal 2018 outlook, which now contains EFCO, includes growth from existing businesses as well as from the acquisition."

- 40 -

*       *       *

Apogee is updating its full-year fiscal 2018 outlook to incorporate the June 12 acquisition of EFCO as well as Sotawall and EFCO acquisition-related charges and amortization of short-lived intangibles associated with backlog.

- Revenue growth of 26 to 28 percent.

- Operating margin of 10.5 to 11.0 percent, with addition of EFCO revenues at a mid-single digit operating margin.

- Adjusted operating margin of 11.5 to 12.0 percent.

- Earnings of $3.31 to $3.51 per diluted share.

- Adjusted EPS of $3.65 to $3.85.

117. Apogee also hosted an earnings call with analysts and investors at 8:00 a.m., Central Time, on June 22, 2017, to discuss Apogee's 1Q18 results and promote the purported benefits EFCO would bring to Apogee. Defendants Puishys and Porter, among others, participated on the call.

118. During the June 22, 2017 call, Defendants reiterated Apogee's consolidated FY18 guidance referenced in the June 22, 2017 press release, as well as EFCO's FY18 revenue growth and mid-single digit operating margin guidance that Defendants had initially issued during the May 1, 2017 call.

119. For example, Defendant Puishys stated during the call "[w]e anticipate an adjusted operating margin of 11.5% to 12%, up slightly from last year as we had EFCO revenues at mid-single-digit operating margins." During the call, Defendant Puishys described EFCO as "a business greater than $250 million in revenue that provides us a terrific opportunity to bring their mid-single-digit margins to the same levels of Apogee."

120.   During the Q&A portion of the June 22, 2017 call that followed opening remarks, analysts were particularly interested in the EFCO acquisition and understanding how Apogee had come to its updated guidance.   For example, an analyst from CJS Securities, Inc. asked Defendant Puishys about Apogee's outlook that EFCO would operate at a mid-single digit operating margin in FY18, to which Defendant Puishys responded in relevant part:

**Christopher Paul Moore - CJS Securities, Inc. - Research Analyst**:

Okay, got you.  And ***similar conversation with the EFCO operating margin***, just in terms of – going from wherever – ***the 5% or 6%*** that's now to 10%, is that a 3- to 4- year time frame?  Or are there some low-hanging fruit that accelerates that a little bit? Or how do you look at that?

**Joseph F. Puishys – Apogee Enterprises, Inc. – CEO, President & Director**:

Well, we identified what we believe to be $10 million to $15 million in cost synergies.  Obviously, that's 2 to 3 points of – or 200 basis points plus of margin expansion from our opportunities, primarily around supply chain.  I – listen, it was a 5-year journey from us here at Apogee.  We'll try to be faster than that, certainly with all of our learnings.  ***I believe 3- to 5-year journey to get to double-digit operating margins is an appropriate comment for me to make***, and obviously, I will have aggressive goals with my business.  ***It's a great business***.

121.   In support of their guidance for EFCO's and Apogee's FY18 financial results, Defendants expressly indicated their guidance was supported by their multiple levels of visibility (alleged above in ¶¶49-59).  For example, during the call, Defendant Puishys stated he had "great confidence" that Defendants' internal visibility supported their statements:

And ***based on our visibility*** from our businesses and external metrics, we have gained great confidence in fiscal '18 and beyond.

\*     \*     \*

I'd like to underscore that we feel very good about the future opportunities for Apogee based on our bidding, awards, backlog and the external metrics Jim just highlighted and add to that our new Sotawall and EFCO business units. ***With our visibility, we feel very good about multiyear growth***.

122.    Defendant Porter also assured that Defendants' visibility into EFCO's and Apogee's operations supported Defendants' statements:

> Our fiscal 2018 full year outlook now includes the EFCO business acquisition, and we're providing our estimated actual outlook for earnings as well as an estimated adjusted outlook, both reflect top and bottom line growth for fiscal 2018 ***based on our performance trends and the visibility that we have in our market***. . . .
>
> . . . We feel good that our ***internal visibility and backlog, awards and bidding***, combined with the external market metrics, ***support our outlook*** for sustained growth.

123.    Analysts' commentary was positive on EFCO based on Defendants' June 22, 2017 statements.  For example, following the June 22, 2017 call, Craig-Hallum Capital Group ("Craig-Hallum") published a report entitled "Noisy 1Q With Guidance Raised To Incorporate EFCO. We Think Shares Move Higher As Earnings Power Plays Out With Positive Market Backdrop Firmly In Place. Reiterate BUY Rating And $68 Price Target."  Craig-Hallum reiterated its "Buy" recommendation and $68 price target in the report, concluding that "[g]iven market conditions and operational initiatives, we think [FY18] guidance could ultimately prove conservative."  The report stated in relevant part:

> APOG also raised its FY18 guidance solely to include the impact of EFCO with its previous guidance ex.  EFCO reiterated.
>
> . . . ***[W]e believe APOG is positioned for further operating margin expansion going forward which has been strengthened by the Sotawall and EFCO acquisitions***.

*       *       *

FY18 Guide Raised For EFCO Acquisition – APOG updated its guidance to reflect the closing of the EFCO acquisition and the associated acquisition and amortization costs. The company noted this was the only change to previous guidance and that the original guidance of implied 3%-4% organic growth did not change. Given market conditions and operational initiatives, ***we think guidance could ultimately prove conservative***.

124. The statements referenced above in ¶¶116 and 118-122 were materially false and misleading because they failed to disclose and misrepresented the following adverse facts detailed herein which were known to Defendants or recklessly disregarded by them:

(a)  Defendants' statements above concerning Apogee's consolidated FY18 guidance, and EFCO's FY18 guidance, were materially false and misleading when made because the guidance was unrealistic, lacked a reasonable basis, and failed to account for the full scope of EFCO's undisclosed problems with its weakened sales pipeline and legacy projects alleged above in ¶¶71-76 and 109;

(b)  Defendants' statements above concerning their "visibility," including that Defendants' "internal visibility" supported their guidance and gave them "great confidence in fiscal '18," were materially false and misleading when made. The undisclosed truth was the problems alleged in ¶¶71-76 concerning EFCO would adversely affect EFCO's and Apogee's financial results in FY18 and FY19. Based on Defendants' purported multiple levels of "visibility" and other internal metrics as alleged in ¶¶49-59, Defendants knew or should have known their "visibility" did not support the guidance they issued to the market; and

(c)  as a result of the foregoing, Defendants lacked a reasonable basis for the above-referenced positive statements and therefore these statements were materially false and misleading when made.

### 4.   July 12, 2017 Form 10-Q for 1Q18

125.   On July 12, 2017, Apogee filed a report on Form 10-Q for the quarterly period ending June 3, 2017, signed by Defendants Puishys and Porter.

126.   The Form 10-Q reiterated the FY18 guidance for Apogee's consolidated results, which Defendants issued to the market on June 22, 2017.

127.   Defendants' consolidated FY18 guidance was materially false and misleading when made because, as alleged herein, the FY18 guidance failed to reflect the undisclosed truth about EFCO, including the full impact of the problems caused by EFCO's legacy projects and weakened sales pipeline, as alleged in ¶¶71-76 and 109, *supra*.

**B.   Defendants Begin to Partially Reveal the Truth Regarding the EFCO Acquisition, but Continue to Conceal and Misrepresent the Full Extent of EFCO's Problems with its Legacy Projects**

**1.   August 23, 2017 Guidance Conference Call and Press Release**

128.   On August 23, 2017, prior to the start of trading on the NASDAQ, Apogee issued a press release entitled "Apogee Updates FY18 Outlook for EFCO Acquisition Impact."   On the same day, Apogee attached a copy of the press release to a Form 8-K, which Defendant Porter signed and Apogee filed with the SEC.   The press release announced that Apogee was to host an investor conference call that morning at 8:00 a.m., Central Time.

129.   In the press release, Apogee announced it had ***downgraded*** Apogee's and EFCO's existing FY18 guidance.   Apogee attributed the guidance reductions to "slightly lower than initially anticipated" EFCO revenues and margins "due to revised cost estimates made post-closing on some projects that EFCO will be delivering in the second half of fiscal 2018":

Apogee estimates that EFCO revenues and margins will be slightly lower than initially anticipated due to revised cost estimates made post-closing on some projects that EFCO will be delivering in the second half of fiscal 2018. Fiscal 2018 revenues for EFCO are now expected to be approximately $200 million, compared to the previous outlook of $200 to $220 million, and the operating margin is expected to be 2 to 3 percent, compared to mid-single digit.

130. The press release also cited "growing competitive pressures in the architectural glass mid-size project market," and a "negative [foreign exchange] impact" to another Framing Segment business – Canadian-based Sotawall – in disclosing the reduced guidance.

131. Notwithstanding the reduction in guidance, the press release included statements by Defendant Puishys assuring investors that EFCO was "a great acquisition" and would contribute positively to Apogee's goal of creating "stable performance":

"Our recent acquisitions of Sotawall and EFCO are helping us build a more diversified portfolio, which offers greater long-term growth opportunities while ***contributing to more stable performance*** throughout an economic cycle."

132. Apogee also provided positive "initial" fiscal 2019 guidance in the press release, stating "for fiscal 2019 we expect double-digit revenue growth and triple-digit operating margin improvement, based on our order pipeline, bidding and backlog already booked for fiscal 2019."

133. Apogee hosted a conference call for analysts and investors at 8:00 a.m., Central Time on August 23, 2017. Defendants Puishys and Porter, among others, participated on the call. During the call, in addition to disclosing previously concealed information regarding EFCO, Defendants continued to make material misstatements and omissions of fact that misled analysts and investors regarding the actual impact the problems with EFCO would have on EFCO and Apogee.

134.    During the call, Defendant Puishys stated that Apogee was lowering EFCO's FY18 projected revenue to approximately $200 million:

> This year, we are projecting fiscal 2018 revenues at the lower end of the prior revenue range.  $200 million versus the prior outlook of $200 million to $220 million, driven by lower level of book-and-bill order activity post signing and post close.  ***We attribute this to market distraction and disruption related to the transaction. We have subsequently seen order activity return to normalized rates, but do not expect to make up the first couple of months***.  We expect to see nice growth in this business in the future.

135.    Defendant Puishys also disclosed that "as a result of higher costs on a few projects," EFCO's operating margin was expected to be "2% to 3% versus our prior mid-single-digit outlook" provided on June 22, 2018.  Nonetheless, Defendant Puishys assured investors that "[w]e've got our arms around" "the higher costs on" EFCO's legacy projects:

> EFCO margins are now initially expected to be lower than the previously expected forecast 2% to 3% versus our prior mid-single-digit outlook.  ***This is as a result of higher costs on a few projects.  As we got into the business, we identified a discrete number of projects where the resources required to successfully execute the projects were underestimated.  We've got our arms around this*** and in some cases have leveraged other Apogee business units to support these projects.

136.    Ostensibly based on Apogee's analysis of the "higher costs on" EFCO's legacy projects, Defendant Puishys reassured investors the "fiscal '18 impact from these issues is approximately $5 million operating income."

137.    During the Q&A portion of the call, analysts focused primarily on the reduced FY18 guidance for Apogee and EFCO.  During one exchange, Defendant Puishys made the following statements in response to a question about EFCO's operating margin in FY18 and FY19:

**Christopher Paul Moore - CJS Securities, Inc. - Research Analyst**:

I guess, we – *could we talk maybe just a little bit about a reasonable trajectory on the EFCO margins*. If we're 2% to 3% for the balance of '18, looking to get double-digit in 3 years. Is it kind of a step function to get there? Or is there some low-hanging fruit in '19? And can you just kind of talk to that a little bit?

**Joseph F. Puishys – Apogee Enterprises, Inc. – CEO, President & Director**:

Well, Chris, I'll give you some high level and then Jim can get into some detail. Obviously, *we're reporting some unexpected project costs at EFCO that are hitting in F '18, which will, obviously, provide us a favorable comp next year, all problems end up being a good comp looking forward. So I think we'll see a little bit of a step improvement in F '19*. And the bottom line is EFCO has done a wonderful job in the mid and small project segment. They took on some work in the larger sizes. Frankly, they're lucky that Apogee has come to bear here as the acquirer, because we have extremely capable people to handle large projects and I brought resources to bear, as I mentioned, from my other Apogee family members to make sure we execute these projects as effectively as possible. But clearly, *we've got a couple of 100 basis points of margin headwinds this year from this issue we're bringing to bear today. And I would expect that to be nonrecurring* as Jim and I will be managing the approval process for any large project at EFCO, just like we always have for our Framing Systems and our installation business at Apogee.

138. In responding to the analyst's question, Defendant Puishys attempted to quell concerns over Defendants' disclosure by misleadingly stating that the problems with EFCO would affect EFCO's operating margin by only "a couple of 100 basis points" in FY18, and that EFCO's operating margin would experience a "step improvement in F '19" from the 2%-3% level in FY18.

139. In following up on Defendant Puishys' response to the analyst's question, Defendant Porter did not correct Defendant Puishys' false statement that EFCO's operating margin would experience a "step improvement in F '19." Rather, while purporting to know when EFCO's legacy work would be performed, Defendant Porter also minimized the

- 48 -

significance of EFCO's legacy projects in FY19, stating just "a couple of projects" would extend "through fiscal '19" and would become a "smaller," "declining piece of the business":

**Brent Edward Thielman – D.A. Davidson & Co. – Senior VP & Senior Research Analyst**:

Okay. And then on EFCO, Jim, I think you mentioned some of this legacy work moves into fiscal '19.  Does that get wrapped up in the first half next year?

**James S. Porter - Apogee Enterprises, Inc. – Executive VP & CFO**:

It starts to wind down. I mean, there is a couple of projects that we'll carry through fiscal '19, but they'll become smaller, become a declining piece of the business.

140.   During another exchange with an analyst from Kansas City Capital Associates, Defendant Puishys disclosed that EFCO's "lower level of book-and-bill order activity" – which Defendants cited as a *primary reason* they were reducing EFCO's forecasted FY18 results – first began developing "in the October [2016] time frame":

**Jonathan Paul Braatz - Kansas City Capital Associates - Partner and Research Analyst**:

Joe, you mentioned that *after the EFCO acquisition* there is a little bit of hesitancy, I guess, on their customer's part to place orders and you had mentioned *a lower book-to-bill ratio for the first 2 months*.  Why was that?  What caused the pause?  I mean, obviously, EFCO was acquired by a large company, a healthy company, financially secure.  What caused the pause in some of the bookings?

**Joseph F. Puishys - Apogee Enterprises, Inc. - CEO, President & Director**:

Yes, great question, Jon.  So listen, *this sale process became public in the early part of the 2016 fourth quarter, so back in the October time frame*.  The uncertainty related to the disposition of a business always results in some consternation at the customer level, at the sales representation level.  We certainly saw distraction from the management team and *the due diligence*

*process was intense for the management team*. It turned into some pause in the ordering process from customers. *So by the time we closed, the pipeline had been weakened and therefore, the bookings in the first couple of months were very, very soft. And frankly, were soft in the months leading up to the final closing of the transaction*. This shouldn't be a surprise in the real world when a company is being sold. I've been part of divestitures and acquisitions in my career. I'd say, that was part of the problem. *But the biggest issue with EFCO was some of the cost estimating on some of the larger projects they have gone after where we're putting all these resources to bear and addressing these projects, so that they get executed flawlessly and unfortunately it has margin implications to it*.

141.    In following up on Defendant Puishys' response, Defendant Porter stated that the "period where we saw *the most disruption*" to EFCO's sales pipeline was during the "*couple of months before we actually announced the signing of the transaction*." In other words, at the time Defendants announced the EFCO acquisition on May 1, 2017, Defendants *had knowledge* of this substantial disruption to EFCO's sales pipeline, which they knew or should have known would adversely affect EFCO's and Apogee's financial results. However, they failed to disclose these material facts, and instead offered their FY18 guidance, which they were *now retracting* based on previously concealed information.

142.    Further seeking to counter the impact of their FY18 guidance reduction, Defendants assured investors and analysts on the August 23, 2017 call that Defendants were "comfortable we now have our hands around" the problems with EFCO.

143.    As a result of Defendants' August 23, 2017 statements, Apogee's stock price closed at $41.01 on August 23, 2017, on unusually heavy trading volume. The $41.01 price represented a *12.76% drop* from the stock's previous closing price of $47.01.

144.    Apogee's stock price remained artificially inflated, notwithstanding Defendants' August 23, 2017 partial disclosure of certain previously omitted information,

however, as a result of Defendants' material misstatements alleged herein, including their misleading guidance for FY18 and FY19.

145.  In fact, analysts were placated by Defendants' assurances, including that the operating margin impact from EFCO's problems would be limited to "a couple of 100 basis points" in FY18 and would be substantially restricted to FY18, and that EFCO's operating margin was expected to *improve* in FY19 from FY18's 2%-3% outlook.

146.  As one analyst stated to Defendants on the August 23, 2017 call, it "sounds like you've got your arms around that and that, *that is something that will not persist*."

147.  To further counterbalance the news of the FY18 guidance downgrade, Defendants began issuing *positive* guidance for FY19.  During the August 23, 2017 call, Defendant Puishys stated "[w]e feel especially good about Apogee's top and bottom line prospects for growth in fiscal 2019, and *we expect double-digit revenue growth and triple-digit operating margin improvement for fiscal 2019*."  Defendant Puishys even boasted during the call that "[i]n fact, we feel better about F'19 and F'20 than just 90 days ago."

148.  The statements referenced above in ¶¶129, 131-132, 135-139, 142 and 147 were materially false and misleading because they failed to disclose and misrepresented the following adverse facts detailed herein which were known to Defendants or recklessly disregarded by them, as follows:

(a)  Defendants' statements concerning EFCO's FY18 operating margin, including that EFCO's operating margin forecast was now "2%-3%," that the problems with EFCO would affect EFCO's operating margin by only "a couple of 100 basis points" in FY18, and that Defendants were "comfortable we now have our hands around" the problems

- 51 -

with EFCO, were materially false and misleading when made because they failed to account for the actual impact EFCO's problems would have on Apogee's financial results;

(b)  Defendants' FY19 guidance statements, including that EFCO's operating margin would experience a "step improvement in F '19" from the 2%-3% FY18 level, that the "couple of [EFCO legacy] projects" that "carry through" to FY19 would become "a declining piece of [EFCO]," and that Apogee expected an overall "triple-digit operating margin improvement for fiscal 2019," were materially false and misleading when made because they failed to account for the full risk posed by EFCO's problematic legacy projects.  As set forth in ¶¶73-75 and 177, Defendants knew from their due diligence process of EFCO's problems and that those problems continued to exist, which Defendants failed to fully acknowledge; and

(c)  As a result of the foregoing, Defendants lacked a reasonable basis for their positive statements concerning EFCO and therefore these statements were materially false and misleading when made.

149.  That same day, following the August 23, 2017 call, Craig-Hallum published a report announcing it was *lowering* its price target on Apogee's stock, from $68 to $64, as a result of Defendants' FY18 guidance downgrade.  Nonetheless, Craig-Hallum reiterated its "Buy" recommendation, citing Defendants' assurance that "*the negative impact related to EFCO [is] relegated to FY18*," and that they "feel[] better about [Apogee's] FY19 and FY20 outlook than [they] did 90 days ago":

> With it almost through its 2Q, APOG adjusted its FY18 guidance lower to reflect the impact of EFCO (a temporary order dislocation around the acquisition and higher than anticipated costs on a few large projects) and increased competition in mid-scale projects. APOG indicated that order trends

at EFCO have since normalized and it has put in place operational changes *so as to keep the negative impact related to EFCO relegated to FY18*. . . .

. . . Supported by its backlog, bidding activity, and pipeline, APOG expects overall market growth for at least the next three years and stated that it feels better about its FY19 and FY20 outlook than it did 90 days ago. . . .

With a positive market backdrop in place, we view APOG as an attractively valued investment in non-res construction and believe that it will post operating margin expansion and earnings growth over the cycle.

### 2.     September 19, 2017 Earnings Call and Press Release

150.    On September 19, 2017, prior to the start of trading on the NASDAQ, Apogee issued a press release reporting its 2Q18 results.  That same day, Defendant Porter signed and Apogee filed on Form 8-K a copy of the September 19, 2017 press release.

151.    In the press release, Apogee stated it was "maintaining the full-year fiscal 2018 outlook provided on August 23."

152.    The press release attributed the following statement to Defendant Puishys:

"Looking ahead to fiscal 2019, we anticipate double-digit revenue growth and triple-digit basis-point operating margin improvement, based on bidding, our order pipeline and backlog already booked for the year. . . .  Our outlook is supported by internal market visibility and positive external metrics, including forecasts for mid-single digit U.S. commercial construction market growth."

153.    Apogee hosted an earnings conference call with analysts and investors that morning at 8:00 a.m., Central Time to discuss Apogee's financial results for 2Q18 and its outlook for FY18 and FY19.  Defendants Puishys and Porter, among others, participated on the call.

154.    During the call, Defendant Porter stated Defendants were "reaffirming our guidance for fiscal 2018 provided approximately a month ago," on August 23, 2017.  As

alleged in ¶¶135 and 137, the guidance Defendants issued on August 23, 2017 included that EFCO would operate at 2%-3% operating margins in FY18.

155.   Defendants also reiterated their FY19 guidance provided to the market on August 23, 2017 and presented in the September 17 press release described above in ¶152, that Apogee would realize double-digit revenue growth and triple-digit operating margin enhancement in FY19.

156.   During the call, Defendant Porter made the following statements in support of Defendants' FY19 guidance:

> Our backlog and pipeline give us ***solid visibility to fiscal '19 and beyond***.

*   *   *

> We feel good that our internal visibility from backlog, awards and bidding, combined with external market metrics, support our outlook for sustained growth.

157.   During the call's Q&A session, an analyst asked Defendants for an update on the "headwinds" EFCO had experienced with its order activity.   In response, Defendant Puishys disclosed that Defendants had learned of the disruption to EFCO's sales pipeline from their diligence on the acquisition:

> **Jonathan Paul Braatz - Kansas City Capital Associates - Partner and Research Analyst**:
>
> Okay, okay. And then secondly, going back to EFCO, one of the headwinds was incoming order rates. Have you seen incoming order rates return to a more normal level and – from the decline that we have seen early on?
>
> **Joseph F. Puishys - Apogee Enterprises, Inc. - CEO, President & Director**:
>
> Yes.  I've met with the entire sales organization of EFCO and our sales counsel, and ***we're beginning to see really good improvement in our order***

- 54 -

*patterns, something Jim and I look at literally every day, and trend has been very good*. So I'm confident. I know the – listen, *if you've ever been a part of a company that's gone through a sale process, it's distracting*. The sales organization doesn't know where the company is going to end up. I'm absolutely, I believe, speaking for all my EFCO colleagues, 100% delighted that they ended up as part of Apogee. It was the best place for this company to land. *But they didn't know that from October of last year until June, when the sale was announced. That distraction took its toll. We certainly were aware of that*.

158. Despite Apogee's lukewarm results in 2Q18, analysts remained positive about Apogee's ability to achieve its FY18 guidance and maintain its outlook for FY19, especially given Defendants' statements regarding their internal visibility into Apogee's and EFCO's businesses.

159. For example, Craig-Hallum published a report on September 19, 2017, entitled, "Largely Past The Acquisition Noise, Focus Can Now Be On Expected Strength In 2H18/FY19. Reiterate BUY Rating, $64 Price Target," stating:

> APOG reported 2Q results below consensus on project timing in the Glass and Services segments, but maintained its outlook for FY18 and FY19 given expected sustained market growth and visibility from backlog, awards & bidding, and positive external market metrics. *Despite challenges in 1H from timing and integration from the recent acquisitions (most notably EFCO), we note 2H and FY19 comps should improve noticeably and we believe current levels provide an attractive entry point* with a positive non-residential construction market backdrop remaining firmly in place, an outlook for meaningful operating margin expansion as a result, and valuation at 6x EV/EBITDA and 10.5x P/E versus building materials comps at 10x and 19.5x, respectively.

160. The statements referenced above in ¶¶152 and 154-156 were materially false and misleading because they failed to disclose and misrepresented the following adverse facts detailed herein which were known to Defendants or recklessly disregarded by them, as follows:

(a)     Defendants' FY18 EFCO operating margin guidance was materially false and misleading because it failed to account for the actual impact EFCO's problems were having on EFCO and Apogee;

(b)     Defendants' FY19 guidance statements that Apogee expected an overall "triple-digit operating margin improvement for fiscal 2019," were materially false and misleading when made because they failed to account for the full risk posed by EFCO's problems with its legacy projects.  As set forth in ¶¶73-75 and 177, Defendants knew of EFCO's problems from their due diligence process and that those problems continued to exist, which Defendants failed to fully acknowledge;

(c)     Defendants' statements above concerning their "visibility," including that their "backlog and pipeline give us solid visibility to fiscal '19" were materially false and misleading when made.  The undisclosed truth was the problems alleged in ¶¶73-75 concerning EFCO would adversely affect EFCO's and Apogee's financial results in FY18 and FY19.  Based on Defendants' purported multiple levels of "visibility" and other internal metrics as alleged in ¶¶49-59, Defendants knew or should have known their "visibility" did not support the guidance they issued to the market; and

(d)     As a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about EFCO and therefore these statements were materially false and misleading when made.

### 3.     December 21, 2017 Earnings Call and Press Release

161.   On December 21, 2017, prior to the start of trading on the NASDAQ, Apogee issued a press release announcing its financial results for 3Q18.  On the same day, Apogee

filed a report on Form 8-K, signed by Defendant Porter, which included a copy of the December 21, 2017 press release.  The press release also announced that Apogee was to host an investor conference call that morning at 8:00 a.m., Central Time.

162.    In the press release, Apogee announced it was lowering its FY18 guidance due to a "'slower than expected second half for our architectural glass segment,'" "'higher than expected health care costs,'" and "'competitive pressures'" in the Glass Segment.

163.    The press release also quoted Defendant Puishys as stating "'we continue to anticipate double-digit revenue growth and triple-digit basis-point improvement in operating margin'" in FY19.

164.    Apogee held an earnings call on December 21, 2017, to discuss Apogee's 3Q18 financial results.  Defendants Puishys and Porter, among others, participated on the call.

165.    During the call, Defendant Porter repeated Apogee's announcement it was lowering its FY18 guidance on account of the reasons stated in ¶162.

166.    Defendants reiterated during the call the same FY19 guidance Defendants issued to the market on August 23, 2017, and reaffirmed on September 19, 2017 and October 12, 2017.

167.    During the call's Q&A session, in addressing questions concerning EFCO's operating margin, Defendants did not alter their existing guidance that EFCO would operate at 2%-3% operating margins in FY18.

**Eric Andrew Stine – Craig-Hallum Capital Group LLC, Research Division – Senior Research Analyst**:

Okay, thanks.  Last one for me. Just turning to the EFCO standard framing. Good to hear that you've got a new head starting shortly. *I think in the past, you've talked about that, that business from an operating margin perspective is 4 years behind Apogee's business as a whole*.  I mean, what's happened over the last few months, does it – has it done anything to change that?  hat timeline, or is it still?  Or that's the way we should think about it in terms of operating margin expansion?

**Joseph F. Puishys - Apogee Enterprises, Inc. - CEO, President & Director**:

Yes, well my confidence in achieving $10 million to $15 million is extremely high.  We've already completed negotiations for aluminum purchases, leveraging the other Apogee assets purchases and we'll be looking at substantial year-over-year improvements in aluminum, directly going to the EFCO business.  My Apogee team and talent from our other business units have descended upon that business to help them make improvements.  We've mentioned a particular project or 2, where our very qualified large project team at Harmon has in effect taken over the reins to help them execute these projects at better results.  *The business has performed quite nicely* and has -- and since the last quarter every month has provided me a little upside on the results and I am pretty pleased with how the business is performing. I'm 100% confident taking this business, *which is at margins like we had in Framing Systems 5, 6 years ago* to the kind of numbers we enjoy today in Framing Systems.  There in the same marketplace, they have the same model for manufacturing. We will get the business there. *So we're off to a great start at – in EFCO in particular*.

168.    During the call, Defendant Porter made the following statements in support of

the FY19 guidance Defendants provided on the call:

We continue to expect *sustained growth* for Apogee based on our internal visibility from backlog, awards and bidding and forecast for low to mid-single-digit growth in U.S. commercial construction markets at least through fiscal 2020.

169.    The statements referenced above in ¶¶163 and 166-168 were materially false

and misleading because they failed to disclose and misrepresented the following adverse

facts detailed herein which were known to Defendants or recklessly disregarded by them, as

follows:

(a)     Defendants' statements they were "pleased with how [EFCO] is performing" and they were "off to a great start" with EFCO were materially false and misleading because they failed to account for the actual impact EFCO's problems were having on EFCO and Apogee.  During 4Q18 – which was *already underway* on December 21, 2017 – *EFCO would recognize an operating loss of $5.3 million and an operating margin of negative 12.9%*.  Based on Defendants' purported multiple levels of "visibility" and other internal metrics as alleged in ¶¶49-59, Defendants knew or should have known that EFCO would operate at a tremendous loss and a negative operating margin in 4Q18, substantially undermining Defendants' statements above;

(b)     Defendants' FY19 guidance for overall "triple-digit operating margin improvement for fiscal 2019," was materially false and misleading when made because it failed to account for the full risk posed by EFCO's problems with its legacy projects.  As set forth in ¶¶73-75, 109(a) and 177, Defendants knew of EFCO's problems from their due diligence process and that those problems continued to exist, which Defendants failed to fully acknowledge;

(c)     As Defendants would eventually disclose in April 2018, Apogee was even further behind on improving EFCO's operating margin than Defendants had previously disclosed, the EFCO business unit would be expected to just break even in FY19, and Apogee's consolidated operating margin would not be expected to increase by triple-digits in FY19; and

(d)     As a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about EFCO and therefore these statements were materially false and misleading when made.

### C.     Additional Revelations Regarding the True Nature of the Problems with EFCO Legacy Projects Trickle Out

#### 1.     April 12, 2018 Earnings Call and Press Release

170.    On April 12, 2018, prior to the start of trading on the NASDAQ, Apogee issued a press release announcing its financial results for the fourth quarter and full year of fiscal year 2018, titled "Apogee Reports FY18 Full-Year, Fourth-Quarter Results." Apogee filed a copy of the press release the same day with the SEC on Form 8-K, which Defendant Porter signed. The press release also announced that Apogee was to host an investor conference call that morning at 8:00 a.m., Central Time.

171.    To analysts' and investors' surprise, the press release announced that Defendants were *retracting* their prior guidance – issued to the market beginning on August 23, 2017 – for a triple-digit increase in Apogee's operating margin in fiscal year 2019:

> "In fiscal 2019, we anticipate Apogee's top line will grow approximately 10 percent *and operating income will increase to a record level*," [Puishys] said. . . .

> . . . "Our positive outlook is supported by external forecasts for continued solid U.S. commercial construction markets and our internal visibility that includes a healthy backlog and pipeline of projects that we're bidding."

172.    The press release also provided the following outlook for fiscal 2019:

- Revenue growth of approximately 10 percent.

- Operating margin of 8.8 to 9.3 percent.

- Adjusted operating margin of 9.1 to 9.6 percent.

- 60 -

- Earnings of $3.30 to $3.50 per diluted share.

- Adjusted EPS of $3.43 to $3.63.

                              *        *        *

"Apogee's backlog, bidding and pipeline of potential work support growth through fiscal 2020," said Puishys, who added that "although visibility into fiscal 2021 is limited, the company is not seeing any slowdown in commercial construction markets."

173.   Apogee's FY18 financial results included 19% revenue growth versus FY17, diluted earnings per share of $2.76, and adjusted earnings per share of $3.23.  Apogee's consolidated FY18 operating and adjusted operating margins were 8.6% and 10%, respectively.

174.   Apogee hosted an earnings conference call with analysts and investors that same day to discuss Apogee's FY18 results and FY19 outlook.  Defendants Puishys and Porter, among others, participated on the call.

175.   During the call, Defendant Puishys revealed that Apogee was even further behind on improving EFCO's operating margins than Defendants had previously disclosed, stating: "we are approximately *18 months behind* and starting from a lower point in our EFCO margin improvement process. *This reality impacted Apogee's fiscal 2018 margins, and we'll do so in fiscal 2019*."

176.   Moreover, Defendant Porter announced that EFCO was expected to "breakeven" in FY19, and Apogee was *withdrawing entirely* its previously issued outlook for triple-digit basis point improvement in Apogee's FY19 operating margin – which Defendants issued on August 23, 2017, September 19, 2017, and December 21, 2017:

- 61 -

We have come off our previous expectation for a 100 basis point overall margin improvement for fiscal 2019, ***primarily driven by the lower expectations for EFCO in fiscal 2019***.

As Joe indicated, ***we're expecting breakeven at EFCO in fiscal 2019*** to the lower volume and delays to achieve operational improvement.  As we previously stated, EFCO has had a low starting point, as we had a longer journey to margin improvement.

177.    Analysts were caught off guard by the news that EFCO was expected to just break even in FY19.  For example, in response to a Goldman Sachs analyst's request for "greater clarity" on what was "going on," Defendant Puishys admitted that Defendants "***learned in due diligence***" of EFCO's problems with its legacy projects.  Despite Defendants' extensive diligence and scrutiny of EFCO's legacy project costs, Defendant Puishys inexplicably claimed that Defendants did not "realize[]" until "the second half of calendar year 2017" that the "problems were more substantial":

**Samuel Heiden Eisner – Goldman Sachs Group Inc., Research Division – VP**:

Can we just start out with EFCO? Obviously, the guidance for – and I want to make sure I got this right, I think breakeven for EFCO in fiscal '19 – ***kind of, when you guys are now in the business, what's going on***.  Maybe you can just give us some greater clarity and color on why, I guess, profit expectations are not, kind of, matching up to what was originally thought?

**Joseph F. Puishys - Apogee Enterprises, Inc. - CEO, President & Director**:

Sam, primarily the large projects they embarked on a couple of years prior to or during the – couple of years before they divested the company.  ***They got out from their skis and areas that they weren't familiar with on large curtain wall projects***.  They – hindsight, underestimated the cost and execution complexities of that.  As we've gotten more involved in the business in the second half of calendar year 2017, ***we realized that the problems were more substantial than we learned in due diligence, that's our fault***.  The – we put the resources in place as these projects revenue, ***throughout fiscal 2019, we're going to feel the force of a lot of no-margin work***.  The most complex work we have moved to our Services segment to execute, and we feel

- 62 -

good about that.  And we put resources into EFCO to help them migrate to the kind of business they should be.  And to have them focus on what they've always been good at, which is window work.  And as I mentioned in my comments, I put a new President in, he's been one of our named executive officers at Apogee and running our operational program.  He is just what the doctor ordered, and I like the turnaround I'm seeing.  You heard it before, but Sam, *I feel we've uncovered all the surprises*.  And I'm confident now from a new starting point, our journey can begin.  I think the work – we've seen a real uptick in work in last few months.  And there has – there's definitely a downward slope to their order – their inbound order work.  These large projects that were contributing to poor financial performance were contributing to lack of attention to their core business.  We've rectified that. After several months, we began to see the work return we've improved quality and delivery and continue to do so.  And I'm confident that the second half of the year will be better.  We'll have most of these large projects behind us after the end of fiscal '19.

178.    The same Goldman Sachs analyst further probed as to why Defendants' revelations on April 12, 2018 were seemingly inconsistent with prior statements Defendants had made just a few months prior:

**Samuel Heiden Eisner - Goldman Sachs Group Inc., Research Division – VP**:

Got it. And maybe going to, kind of, bridging that over to the guidance for fiscal '19. So I think the implied midpoint of your EBIT margin or operating profit margin is, let's call it, 9.3%, 9.4%.  You did 10% this year, so down about 60, 70 basis points.  Three months ago, you guys were saying triple-digit basis point margin expansion.  So there's a swing there in a 3-month period of roughly a 160 basis points.  And so I'm curious is there a way to break down what has changed in the guidance over the last 3 months? How much is related to EFCO of the 160? How much is related to inflation? How much is related to competition?  If there's any kind of large buckets that you can provide us, I think, that would be super helpful.

**James S. Porter - Apogee Enterprises, Inc. - Executive VP & CFO**:

Sam, it's Jim. The primary bucket is a change from an expectation that we're having of improving EFCO to be mid-single-digit operating margins to be in breakeven.  And really, from the visibility of the initiatives that we identified, the time that's going to take for those to flow into the business and the ability to ramp that up is really the top and most important difference between that ability to get that improvement.

179.    Recognizing that the EFCO transaction didn't "play[] out as [Apogee] initially planned," another analyst sought additional color "that sort of helps us feel like the risk is appropriately reflected."  In responding to the analyst's question, Defendant Puishys conceded the FY19 guidance Defendants issued prior to April 12, 2018, ***did not reflect*** the full risk posed by the problems with EFCO, notwithstanding Defendants' earlier statements during the Class Period that their guidance fully reflected their multiple levels of visibility (*see* ¶¶156 and 168), which would have included the timing of, and operating margins for, EFCO's legacy project work acquired in the 2017 transaction:

> **Brent Edward Thielman – D.A. Davidson & Co., Research Division – Senior VP & Senior Research Analyst**:
>
> Okay.  On EFCO, Joe, I mean, ***obviously the transaction hasn't played out as you initially planned*** and now we're – I mean, it seems to me we're looking at additional delays and kind of given to the targeted margin.  So I guess I'm looking for any sort of additional color that you've got that sort of helps us feel like the risk is appropriately reflected here.
>
> **Joseph F. Puishys - Apogee Enterprises, Inc. - CEO, President & Director**:
>
> I feel the risk is appropriately reflected here for EFCO.  We definitely were – had more surprises than we wanted ***and that you expected***.  That's on us.  We have said it today, we believe ***we've now identified everything that we could with the business***.  It was a challenge.  I've got a new leader down there who's doing a phenomenal job.  I'll be with the entire selling organization of EFCO tonight and tomorrow. And like I said, I'm pleased with the turnaround in order profile.  We've got the right leaders in place.  ***We have taken the problems and put them in the hands of talented people in our company that have been managing large massive projects for a long time.  They got out in front of their skis. We didn't pick up how far out they were.  We now know.  I believe we are – our F '19 guidance reflects the full risk that, that business had***.

180.    The same date, on April 12, 2018, Craig-Hallum published a report slashing its price target for Apogee stock from $60 to $55, on news that Apogee had "lowered its

operating margin target (previously expecting 1%+ improvement Y/Y) due primarily to lower margin expectations in Framing from the mid-2017 EFCO acquisition (mainly lower-than-expected margin from legacy projects)."   The report's authors noted they were "cautiously optimistic that guidance is **now appropriately set**," adding it would "take a clean/un-eventful quarter for shares to really turn."

181.   As a result of the information released to the market, Apogee's stock price dropped approximately 8.86% ($3.76), closing at $38.70 per share on April 12, 2018, on trading volume of more than three million shares.   The drop would have been more substantial had Defendants disclosed the full truth regarding EFCO's legacy projects. Apogee's stock price remained artificially inflated following April 12, 2018, because Defendants continued to misstate and conceal the full scope of the cost of EFCO's legacy projects and the full impact of Defendants' fraudulent scheme.

182.   The statements referenced above in ¶¶177 and 179 were materially false and misleading because they failed to disclose and misrepresented the following adverse facts detailed herein which were known to Defendants or recklessly disregarded by them, as follows:

(a)   Defendants' statements that they had "uncovered all the surprises" with EFCO, had "identified everything that we could with" EFCO, and that Apogee's "FY19 guidance reflects the full risk" of EFCO's legacy projects, were materially false and misleading when made.   The undisclosed truth was Defendants had not disclosed the "full risk" that EFCO's legacy projects posed to Apogee, or "all the surprises" with EFCO's legacy projects.   Rather, Defendants continued to have the same problems with EFCO's

legacy projects that they admitted they knew about during the due diligence process. *See* ¶¶73-76 and 109(a);

(b)     Defendants' statements above concerning their FY19 guidance were materially false and misleading when made because they failed to account for the full risk EFCO's legacy projects posed to the Company's financial results; and

(c)     As a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about EFCO and therefore these statements were materially false and misleading when made.

**D.     Defendants Conceal Material Problems with Apogee's Glass Segment Operations, While Continuing to Conceal the Full Extent of the Problems with EFCO's Legacy Projects**

**1.     June 28, 2018 Earnings Call and Press Release**

183.     On June 28, 2018, prior to the start of trading on the NASDAQ, Apogee issued a press release announcing its financial results for 1Q19, titled "Apogee Reports Fiscal 2019 First-Quarter Results." Apogee filed a copy of the press release with the SEC on a Form 8-K signed by Defendant Porter. The press release also announced that Apogee was to host an investor conference call that morning at 8:00 a.m., Central Time.

184.     Apogee hosted an earnings conference call for analysts and investors that same day to discuss the results of Apogee's 1Q19, which ended on June 2, 2018. Defendants Puishys and Porter, among others, participated on the call.

185.     During the call, Defendants made several statements with regard to the Glass Segment's order activity in 1Q19 and year-to-date. For example, Defendant Puishys made

the following statements with respect to Glass Segment and the Sotawall business (a division

within the Framing Segment):

Currently, ***both of these businesses are experiencing significant strength in orders***.  In glass, we've begun to see wins in the large project segment again.

***We're also taking steps to manage any potential downside as well***. We're utilizing our strong visibility around project volumes to flex fixed costs whenever possible.

186.   Defendant Puishys also stated the following with regard to the Glass Segment:

***Importantly, this business is in very solid competitive shape. Order activity was very strong, especially toward the end of the quarter***, and we continue to win in the midsize market and regain large project work.

We now have the majority of fiscal 2019 revenues in hand as firm awards, significantly further ahead than where we were for the same metric a year ago.  ***This gives us confidence that the glass business will grow in the remainder of the year***.

187.   During the Q&A portion of the call, Defendant Puishys made the following

statements in response to one analyst's question regarding the Glass Segment:

**Brent Thielman - D.A. Davidson & Co. – Analyst**:

Okay.  Thanks for that. And then back on the glass business, obviously it sounds like the large project stuff is coming back nicely for you, and a portion of that being recapturing some share. Joe, what's your outlook for that particular sector of the market at its core?  How far out can you see jobs? And is it a mid-single-digit growth type sector within the non-res market?  Is it faster or slower than that?

\*     \*     \*

**Joe Puishys - Apogee Enterprises, Inc. – CEO**:

I mentioned the glass orders were up substantial.  ***We don't generally rely on backlog in that business because of our quick turn from order to delivery***, but that backlog was up nicely in the quarter.

. . . ***So the business is in very good position. It came off its tough quarter***. It's exactly – we guided that we'd be down 20%.  We had good visibility.  We

- 67 -

didn't surprise. It's a tough optic.  ***But Q2, as I mentioned and Jim mentioned, will see a nice improvement in the revenues over Q1***.  And Q3 and Q4 will show nice year-over-year growth based on our current order forecasts.

188.   During the call, Defendant Puishys stated the following in response to a follow-up question from Tieton Capital Management regarding Apogee's "successes and activities" in servicing glass markets:

> We moved downstream in the medium projects because the margin profiles are the same, if not better; but you have to be able to deliver in more consistent and reliable lead times.  And we were only able to do that because of the processes and the automation investments we've made in our glass segment, and ***the people we put in place that have allowed us to consistently meet the shorter lead times demanded in the mid segment***.

189.   During the June 28, 2018 call, an analyst from Tieton Capital Management asked the following question regarding the Glass Segment's backlog, to which Defendant Puishys responded in relevant part:

**Bill Dezellem - Tieton Capital Management – Analyst**:

> You had mentioned qualitatively the glass – Architectural Glass revenue – pardon me, backlog, was up nicely from a year ago.  Would you be able to quantify that in some dollar terms for us?

**Joe Puishys - Apogee Enterprises, Inc. – CEO**:

> Bill, I was referring to the – normally when I'm talking about backlog, although we provide a year-over-year comp, backlog is the one metric that's more important to talk about sequentially.  And I was referring to Q1's increase in backlog, which gave me the confidence that Q2's revenues would be substantially higher.  I said double digits, or midteens percentage increase in revenue Q2 over Q1, thanks to a backlog increase in that business.
>
> *            *            *
>
> And frankly, it's a metric of how the orders were for the last 2 to 12 weeks, depending on how busy we are. It's more the trend I'm concerned about, and it's been very, very favorable for the last – the whole quarter, the

order – *the bigger problem we had in glass was trying to hire enough people to make the product we'll be shipping for the rest of the year*.

190.    During the call, Defendants stated that Apogee was "a great employer," "[w]e get the people we need" and "[w]e're at full employment."

191.    Notwithstanding the undisclosed truth regarding the Glass Segment, during the call, Defendant Puishys stated Apogee was *raising* its FY19 guidance originally issued on April 12, 2018, citing "ongoing productivity gains" and "operational improvements" at Apogee:

> We saw ongoing productivity gains, operational improvements, and tight financial management, including excellent cash conversion. ***Based on these results, and a strong outlook, we've raised our outlook for the full-year guidance by $0.05 per share, as well as our margin goals***, and re-affirmed our expectation of 10% top-line growth.

192.    Defendant Porter elaborated on the increased FY19 guidance during the June 28, 2018 call:

> Lastly, I'll turn to our updated fiscal 2019 guidance, which is on slide 12. As we announced in this morning's press release, ***we're raising full-year earnings per share guidance ranges by $0.05 along with margin guidance***. This is based on solid first-quarter performance and an improved margin outlook for the year, largely at Architectural Services. ***We continue to forecast approximately 10% top-line growth for the year*** based on solid organic growth across the businesses for the remainder of the year in addition to our first-quarter gains.
>
> ***Our expectations for segment-by-segment revenues for the full year are in line with what we described last quarter. . . . Architectural Glass should be flat to slightly up for the full year***. We expect revenues to be up 15% to 20% sequentially in the second quarter with modest year-over-year growth in the third and fourth quarters. . . .
>
> We've raised our outlook for operating margin to a range of 8.9% to 9.4%, and for adjusted operating margin to 9.2% to 9.7%, in line with our increased earnings guidance. . . .

- 69 -

Our outlook for full-year operating margins in the other segments remains consistent with last quarter's outlook. We expect solid sequential improvements quarter over quarter, with full-year reported operating margins in Architectural Framing Systems at approximately 8%; Architectural Glass approaching 10%; and Large-Scale Optical, almost 25%. We continue to forecast our tax rate will be approximately 24%.

Earnings per diluted share are expected to range from $3.35 to $3.55, and adjusted EPS of $3.48 to $3.68.

193.     The June 28, 2018 press release also contained the following announcement by

Defendant Puishys:

"Based on the first quarter's positive performance, sustained backlog growth and order activity, and a good outlook for the North American construction industry, *we are raising our fiscal 2019 earnings guidance ranges by 5 cents per share*, and can affirm our fiscal 2019 goals for revenue growth. We also remain confident in our outlook for continuing top- and bottom-line growth into fiscal 2020 and beyond."

194.     During the call, Defendant Puishys provided the following assurances in

support of Defendant's FY19 guidance:

I want to remind everyone that *our visibility, which is critical to our forecast here, goes well beyond our nearly $1 billion in booked backlog*. It also includes awards that are not yet in backlog. It includes commitments and wins, bidding activity, and architectural calls. *All of these indicators continue to be very positive* and support an outlook for at least two-plus years of end market growth.

195.     During the call, Defendant Porter also offered the following statements

regarding Defendants' "visibility":

And Bill, as we've talked about, because of that quick turn in the backlog, we generally talk about, qualitatively, Architectural Glass in terms of our commitments or awards as well as our backlog. *Because we have visibility in terms of that work much greater than what's specifically in the backlog*, and that trend has been positive both year-over-year and sequentially.

196.     Analysts also inquired about EFCO during the June 28, 2018 call. For

example, an analyst from CJS Securities asked specifically about EFCO's legacy projects:

**Chris Moore - CJS Securities – Analyst**:

Maybe we could just walk through the EFCO – *expected EFCO margin progression from a high level in terms of – when will most of the mispriced pipeline run off*? And do you expect, for example – will there be a big bump in EFCO margins in late 2019, sometime in 2020? Just a little bit more detail on that, if you could.

**Joe Puishys - Apogee Enterprises, Inc. – CEO**:

Yes, Chris, I'll start, and Jim will give you more detail on the numbers. In general, *we had a couple of projects that were particularly troublesome, one of which is virtually complete; and the second one is exiting the engineering stage, and we now go into full-scale production. So I feel good about both these projects, and believe we are substantially completed through the hurdles*, and the work we've been bidding on has been core to the Company. *So I would say, for the most part, the problematic projects are behind us.* As I mentioned, we had a little bit better than breakeven business.

I'll let Jim comment on the progression for the year, but it's upwards opportunity for us for sure.

**Jim Porter - Apogee Enterprises, Inc. - EVP and CFO**:

Yes. Chris, for the current fiscal year, I think we had given some messages that the first half of the year would be a little bit negative, the second half of the year, a little positive; roughly breakeven for the year. Our first quarter was slightly better than we expected, not much. But we still expect the first half to be breakeven to slightly negative; and the second half, slightly positive; and roughly breakeven for the year, *but at a trajectory of improving the margins as we work through the better work and start to see the impact of the operational initiatives*.

197.   The statements referenced above in ¶¶183-196 were materially false and misleading because they failed to disclose and misrepresented the following adverse facts detailed herein which were known to Defendants or recklessly disregarded by them, as follows:

(a)   Defendants' statements above concerning the Glass Segment's "significant strength in orders" and "solid competitive shape" were materially false and

misleading when made because the Glass Segment was not prepared to handle the "significant strength in orders" in 2Q19, as alleged in ¶¶96 and 207-210.

(b)  Defendants' statement above that Apogee was "taking steps to manage any potential downside" was materially misleading because it communicated that any "downside" from the Glass Segment's "significant strength in orders" was only "***potential***." This failed to disclose that the "significant" order activity was ***actually*** – not "potential[ly]" – causing significant "downside" to the Glass Segment, as alleged in ¶¶96 and 207-210;

(c)  Defendants' statements that the Glass Segment was "consistently meet[ing] the shorter lead times" and concerning Apogee's "quick turn from order to delivery," were materially false and misleading because they omitted that Apogee's lead times were adversely impacted by the problems alleged in ¶¶96 and 207-210.  This was important because, as Defendant Porter claimed during a December 2017 earnings call, Apogee's ability to achieve "shorter lead times" was a "key attribute" and was "important [in order] to be able to access the midsized project market";

(d)  Defendants' statements above that Apogee "had" in 1Q19 a "big[]" problem" "trying to hire enough people," and that "[w]e get the people we need" and "[w]e're at full employment," were materially false and misleading because it failed to disclose that the Glass Segment was still having substantial problems in ***2Q19*** hiring a workforce sufficient to handle the Glass Segment's order activity.  Defendants' misstatements created the false impression that Apogee was ***not*** experiencing problems in its Glass Segment, that its current workforce ***was*** sufficient, and that the "problem" Apogee "had" in 1Q19 regarding hiring had been resolved as of June 28, 2018 when in fact they

admitted three months later that the "avalanche" of problems hit in June prior to these statements. Moreover, Defendants made the above statements after assuring the market earlier in the Class Period that Apogee would "'have adequate glass capacity to meet peak commercial construction market demand in upcoming years,'" and would "'continue[] to deliver very high levels of customer service with six to eight week lead times'";

(e)     Defendants' statements above concerning their raised guidance was materially false and misleading when made because the guidance was unrealistic, lacked reasonable basis, and failed to account for the significant problems facing;

(f)     Defendants' statements above regarding their "visibility" and that "[a]ll of [the] indicators" in Defendants' "visibility" supported their outlook were materially misleading when made and omitted that the Glass Segment faced significant challenges in 2Q19 as alleged in ¶¶96 and 207-210;

(g)     Defendants' statements above concerning EFCO, including that EFCO was "substantially completed through the hurdles" from its "couple of projects that were particularly troublesome," and that it was "upwards opportunity for us for sure" on EFCO's margins in FY19, were materially false and misleading when made because they failed to account for the full risk EFCO's legacy projects posed to EFCO's and the Company's financial results. Just like Defendants' admissions on prior conference calls that the EFCO legacy projects' costs were greater than Defendants had previously disclosed, the same situation existed at this time, and had existed since the due diligence process on the EFCO acquisition. *See* ¶109(a). Furthermore, Apogee's and the Framing Segment's reported

financial results for FY19 were inflated by Apogee's failure to appropriately recognize charges associated with EFCO's troubled legacy contracts, as alleged in §VII; and

(h)   As a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about the Glass Segment and EFCO and therefore these statements were materially false and misleading when made.

198.   That same day, on June 28, 2018, Craig-Hallum announced it was increasing its Apogee stock price target from $55 to $60, on the "important" news that Apogee had "increased its FY19 EPS guidance."  The report's authors considered it "noteworthy that APOG's visibility into its business is significant and much improved Y/Y" – with "indications that things are back on track, we are raising our price target to $60 and reiterate our Buy rating on APOG."

**2.     July 12, 2018 Form 10-Q for 1Q19**

199.   On July 12, 2018, Apogee issued a quarterly report on Form 10-Q for the first quarter ended June 2, 2018.  Defendants Puishys and Porter both signed the Form 10-Q.

200.   Notwithstanding the undisclosed truth alleged herein regarding the Glass Segment, and the fact that Apogee issued the 10-Q over a month into Apogee's 2Q19, Defendants reaffirmed in the 10-Q Apogee's FY19 guidance issued to the market on June 28, 2018.

201.   The FY19 guidance Defendants provided in the 10-Q was materially misleading for the same reasons set forth in ¶197.

E.     **Defendants Reveal the Truth Regarding the Existence of Material Problems with Apogee's Glass Segment, While Continuing to Conceal the Full Extent of the Problems with EFCO's Legacy Projects**

1.     **September 18, 2018 Earnings Call and Press Release**

202.    On September 18, 2018, Apogee issued a press release announcing its financial results for 2Q19, which it filed with the SEC that same day on a Form 8-K signed by Defendant Porter.

203.    The press release reported poor 2Q19 results in the Glass Segment due to "[c]hallenges in ramping-up production to meet significant demand." Quoting Defendant Puishys, the press release reported that "'challenges ramping-up production in Architectural Glass in a tight labor market impacted overall results in the quarter,'" and that Apogee "'experienced difficulty hiring and training new staff to meet rapidly rising order volumes.'" According to Defendant Puishys, Apogee "'moved aggressively to address these issues and made improvements as the quarter progressed,'" and "'expect[s] to fully resolve these issues in the second half of the fiscal year, as our workforce stabilizes and our factories reach higher levels of output and productivity.'"

204.    Further, Defendant Puishys reported that "'[a]s a result of lower than expected second quarter results and a reduced second half outlook for Architectural Glass, we have decreased our guidance for the fiscal year.'"

205.    The press release reported the following Glass Segment-specific results:

Architectural Glass had second quarter revenue of $88.1 million, down 9.5 percent from the prior year quarter. Order activity grew substantially during the quarter, with the segment recording its highest quarterly order volume in 15 years. Sequentially, Architectural Glass revenue grew 15 percent, compared to $76.9 million in the first quarter of fiscal 2019.

- 75 -

Operating income was $1.7 million in the second quarter and operating margin was 2.0 percent, down from $10.3 million last year and 10.5 percent in the prior year, respectively. The lower operating margin was primarily driven by significantly increased labor costs, lower productivity, and higher cost of quality, as the segment was challenged to efficiently ramp-up production to meet the higher than expected, short lead-time customer demand.

206.    Apogee held an earnings conference call on September 18, 2018, at 8:00 a.m., Central Time to discuss Apogee's 2Q19 results.  Defendants Puishys and Porter, among others, participated on the call.

207.    During the call, Defendants surprised the market by disclosing the Glass Segment had faced "significant challenges" during 2Q19 which "caused the business to fall well short of [Apogee's] expectations for the quarter and to impact our full year outlook."

208.    During the call's Q&A session, analysts inquired about the Glass Segment's problems in 2Q19.  During one exchange, Defendant Puishys admitted that "*[t]he main issue was in June, where the avalanche hit*," that the "avalanche of orders" had substantially prolonged lead times in the Glass Segment, and that Apogee was still "90 to 120 days" from returning back to its normal lead times:

> **Brent Edward Thielman - D.A. Davidson & Co., Research Division - Senior VP & Senior Research Analyst**:
>
> Joe, on Glass, with lead time shorter and orders pretty strong here, I guess I'm confused why we wouldn't see faster growth this year even with the inefficiencies? Is that because you're picking up more of the larger project business?
>
> **Joseph F. Puishys - Apogee Enterprises, Inc. - CEO, President & Director**:
>
> No. You will see – we've been on a downward trajectory on orders for the last 4 quarters prior to Q2. *We had been talking about the wave was coming*. You would think we would have been better prepared, and it's unfortunate that it caught us by surprise, the magnitude, and then it started to snowball. And if you've ever run a factory, *when you're overwhelmed with*

***business, it starts to become a fire drill and a crisis***, and it's unfortunate.  It – we are working out from under it.  We've seen improvement.  ***The main issue was in June, where the avalanche hit***.  July was slightly better.  August was slightly better.  September will be better.  We will see nice growth in revenues in Glass in the second half of this year and next year.  So the revenue growth is coming, Brent.  The reason we didn't see it in the first half of the year was simply the flow of orders.  And the last 2 quarters or last 3 quarters of last year, and the first quarter of this year, it's come roaring back.  As I mentioned, we don't really publish backlog in that business.  We're typically – we have always historically strived to be a 12-week lead time business. We managed that down to 6 to 8 weeks consistently, which allowed us to win share in the mid-markets.  ***The avalanche of orders have driven up the lead times, and we're fighting to get those back in the next 90 to 120 days***.  And as we manage that backlog down, you'll see pretty solid revenue growth in the second half of the year in Glass.

209.    Defendant Puishys disclosed that Apogee's "backlog in Glass increased" in 2Q19 "partly due to our problems," causing substantially longer "delivery lead times."

210.    Defendant Puishys also disclosed "during [2Q19], we added over 300 new employees in our Glass factories, a 20% increase to the workforce within the quarter."  As a result, Apogee "experienced a drop-off in margins and higher scrap rates, lower throughput and more expedited orders, all related to the influx of new employees."

211.    Defendants revealed that the Glass Segment's problems had adversely impacted the Glass Segment's and Apogee's 2Q19 and FY19 results.

212.    For example, Defendant Porter disclosed that the Glass Segment's problems in 2Q19 resulted in it achieving operating income of just $1.7 million, down 83% from the Glass Segment's $10.3 million in operating income from 2Q18.  Defendant Porter also disclosed that the Glass Segment's revenue had declined 95% compared to 2Q17.

213.    As a further surprise to investors and blow to Apogee's stock price, Defendant Porter revealed Apogee was lowering its FY19 guidance.  Specifically, Defendants lowered

Apogee's FY19 guidance for revenue growth to 8%-10%, versus the 10% guided on June 28, 2018 and July 12, 2018, due to the problems in 2Q19.   Defendants also lowered their guidance for Apogee's FY19 operating margin and adjusted operating margin previously issued on June 28, 2018, and reaffirmed on July 12, 2018, on account of the problems in 2Q19.

214.    During the September 18, 2018 call, analysts sought an "update" on the EFCO legacy projects at Apogee:

**Eric Andrew Stine - Craig-Hallum Capital Group LLC, Research Division - Senior Research Analyst**:

> Yes, okay. Understood. Maybe last one for me, just on the – on EFCO and the legacy projects that you need to work through. Just an update, I mean, is there – are you still thinking that, I believe, ***one, you're close to being done and another, if you look at a few quarters, that will be complete as well***?

**Joseph F. Puishys - Apogee Enterprises, Inc. - CEO, President & Director**:

> ***Yes, that is still true***. One is nearly complete. The other one will really start, frankly, to revenue in second half of Q3 and then frankly, for about 2 years as we will be totally focused on production. I think we've told you all that EFCO is solely responsible for building the system. Our Services business will be doing the installation and installation management over this couple year project. We expect low margins, ***but it is expected to be profitable***.

215.    Another analyst inquired whether there would be any "spike" in EFCO's profitability in the second half of FY19:

**Christopher Paul Moore - CJS Securities, Inc. - Research Analyst**:

> Got it. You went through it, Joe, but I missed it. Just in terms of the EFCO margin progression. ***So I know you're talking about being profitable second half of this year in EFCO***. Is – from a kind of trajectory standpoint, is it just going to be kind of slow and steady over the next couple of years? ***Is there any point where that likely would spike***?

**Joseph F. Puishys - Apogee Enterprises, Inc. - CEO, President & Director**:

*It'll be slow and steady*.  We are in the midst of an announced investment in the factory there that the prior leaders of the business under the prior parent, we're trying to get approval for.  I understand why the prior parent didn't approve it based on their long-term plans to exit that nonresidential business called EFCO. We have approved that. We – it's been in the press that we're adding some substantial cost or investment for the factory in Monett, Missouri. And that will be done in about the May time frame of next year, May, June.  And we'll really start to amp up the productivity improvements in that business, I'd say, slow and steady.  Until then, we still have purchasing synergies we're driving. *And over the next 3 years, my goal is for a couple hundred basis points of margin expansion each year*.

216.    Later on in the call, an analyst inquired as to whether the Framing Segment's improved margins in 2Q19 indicated Apogee was "effectively surpassing" "the problem contracts at EFCO":

**Brent Edward Thielman - D.A. Davidson & Co., Research Division - Senior VP & Senior Research Analyst**:

Okay.  But the problem contracts at EFCO, you're effectively surpassing those now?

**James S. Porter - Apogee Enterprises, Inc. - Executive VP & CFO**:

*Yes. Yes.*  As Joe described, *the one project is – we're like 98% complete*. And so I mean, that's just a drag because it's a little bit of work that has cost associated with it.  But overall, it's really the *– and then the other project is really just starting*.  And so it's really that core business and getting – we're making nice progress on the productivity initiatives.  Continuing to drive – to grow the order intake on that core kind of bread and butter business, that was their business.  As we look later in the year, we start to see some momentum with that.

**Joseph F. Puishys - Apogee Enterprises, Inc. - CEO, President & Director**:

The project Jim referenced, that's just basically starting.  We've incurred a lot of cost and headwinds to get to this point.  So this is a big milestone where we're pretty much now past.  We're getting past the

engineering and hopefully can totally focus on producing units, and I'm more comfortable with that. Getting to this stage has been a battle. We're not quite there, but we're almost there.  And I expect in the third quarter, we'll be focused on producing instead of designing.

217.   As a result of Defendants' statements regarding the Glass Segment on September 18, 2018, Apogee's share price closed at $42.48 on September 18, 2018, down **11.9%** from Apogee's closing price of $48.22 on September 17, 2018, on unusually heavy trading volume.

218.   The statements referenced above in ¶¶202, 204, 205 and 213-216 regarding EFCO, however, were materially false and misleading because they failed to disclose and misrepresented the following adverse facts detailed herein which were known to Defendants or recklessly disregarded by them, as follows:

(a)   Defendants' statements above, including that EFCO was expected to be profitable in the second half of FY19, that its profitability would be "slow and steady," and that Apogee was "effectively surpassing" "the problem contracts at EFCO," were materially false and misleading when made because they failed to account for the full risk EFCO's legacy projects posed to the Company's financial results.  As set forth in ¶109(a) above, Defendants knew from their due diligence process of EFCO's problems and that those problems continued to exist, which Defendants failed to fully acknowledge.  The undisclosed truth was Apogee had not "effectively surpass[ed]" the problem contracts at EFCO and would not experience "slow and steady" profitability in the second half of 2019.  The problems that existed at EFCO with its legacy projects, that were previously disclosed in prior fiscal quarters, still existed.  Furthermore, Apogee's and the Framing Segment's

reported financial results for FY19 were inflated by Apogee's failure to appropriately recognize charges associated with EFCO's troubled legacy contracts, as alleged in §VII; and

(b)    As a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about EFCO and therefore these statements were materially false and misleading when made.

### F.    Apogee Continues to Reveal Additional Details Regarding the True Nature of the Impact from the Legacy EFCO Projects

#### 1.    December 20, 2018 Earnings Call and Press Release

219.    On December 20, 2018, prior to the start of trading on the NASDAQ, Apogee issued a press release reporting its 3Q19 results. That same day, Defendant Porter signed and Apogee filed on Form 8-K a copy of the December 20, 2018 press release.  The press release announced that Apogee was to host an investor conference call that morning at 8:00 a.m., Central Time.

220.    In the press release, Apogee announced it was reducing its FY19 guidance "to reflect lower volumes in Architectural Framing Systems and operational improvement efforts in Architectural Glass which are now expected to extend into fiscal 2020."  Apogee reduced its FY 2019 outlook as follows:

- Revenue growth of 6 to 7 percent, compared to 8 to 10 percent previously

- Operating margin of approximately 8.4 percent, compared to 8.3 to 8.8 percent previously

- Adjusted operating margin of approximately 8.7 percent, compared to 8.6 to 9.1 percent previously

- EPS of approximately $3.00, at the low-end of the previous guidance range of $3.00 to $3.20

- 81 -

- Adjusted EPS of approximately $3.13, compared to $3.13 to $3.33 previously

221.    Apogee hosted an earnings conference call for analysts and investors that same day to discuss Apogee's financial results for 3Q19 and its outlook for FY19.  Defendants Puishys and Porter, among others, participated on the call.

222.    During the call, Defendants reiterated their revised FY19 guidance provided in the press release issued the same day.  Defendants stated their FY19 guidance – which they issued approximately three weeks into Apogee's 4Q19 – was supported by their multiple levels of visibility, which Defendant Puishys described as follows:

> *I've often said, we have 4 levels of visibility.  The most concrete is our book backlog, which is where we have a purchase order, a contractual commitment to deliver goods and services*, hence the $900 million of the work that will go into revenue, and in my entire 7-plus years here, I've never seen in – within a fiscal year, us have work come out of backlog.  I think we've had a project come out and come back in kind of a deal, but it's very rare.  That's great visibility.  *Our second level is work we've been awarded that's about to enter backlog that's in contract negotiations with our legal teams.  And then that's pretty solid, and beyond that, we have work that, we believe, we've been verbally awarded or we believe we're the only bidder with the capabilities*.  Perhaps we had the architectural spec.  So if a project goes forward, we think that's in the wind tunnel for us.  And then lastly, the lease concrete is *work we're bidding with our contractors and for some of our businesses to glaziers*.  And the pipeline of the amount of work that's in that last category is in the billions, and it's substantial.  Some projects have a very low probability of being won, some have a very high.  *We look at all of that when we give our comments about the long-term health of what we're seeing*.

223.    During the call's Q&A portion, in response to a question regarding EFCO's profitability, Defendant Porter revealed that despite the Company's prior assurances that the hurdles were behind it and its projections, when given, were supported by its multiple levels

of visibility, EFCO would be "a little bit negative in earnings for this fiscal year" due to

"lower volumes":

> **Christopher Paul Moore - CJS Securities, Inc. - Senior Research Analyst**:
>
> Got it.  Can we talk a little bit more about the EFCO progression? Just trying to get a sense in terms of – is it – *is that business close to marginally profitable?  Or kind of how you're seeing it flow over the next 6 to 12 months*?
>
> *       *       *
>
> **James S. Porter - Apogee Enterprises, Inc. - Executive VP & CFO**:
>
> And, Chris, I'll then speak to the financial performance of the business. As Joe said, we are seeing continuous improvement in the productivity in the all operational metrics of that business.  But volume leverage is a key driver in that business.  *And so we have seen lower volumes in the third quarter, and visibility we expect it in the fourth quarter.  And so the business will be a little bit negative in earnings for this fiscal year*.  But we really see a continuous progression in the performance in that business.  And importantly, we put a new Vice President, Sales and Marketing in that business in the beginning of the second quarter, one of our top guys from within the company, and we're seeing really a nice progression on activity, and we expect to see that order rate improve, the volume pick up and be able to see the leverage in positive performance in fiscal '20.

224.    As a result of Defendants' statements on December 20, 2018, Apogee's share

price closed at $26.73 on December 20, 2018, *down approximately 13.29%* from Apogee's

closing price of $30.82 on December 19, 2018, on unusually heavy trading volume. The

stock price would have fallen further had the Company disclosed the full scope of the EFCO

legacy projects' financial impact.

225.    The statements referenced above in ¶¶220 and 222-223 were materially false

and misleading because they failed to disclose and misrepresented the following adverse

facts detailed herein which were known to Defendants or recklessly disregarded by them, as

follows:

(a)     The statements above concerning Defendants' "visibility," and the revised FY19 guidance, were materially false and misleading when made because they failed to account for the full risk EFCO's legacy projects posed to the Company's financial results. The problems that existed at EFCO with its legacy projects, that were previously disclosed in prior fiscal quarters, still existed.  Furthermore, Apogee's and the Framing Segment's reported financial results for FY19 were inflated by Apogee's failure to appropriately recognize charges associated with EFCO's troubled legacy contracts, as alleged in §VII; and

(b)     As a result of the foregoing, Defendants lacked a reasonable basis for their FY19 guidance, positive statements about their FY19 guidance, and statements that Defendants' "visibility" supported that guidance, and therefore these statements were materially false and misleading when made.

**G.     The Full Truth Regarding EFCO's Legacy Projects Is Revealed When the Company Takes a $42.6 Million Charge on EFCO's Legacy Projects and "Adjust[s]" Certain Income Apogee Previously Recognized on EFCO's Legacy Projects**

**1.     April 11, 2019 Earnings Call and Press Release**

226.     On April 11, 2019, prior to the start of trading on the NASDAQ, Apogee issued a press release reporting Apogee's results for 4Q19 and FY19, as well as disclosing Apogee was taking "$45.7 million of pre-tax charges related to the EFCO acquisition." That same day, Defendant Porter signed and Apogee filed on Form 8-K a copy of the April 11, 2019 press release.  The press release also announced that Apogee was to host an investor conference call that morning at 8:00 a.m., Central Time.

227.     Apogee's FY19 results included 5.8% revenue growth versus FY18, diluted earnings per share of $1.63, and adjusted earnings per share of $2.96.  Apogee's consolidated

FY19 operating margin was 4.8%, down about 44% from FY18.  The press release also reported Apogee realized a GAAP *net loss of $(0.45) per share in 4Q18*, "which included pre-tax charges of $42.6 million for increased project-related charges on [legacy projects] that were acquired with the purchase of EFCO and of $3.1 million for a non-cash impairment of the trade name acquired with the purchase of EFCO."

228.    The press release contained the following quotations by Defendant Puishys:

"As we have discussed previously, a small number of legacy EFCO projects we inherited from the acquisition have presented significant challenges," added Mr. Puishys.   "During the fourth quarter, we made substantial progress toward completion of these projects and performed detailed updated cost estimates. *The charges announced today are expected to cover the remaining costs related to these legacy projects and should alleviate any additional impact on future financial results*.  We are also actively pursuing available options to recover these added costs from certain parties."

"We are focused on putting these issues behind us and positioning EFCO for long-term success.  In fiscal 2020, we expect to complete these legacy projects and to continue taking important steps toward improving EFCO's productivity and operating margins.  EFCO ended fiscal 2019 with solid orders momentum, which we expect to continue in fiscal 2020, setting the stage for future profitable growth."

229.    The press release also disclosed the $45.7 million charges included "adjustment[s] for profits recognized during the first three quarters of fiscal 2019 on contracts that were acquired with the purchase of EFCO."

230.    Apogee hosted an earnings conference call for analysts and investors at 8:00 a.m., Central Time on April 11, 2019 to discuss Apogee's financial results for 4Q19 and FY19, as well as the charges it was taking on the EFCO legacy projects.  Defendants Puishys and Porter, among others, participated on the call.

231.   During his opening remarks, Defendant Puishys stated the $42.6 million charge

Apogee took in 4Q19 "cover[ed] the remaining costs related to [EFCO's] legacy projects":

> The EFCO acquisition has advanced our diversification strategy in Framing Systems. It provides increased scale, adding to our product offerings and expanding the markets we serve.  I remain very confident that EFCO is an important part of our future at Apogee and our future improvements.
>
> However, as we previously discussed, we also inherited a few legacy projects with the EFCO acquisition that have presented substantial issues.  We started the installation on the last and significantly largest of these projects late in calendar year 2018 and made substantial progress towards completion in the fourth quarter.  ***The charges we announced this morning are expected to cover the remaining costs related to these legacy projects, and we expect to be substantially complete on these projects by third quarter this year***.  We are aggressively working to minimize these costs and we are actively pursuing all options available to us to recover these added costs through insurance and other legal actions.  These charges announced today, and – do not include any future recoveries and they are not in our guidance that we're providing for F '20 as well, meaning the – any potential recoveries.

232.   Defendant Porter provided additional information regarding the EFCO-related

charges during the call:

> As Joe mentioned, we recorded pretax charges in the quarter.  ***$42.6 million was related to increased project-related charges on the legacy EFCO contracts. This includes an increased estimate of the cost to complete the projects and claims related to project delays and other disputes. We also recorded a $3.1 million noncash charge for the impairment of tradename intangibles related to EFCO***.
>
> Including these charges, we had a fourth quarter operating loss of $14.8 million.  Excluding these charges and the amortization of short-lived acquired intangibles, fourth quarter adjusted operating income was $31.2 million compared to $34.1 million in last year's fourth quarter.  The decrease was primarily driven by reduced volumes and lower margins in Architectural Framing Systems, which offset higher operating income in Architectural Services.  Adjusted EBITDA came in at $42.4 million compared to $46.2 million in last year's fourth quarter.
>
> ***With the charges included, we had a net loss of $0.45 per share in the fourth quarter***.  On an adjusted basis, earnings per share was $0.85 compared to $0.96 in the prior year period.

233.   Defendant Porter also disclosed Apogee's EFCO-related charges included *"**adjustments" to profits Apogee had previously recognized*** during the first three quarters of FY19:

> I'd like to mention that in our full year adjusted results, ***the project-related charges that we recorded in the fourth quarter included some adjustments for profits recognized in the first 3 quarters of the fiscal year***.

234.   To put it in context, the fourth quarter $42.6 million charge roughly equaled ***the entire Framing Segment's operating income during the first three quarters of FY19*** ($43.5 million).  The charge was also ***53 times*** the size of EFCO's total operating income ***during all of fiscal year 2018*** ($0.3 million).

235.   As a result of the information released to the market on April 11, 2019, Apogee's stock dropped approximately 6.25% ($2.43), falling from a close of $38.83 per share on April 10, 2019 to a close of $36.40 per share on April 11, 2019, on unusually high trading volume of more than 1.44 million shares.

## VII.   DEFENDANTS ISSUED FALSE FINANCIALS AND VIOLATED GAAP

236.   In addition to the allegations in ¶¶98-225 that Defendants' statements concerning the EFCO business were materially false or misleading, Defendants also filed materially false and misleading Apogee financial statements with the SEC during the Class Period, by failing to properly account for legacy EFCO contracts.

237.   SEC regulations require that public company registrants like Apogee file regular year-end and quarterly public financial statements on Forms 10-K and 10-Q

respectively.  In addition, the SEC requires that such financial statements must be prepared in accordance with Generally Accepted Accounting Principles ("GAAP").[2]

238.    In violation of GAAP and SEC regulations however, Apogee's public financial statements during the Class Period were materially false and misleading because Apogee improperly accounted for legacy EFCO contracts by failing to properly recognize known or knowable increases in contract expenses and losses in accordance with GAAP on a timely basis.  Defendants' failure to recognize these losses on a timely basis (i) violated GAAP; (ii) gave investors a false picture of the profitability and prospects of Apogee, its Framing Segment, and its closely-watched EFCO business; and (iii) rendered misleading Apogee's statements discussed at ¶¶98-225.

**A.    Apogee's Financial Accounting and Disclosures for EFCO Legacy Contract Costs Violated GAAP**

239.    According to the Company's "Significant Accounting Policy" footnote contained in its 1Q19 through 3Q19 10-Q reports, in about half of Apogee's businesses, contract "revenue is recognized at the time products are shipped," while the remaining segments are "businesses that recognize revenue over time."

---

[2]    GAAP comprises the standards recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices.  The SEC has the statutory authority for the promulgation of the GAAP for public companies and has generally delegated that authority to the Financial Accounting Standards Board ("FASB").  The FASB's promulgated standards are generally contained within the FASB Accounting Standards Codification ("ASC"), which are considered to be the highest standards of GAAP.  SEC Regulation S-X, 17 C.F.R. §210.4-01(a)(1), provides that financial statements filed with the SEC that are not presented in conformity with GAAP will be presumed to be misleading, despite footnotes or other disclosures.

240.    The EFCO legacy contracts were among these projects in which revenue was recognized over time.[3]  For contracts in which Apogee recognized revenue over time, the Company disclosed that it estimates progress to contract completion either by "comparing total costs incurred to-date to the total estimated costs for the contract, and record[ing] that proportion of the total contract price as revenue in the period" (percentage of completion accounting), or "recognizes revenue following an over-time output method based upon units produced."

### 1.    GAAP Required that Apogee Estimate, Track and Update Current and Future Contract Costs in an Accurate, Dependable Manner

241.    GAAP governing revenue recognition over time for the EFCO legacy construction contracts during the Class Period is set forth in ASC 605-35 Revenue Recognition Construction-Type and Production-Type Contracts, and in ASC 606, Revenue from Contracts with Customers.  Notably, in order to qualify for revenue recognition over time, both of these accounting rules require that a company must first be able to generate reliable information in order to make reasonably accurate and dependable estimates of future contract cost and progress to completion, including a regular review and revision of such estimates.

---

[3]    The Company revealed that it had already been recognizing revenue on these EFCO legacy contracts for at least the first three quarters of fiscal 2019 when, on April 11, 2019, it disclosed that a portion of the $42.6 million charge Defendants announced that day – to record increased cost estimates to complete legacy EFCO contracts – "include[d] an adjustment for profits recognized during the first three quarters of fiscal 2019 on contracts that were acquired with the purchase of EFCO."  While Apogee also recognized EFCO contract revenue during FY18 immediately following the EFCO acquisition, the Company did not disclose its revenue recognition policy for EFCO during that period.

242.    For example, GAAP specifies that:

[a]n entity shall recognize revenue for a performance obligation satisfied over time only if the entity can reasonably measure its progress toward complete satisfaction of the performance obligation.  An entity would not be able to reasonably measure its progress toward complete satisfaction of a performance obligation if it lacks reliable information that would be required to apply an appropriate method of measuring progress.

ASC 606-10-25-36.

243.    GAAP in force when the Company acquired EFCO in 2017 also required that contract costs be identified, estimated, and accumulated with a reasonable degree of accuracy, and that total estimated costs of a project include costs incurred to date and an estimate of the costs to complete the contract. ASC 605-35-25-32. For costs incurred to date on a contract, GAAP at ASC 605-35-25-33 states:

An entity *should be able to determine costs incurred on a contract with a relatively high degree of precision*, depending on the adequacy and effectiveness of its cost accounting system. . . . [A]n objective of each system or of each set of procedures should be *to accumulate costs properly and consistently by contract with a sufficient degree of accuracy to assure a basis for the satisfactory measurement of earnings*.

244.    Further, GAAP also required an ongoing review of contract costs, recognizing that estimating contract costs "is an integral part of contractors' business activities, and there is a necessity to revise estimates on contracts continually as the work progresses." ASC 605-35-25-64.

245.    In Apogee's case, these contract cost estimation, tracking and revision practices and procedures required by GAAP should have revealed to Defendants no later than 2Q18 that future cost overruns and losses were a ticking time-bomb in several of the larger EFCO legacy contracts, as evidenced by Defendants' remarks on the August 23, 2017

conference call announcing that contract cost reviews had unearthed financial problems on

several EFCO legacy contracts, as detailed at ¶¶135-142, and below.

### 2. The EFCO Legacy Project Cost Overruns and Losses Were Known to Defendants

246.    Substantial evidence indicates that throughout the Class Period, Defendants

knew, or recklessly ignored the mounting evidence and consistently waving red flags, that

several EFCO legacy contracts were underbid, and were already or would eventually

experience significant cost overruns and losses.  As alleged herein, Defendants consistently

assured investors that they had their finger on the pulse of EFCO and had their arms around

EFCO's legacy projects.  For example, as alleged in ¶¶49-58, 121-122, 152, 156, 159, 168,

171, 178, 185, 187, 194, 195, 222 and 223, Defendants claimed to possess keen visibility

into the Company's current, near-term, and medium-term key metrics, including order

patterns, margins, and backlog, and assured investors that they actively reviewed and

monitored these metrics regularly.  Defendants also offered detailed guidance with respect to

EFCO's operations, financial results, and timing of project delivery throughout the Class

Period, and stated on many occasions that they had scrutinized the costs and margins of

EFCO's projects and that Apogee's guidance reflected that information.  Moreover, by virtue

of their position in the Company, Defendants had regular access to, and were kept apprised

of, the results of the Company's regular contract cost estimation and review process required

by GAAP, including the results of the regular reviews of the legacy EFCO contracts.

247.    Furthermore, additional evidence indicates that, from the very beginning,

Defendants were presented with substantial, non-public information indicative of consistent

red flags and specific financial performance problems with the troubled EFCO legacy contracts, including:

(a)     As alleged in ¶¶4, 62-68, 140 and 177, prior to the acquisition, Apogee's senior management, including the Individual Defendants, actively participated in what they described as "intense" due diligence on the EFCO acquisition.  Among other things, their diligence included an analysis of both the individual EFCO legacy projects, as well as EFCO's contract backlog;

(b)     As alleged in ¶¶74, 135, 140 and 177, during the Company's acquisition due diligence and thereafter, senior Apogee management were aware that several of the EFCO legacy contracts obtained in the acquisition were far larger than any contracts EFCO had ever executed and/or included projects in markets in which EFCO had no prior experience and "weren't familiar with" (*e.g.* large curtainwall projects).  Accordingly, Apogee management would have closely examined the underlying bid-cost projections on these projects before the projects began, and then closely monitored them throughout the project life cycle.  This would have included the significantly largest of EFCO's legacy projects, the 93-story, $70 million "Vista Tower" project that EFCO President John Klein described as beyond EFCO's core competency, "ill-advised," and "underbid";

(c)     As alleged in ¶¶10 and 284-285, EFCO was vital to the Company's plan for current and future growth.  Defendants focused closely on EFCO's operations and made numerous public statements about EFCO during the Class Period.  Defendants also issued revenue and margin guidance specific to the EFCO business unit, and thus would have

- 92 -

closely followed internal performance metrics on EFCO each quarter to determine whether

EFCO would meet Defendants' publicly issued guidance; and

(d)    In order to properly account for the acquisition of EFCO and

incorporate it into the Company's own financial and accounting records, GAAP required

Apogee to allocate the acquisition purchase price among all the acquired EFCO assets and

liabilities by first recalculating the fair value of those assets and liabilities. Such valuation

work would have included creating "projections of future operating performance" in order to

value EFCO's backlog, customer relationships and trade names, as disclosed in Apogee's

fiscal 2Q18 Form 10-Q.  It is inescapable that, in order to derive these "projections of

[EFCO's] future operating performance," a deep-dive into, and detailed examination of the

expected financial performance of the underlying EFCO current and backlogged contracts,

was required.  This unavoidable analysis revealed or should have revealed to Defendants the

future financial problems lurking within the significant legacy contracts.

### 3.    The Company Violated GAAP When It Failed to Recognize Losses on the Legacy EFCO Contracts When the Losses Were Known or Knowable by 1Q19

248.    On April 11, 2019, investors were finally made aware of the extent of EFCO

legacy contract losses, when Defendants belatedly admitted that a massive $42.6 million

charge would be required to recognize overruns and losses on a few yet to be completed

EFCO legacy contracts, and that "the charges we announce . . . are expected to cover the

remaining costs related to these legacy projects".  As alleged herein, however, the

unfavorable red flags, facts and circumstances leading to this massive charge were well

known to Defendants beginning with the EFCO due diligence, and mounted through the rest of calendar 2017 and early calendar 2018.

249.    GAAP and SEC rules are clear that, ***while ongoing construction costs are recognized in the period incurred***, both current and remaining anticipated losses on contracts must be recognized in the financial statements when evident:  ***"For a contract on which a loss is anticipated, an entity shall recognize the entire anticipated loss as soon as the loss becomes evident."***  ASC 605-35-25-45.  Further:

> [w]hen the current estimates of the amount of consideration that an entity expects to receive in exchange for transferring promised goods or services to the customer, determined in accordance with Topic 606, and contract cost indicate a loss, a provision for the entire loss on the contract shall be made. ***Provisions for losses shall be made in the period in which they become evident.***

ASC 605-35-25-46.

250.    Apogee violated GAAP by failing to recognize anticipated EFCO cost overruns and losses when they actually became evident in accounting periods prior to fiscal 4Q19.  For example, material EFCO cost overruns and likely future losses were evident to Defendants on August 23, 2017, when the Company publicly stated it had specifically "identified a discrete number of projects" for which EFCO had underestimated the projects' costs, and it had its "arms around" the issue of the projects' costs, as alleged in ¶¶135 and 140.  However, as alleged herein, Defendants misrepresented the scope of the problems with EFCO's legacy projects throughout the Class Period, which problems continued to mount at Apogee.  Thus, Apogee's senior management would still have known in 1Q19 that EFCO would suffer significant future cost overruns and losses on EFCO's legacy projects.  These legacy projects included the $70 million Vista Tower project, one of the remaining

substantial EFCO legacy projects at 4Q19 to which the $42.6 million charge applied, and which EFCO's President admitted had been drastically "underbid" by EFCO.[4]

251.    As alleged herein, Apogee should have, but improperly failed to recognize, significant portions of the $42.6 million EFCO legacy contract overruns and losses when evident in 1Q19, and continuing through 2Q19 and 3Q19.  As the table below demonstrates, due to Apogee's failure to recognize cost overruns and losses on EFCO legacy contracts when evident, Apogee overstated its publicly reported Gross profit, Operating income, Net earnings and EPS in each of its quarterly fiscal 2019 financial statements filed with the SEC on Form 10-Q[5]:

---

[4]    Defendants stated on April 11, 2019, the $42.6 million charge applied to projects including the "significantly largest" of EFCO's legacy projects, a project on which Apogee had "started the installation . . . *late in calendar year 2018*."  As reported in an October 24, 2018, article by *Curbed Chicago*, crews began installation of the curtainwall on the Vista Tower (EFCO's historically largest project, *see* ¶¶74, 231) in *October 2018*.  Apogee's Harmon business unit, which worked jointly with EFCO on fabricating the aluminum and glass curtainwall units, was responsible for installation of the Vista Tower's curtainwall.

[5]    Cost overrun and loss figures in tables in ¶¶251 and 255 below approximated based on Apogee's public disclosures.

| Apogee Misstated Consolidated Financial Statement Line Items | | | |
|---|---|---|---|
| (In $ millions, except EPS) | Q12019 (Qtr ended 6/2/2018) | Q22019 (Qtr ended 9/1/2018) | Q32019 (Qtr ended 12/1/2018) |
| Gross Profit (as reported) | $80.7 | $84.5 | $84.1 |
| Less:   EFCO cost overruns and losses recognized when evident | $14.6 | $11.6 | $16.4 |
| Gross Profit (as adjusted) | $66.1 | $72.9 | $67.7 |
| **Percent overstated** | **22.1%** | **15.9%** | **24.3%** |
| | | | |
| Operating income (as reported) | $22.0 | $28.7 | $31.4 |
| Less:   EFCO cost overruns and losses recognized when evident | $14.6 | $11.6 | $16.4 |
| Operating income (as adjusted) | $7.4 | $17.1 | $15.0 |
| **Percent overstated** | **196.8%** | **67.5%** | **110.0%** |
| | | | |
| Net earnings (as reported) | $15.4 | $20.5 | $21.9 |
| Less:   EFCO cost overruns and losses recognized when evident (post tax) | $11.1 | $8.8 | $12.6 |
| Net earnings (as adjusted) | $4.3 | $11.7 | $9.3 |
| **Percent overstated** | **256%** | **75%** | **135%** |
| | | | |
| EPS (as reported) | $0.55 | $0.73 | $0.79 |
| EPS (as adjusted) | $0.154 | $0.415 | $0.331 |
| **Percent overstated (rounded)** | **258%** | **76%** | **139%** |

252.    The misstatements in the table above were material to the financial statements, for the reasons discussed below.

### 4.    The Misstatements Described Above Were Material to Apogee's Financial Statements

253.    SEC Staff Accounting Bulletin No. 99, Materiality ("SAB 99") sets forth the generally accepted methods to evaluate materiality as it relates to the financial statements of SEC registrants.  SAB 99 specifies numerous factors that indicate Apogee's accounting and disclosure violations, as described above, were material to Apogee's financial statements. SAB 99 states that: "The omission . . . of an item in a financial report is material if, in the

light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion . . . of the item." SAB 99 also states that both "quantitative" and "qualitative" factors must be considered in assessing materiality. Apogee's accounting and disclosure violations surrounding its failure to properly account for EFCO legacy contract cost overruns and losses, as described above, were both quantitatively and qualitatively material.

### a. The Accounting Misstatements Were Quantitatively Material

254. As calculated in the table at ¶251 above, the charges required to recognize the cost overruns and losses when the losses were evident over the three successive quarterly fiscal periods beginning 1Q19 and ending 3Q19, were clearly quantitatively material to Apogee's consolidated financial statements for those periods. In the above table, Consolidated Operating income and EPS would have been materially inflated by 196.8% and 258% (respectively) in just fiscal 1Q19 alone.

255. Additionally, the charges required to recognize the EFCO cost overruns and losses when the losses were evident over the three successive quarterly fiscal periods beginning 1Q19 and ending 3Q19, were also clearly quantitatively material to the Framing Segment operating income disclosures contained in the financial statement footnotes for those periods. For example, as illustrated in the table below, the Company's failure to properly record cost overruns and losses when evident in earlier periods would have overstated Framing Segment operating income by as much as 645.7% in 1Q19 alone.

| Framing Segment Operating Income Misstatements | | | |
|---|---|---|---|
| (In $ thousands) | Q1 2019 (Qtr ended 6/2/2018) | Q2 2019 (Qtr ended 9/1/2018) | Q3 2019 (Qtr ended 12/1/2018) |
| Operating income from operations (as reported) | $12,339 | $18,312 | $12,903 |
| Less known cost overruns and losses recognized when evident | $14,600 | $11,600 | $16,400 |
| Operating income (loss) from operations (as adjusted) | ($2,261) | $6,712 | ($3,497) |
| **Percent overstated** | **645.7%** | **172.8%** | **469.0%** |

### b.    The Accounting Misstatements Were Qualitatively Material

256.    The accounting and disclosure violations described above also met at least the following qualitative materiality criteria listed in SAB 99:

### (1)    The Misstatement Changes a Loss into Income

257.    As noted in the table at ¶255 above, when portions of the costs and losses underlying the $42.6 million charge are taken earlier in FY19 when evident, the necessary adjustment would have changed the separately disclosed Framing Segment's Operating income  into an operating loss for 1Q19 and 3Q19.

### (2)    The Misstatement Concerns a Segment or Other Portion of the Registrant's Business that Has Been Identified as Playing a Significant Role in the Registrant's Operations or Profitability

258.    During the Class Period, Apogee had four primary business segments: Framing, Glass, Services and LSO.  These four segments accounted for approximately 51%, 26%, 16%, and 7% (respectively) of Apogee's net sales in FY18.  As alleged in ¶¶4 and 10, upon joining the Framing Segment following the 2017 acquisition, EFCO substantially increased the size of that segment's revenues.  Due largely to the EFCO acquisition, the

Framing Segment accounted for 51% of Apogee's net sales in FY18, up from approximately 35% in FY17.  The fact Defendants focused closely on EFCO and made numerous public statements about EFCO during the Class Period, further illustrates the significant role EFCO played at Apogee.

**B.    SOX Certifications and Representations Regarding Apogee's Compliance with GAAP**

259.    Apogee's Form 10-K for the fiscal year ended March 3, 2018, filed on April 30, 2018, and remaining in force for the remainder of the Class Period, represented that "the reported financial results of the company prepared in accordance with GAAP," and "[o]ur analysis of operations and financial condition is based on our consolidated financial statements prepared in accordance with U.S. GAAP."

260.    Additionally, Apogee's FY18 10-K and quarterly 10-Qs contained certifications from Apogee's CEO and CFO stating that:  (i) Apogee's report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report"; (ii) Apogee's "financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of [Apogee] as of, and for, the periods presented"; and (iii) "[t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."  Defendants Puishys and Porter issued the foregoing certifications in connection with Apogee's FY18 10-K and its quarterly reports filed on Forms 10-Q covering each of the fiscal quarterly periods from 1Q19 through 3Q19.

261.    The foregoing statements were materially false or misleading when made because, for the reasons alleged above at ¶¶239-258, Apogee's financial statements did not comply with GAAP and did not, in all material respects, fairly represent the financial position of the Company during the periods reported.

## VIII.   ADDITIONAL EVIDENCE OF SCIENTER

262.    The Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading, and knowingly or recklessly substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws.

263.    The Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Apogee, its operations, and its business practices, their control over and/or receipt of the Company's materially misleading misstatements and/or their associations with the Company that made them privy to confidential proprietary information concerning Apogee, were active and culpable participants in the fraudulent scheme alleged herein.  The Individual Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information, which they caused to be disseminated to the investing public.  The ongoing fraud as described herein could not have been perpetrated without the knowledge and/or recklessness and complicity of personnel at the highest level of the Company, including the Individual Defendants.

264.    Defendants Puishys and Porter also undertook the affirmative obligation to obtain knowledge to ensure the Company's disclosures to the market were truthful when

they executed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX").  The

certifications stated that Defendants Puishys and Porter reviewed the Company's Forms 10-

K and Forms 10-Q throughout the Class Period and that they did "not contain any untrue

statement of a material fact or omit to state a material fact necessary to make the statements

made, in light of the circumstances under which such statements were made, not misleading

with respect to the period covered by" that report.

265.    These facts, in conjunction with the additional indicia of scienter detailed

herein, collectively support a strong inference of each Individual Defendant's scienter.

**A.    The Individual Defendants Investigated and Actively
Participated in the EFCO Acquisition**

266.    Defendants' investigation of EFCO's business and operations, as part of

Defendants' due diligence on the EFCO acquisition, provides further evidence of

Defendants' knowledge and scienter.  Defendants Puishys and Porter, among others at

Apogee, participated in an "intense" due diligence process with respect to Apogee's

acquisition of EFCO.

267.    As set forth in the EFCO Agreement, Apogee's due diligence process on the

EFCO transaction included "an independent investigation, examination, analysis and

verification of the business, assets, liabilities, operations and financial condition of [EFCO]."

268.    The EFCO Agreement also stated that Apogee "visit[ed] with [EFCO] and

me[t] with [EFCO]'s representatives to discuss the foregoing matters" set forth in ¶267.

269.    Moreover, the EFCO Agreement stated Apogee "performed the due diligence

[Apogee] deems adequate regarding all matters relating to this Agreement and the

- 101 -

transactions contemplated herein, including those described above" in ¶267. Defendant Puishys signed the EFCO Agreement on behalf of Apogee.

270. Accordingly, Defendants' close involvement in Apogee's due diligence of EFCO provides additional evidence that Defendants knew, or recklessly ignored, that their statements and omission of fact made during the Class Period, detailed in ¶¶98-225 and 236-261, were materially false and misleading.

### B. Defendants' Own Statements Support Scienter

#### 1. Defendants Admitted to Employing "4 Levels of Visibility"

271. Defendants' scienter is also supported by their own statements repeatedly touting the "4 levels of visibility" into Apogee's business and external metrics, which it explained as "critical" to the Company's financial forecast. *See* ¶194.

272. Specifically, Defendant Puishys described the "4 levels of visibility," as follows during the December 20, 2018 conference call (*see* ¶222):

> ***I've often said, we have 4 levels of visibility. The most concrete is our book backlog, which is where we have a purchase order, a contractual commitment to deliver goods and services***, hence the $900 million of the work that will go into revenue, and in my entire 7-plus years here, I've never seen in – within a fiscal year, us have work come out of backlog. I think we've had a project come out and come back in kind of a deal, but it's very rare. That's great visibility. ***Our second level is work we've been awarded that's about to enter backlog that's in contract negotiations with our legal teams. And then that's pretty solid, and beyond that, we have work that, we believe, we've been verbally awarded or we believe we're the only bidder with the capabilities***. Perhaps we had the architectural spec. So if a project goes forward, we think that's in the wind tunnel for us. And then lastly, the lease concrete is ***work we're bidding with our contractors and for some of our businesses to glaziers***. And the pipeline of the amount of work that's in that last category is in the billions, and it's substantial. Some projects have a very low probability of being won, some have a very high. ***We look at all of that***

***when we give our comments about the long-term health of what we're seeing***.

273.    According to Defendants, it was this "visibility" that gave them confidence in the Company's reported Class Period outlook and beyond. *See*, *e.g.*, ¶¶49-58, 121-122, 152, 156, 158, 168, 171, 178, 185, 187, 194, 195, 222 and 223.

274.    Defendants also acknowledged visibility into the Company's key metrics, such as order patterns, margins, and backlog, and assured investors that they were actively reviewing and monitoring these metrics both daily and weekly. For example:

- Defendant Puishys, September 19, 2017 conference call: "I've met with the entire sales organization of EFCO and our sales counsel, and we're beginning to see really good improvement in our order patterns, something Jim [Porter] and ***I look at literally every day*** . . . . "

- Defendant Puishys, December 21, 2017 conference call: "***we do have visibility on the margin and work*** that's entered into backlog"

- Defendant Puishys, September 18, 2018 conference call: "These ***growth opportunities are supported by solid bidding and order activity, a robust and increasing backlog and continued favorable outlook for North American commercial construction market***."

- Defendant Puishys, September 18, 2018 conference call: "Obviously, ***I'm monitoring [margin improvement] every week with our business***."

- Defendant Puishys, December 20, 2018 conference call: "Our Glass people have probably ***the longest term visibility*** because they're in the offices of the architects, and so they're dealing with opportunities that may become a bit packaged to general contractors in the future, maybe a hole in the ground in a year or 2.  Maybe revenue for us in 3 years."

275.    Defendants also stated on many occasions that they had scrutinized EFCO's projects that Apogee had acquired in the 2017 transaction, including the costs of EFCO legacy projects.  For example, as alleged in ¶135, on August 23, 2017, Defendant Puishys stated "[w]e've got our arms" around the "higher costs on" EFCO's projects.  As alleged in

¶167, on December 21, 2017, Defendant Puishys stated Apogee's "very qualified large project team [in the Services Segment] has in effect taken over the reins" on certain EFCO legacy projects.  As alleged in ¶179, Defendant Puishys stated on April 12, 2018 that many "talented people" at Apogee with experience "managing large massive projects for a long time" had analyzed EFCO's legacy projects, the risk of which was "now" reflected in Apogee's guidance.

### 2. Defendants Admitted to Learning of Problems with EFCO's Legacy Projects During Due Diligence

276.   Further supporting scienter are Defendant Puishys' admissions on August 23, 2017 and April 12, 2018 earnings conference calls discussing the current status of the Company's business.

277.   Specifically, on August 23, 2017, the Company announced that it had downgraded Apogee's and EFCO's FY18 guidance, which it attributed to "slightly lower than initially anticipated" EFCO revenues and margins "due to revised cost estimates made post-closing on some projects that EFCO will be delivering in the second half of fiscal 2018."  *See* ¶129.  On the August 23, 2017 call, an analyst sought clarification from Defendant Puishys as to when the "lower book-to-bill ratio" (which the company cited as a primary reason for reducing EFCO's forecasted FY18 results) first began developing.  In response, Defendant Puishys admitted that that these declines first began developing "back in the October [2016] time frame" – in other words, ***before*** the acquisition was announced, let alone closed.  In fact, Defendant Puishys further admitted, "by the time we closed, the pipeline had been weakened and therefore, the bookings in the first couple of months were

very, very soft.  And, frankly, were soft in the months leading up to the final closing of the transaction."  *See* ¶140.

278.   Then, months later, on April 12, 2018, Apogee retracted the FY19 guidance it had previously issued on August 23, 2017 (and had reiterated on both September 19, 2017 and December 21, 2017), attributing the withdrawal primarily to "lower expectations for EFCO" related to some of its legacy projects.  *See* ¶176.  On the earnings conference call the Company held that same day, Defendant Puishys admitted that Defendants had "***learned in due diligence***" of EFCO's problems with its legacy projects, though it attempted to side-step the issue by claiming not to have "realized that the problems were more substantial than we learned in due diligence," until the second half of calendar 2017.  *See* ¶177.

279.   Despite these admissions, Defendants continued to conceal the full extent of the problems associated with the EFCO acquisition.

### 3.   Defendants Admitted to Knowing of Problems in Its Glass Segment

280.   Defendants' scienter is further supported by their admissions regarding the true nature of the Glass Segment's problems revealed for 2Q19.  With regard to the "significant challenges" the Company had faced in "ramping-up production to meet significant demand," Defendant Puishys admitted on the September 18, 2018 conference call that "[t]he main issue was in June, where the avalanche hit," and that the "avalanche of orders" had substantially driven up lead times in the Glass Segment.  *See* ¶208.

281.   These and other statements by Defendants provide additional evidence that Defendants knew, or recklessly ignored, that the misstatements and omissions alleged herein in ¶¶98-225 and 236-261 were materially false and misleading.

C.    **Defendants' Misstatements Concerning the Company's Core Operations Support Scienter**

282.    The known, but undisclosed, adverse facts alleged herein during the Class Period can be imputed to the Individual Defendants who, as high-level executive Company officers (CEO and CFO), knew or recklessly ignored facts related to Apogee's core operations.

283.    As alleged herein, Defendants focused closely on EFCO's operations during the Class Period.  For example, Defendant Puishys stated on May 1, 2017 that EFCO "will report to me directly."  On September 19, 2017, Defendant Puishys stated it was "good for me to get my hands around [EFCO]," and that Defendants Puishys and Porter examined EFCO's order activity "literally every day."  The importance of EFCO to Apogee's core business operations was further evidenced by the Individual Defendants' numerous public statements about EFCO throughout the Class Period, as detailed herein.

284.    Indeed, EFCO's significance to Apogee's operations is highlighted by the Company's disclosed business strategy to "'accelerate our product and geographic growth strategies'" through the EFCO acquisition. For example, on August 23, 2017, Defendant Puishys said:

> "EFCO is a great acquisition with significant long-term potential. With a concentration in mid-size to smaller commercial construction projects, EFCO supports our efforts to diversify future revenue streams. At the same time, it complements and accelerates our strategies to grow through new products and new geographies . . . ."

285.    Notably, EFCO, acquired in the second quarter of fiscal 2018, contributed net sales of $203.7 million in fiscal 2018, or approximately 70 percent of the total Framing Segment's year-over-year growth.  In FY18, due largely to the EFCO acquisition, the

Framing Segment accounted for 51% of Apogee's net sales, up from approximately 35% of Apogee's total net sales in FY17.

## IX.   CLASS ACTION ALLEGATIONS

286.   Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the Class.  The Class is defined as:

> All persons or entities who purchased or otherwise acquired Apogee common stock between May 1, 2017 and April 10, 2019, and who were damaged thereby.

287.   Excluded from the Class are Defendants herein, members of the immediate families of each of the Defendants, any person, firm, trust, corporation, officer, director, or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any Defendant, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

288.   The members of the Class are so numerous that joinder of all members is impracticable.  Apogee securities were extensively traded during the Class Period.  As of January 9, 2019, Apogee had approximately 27,175,800 shares of common stock issued and outstanding that were actively traded on the NASDAQ.  The precise number of Class members is unknown to Lead Plaintiffs at this time.  In addition, the names and addresses of the Class members can be ascertained from the books and records of Apogee or its transfer agent.  Notice can be provided to such record owners by a combination of published notice and first-class mail, using techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

289.   Lead Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class.  Lead Plaintiffs have retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection and intend to prosecute this action vigorously.

290.   Lead Plaintiffs' claims are typical of the claims of the other members of the Class because Lead Plaintiffs' and all the Class members' damages arise from and were caused by the same false and misleading representations and omissions made by or chargeable to Defendants.  Lead Plaintiffs do not have any interests antagonistic to, or in conflict with, the Class.

291.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members to seek redress for the wrongful conduct alleged.  Lead Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

292.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)   whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)   whether statements made by Defendants during the Class Period misrepresented and/or omitted material facts about Apogee and its business;

(c)     whether the price of Apogee securities was artificially inflated during the Class Period; and

(d)     the extent of injuries sustained by members of the Class and the appropriate measure of damages.

## X.     LOSS CAUSATION

293.    The market for Apogee's common stock was open, well-developed and efficient at all relevant times. During the Class Period, Apogee's common stock traded at artificially inflated prices as a direct result of Defendants' materially misleading statements and omissions of material fact, which were widely disseminated to the securities market, investment analysts, and the investing public.

294.    When the relevant truth became known and/or the materialization of the risk that had been concealed by Defendants occurred, the price of Apogee's common stock declined immediately and precipitously as the artificial inflation was removed from the market price of the stock, causing substantial damage to Plaintiffs and the Class.

295.    As detailed herein, Defendants made false and misleading statements and engaged in a scheme that artificially inflated Apogee's stock price by concealing and misrepresenting the true nature of Apogee's business operations, including problems that existed during the Class Period concerning EFCO and Apogee's Glass Segment.  These false and misleading statements and omissions had the effect of preventing the market from learning the full truth and keeping the Company's stock price artificially inflated.

296.    As this information and its impact on Apogee's operations and financial results entered the market through a series of partial disclosures set forth below, the price of Apogee

stock significantly dropped, as the artificial inflation came out of the price over time. As a result of their purchases of Apogee stock during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

### A.    August 23, 2017 Disclosure

297.    Information concerning problems with EFCO began to emerge on August 23, 2017, when, before the start of trading on the NASDAQ, Apogee issued a press release providing an update on Apogee's and EFCO's FY18 guidance, as detailed in ¶¶128-132. Apogee also hosted a conference call at 8:00 a.m., Central Time on August 23, 2017, during which Defendants discussed the update on Apogee's and EFCO's FY18 guidance.  In these statements, Defendants disclosed certain previously concealed information concerning problems at EFCO, and that Apogee was revising downward Apogee's and EFCO's FY18 guidance previously issued to the market.

298.    As a result of the information revealed to the market on August 23, 2017, Apogee's stock dropped approximately 12.76% ($6.00), falling from a close of $47.01 per share on August 22, 2017, to a close of $41.01 on August 23, 2017, on unusually high trading volume of over 2.3 million shares.  The market's negative reaction to the Company's August 23, 2017 revelations is demonstrated in the following stock chart:



299.    The decline in the Company's stock price by approximately 12.76% on August 23, 2017 was the direct result of the nature and extent of the revelations made to the market regarding problems at EFCO that had been concealed or misrepresented by Defendants.  The drop would have been more substantial had Defendants disclosed the true extent of the financial and operational issues facing EFCO and Apogee.  Apogee's stock price remained artificially inflated following August 23, 2017 because Defendants continued to conceal the full impact of their fraudulent scheme from investors.

300.    The timing and magnitude of the Company's stock price decline on August 23, 2017 negated any inference that the losses suffered by Plaintiffs were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.  In its 2018 Form 10-K, Apogee identifies the S&P SmallCap 600 Index, and the Russell 2000 Index, as comparative market/industry indices.

As illustrated by the chart below, the S&P SmallCap 600 Index was nearly flat on August 23, 2017, down only 0.3% from the prior day's close, while the Russell 2000 Index was down only 0.13% against the prior day's close:



**B.    April 12, 2018 Disclosure**

301.    Additional news regarding the problems with EFCO was revealed to investors before the NASDAQ opened on April 12, 2018, when, as detailed in ¶¶170-173, Apogee issued a press release providing Apogee's fiscal results for 4Q18 and FY18, and additional information on the financial and operational issues facing EFCO and Apogee.  Apogee also hosted a conference call at 8:00 a.m., Central Time on April 12, 2018, during which Defendants discussed Apogee's fiscal results for 4Q18 and FY18, as well as the financial and operational issues facing EFCO and Apogee.

302.    As a result of the information released to the market, Apogee's stock dropped approximately 8.86% ($3.76), falling from a close of $42.46 per share on April 11, 2018, to a

close of $38.70 per share on April 12, 2018, on unusually high trading volume of more than

3 million shares.   The market's negative reaction to the Company's April 12, 2018

revelations is demonstrated in the following stock chart:



303.   The decline in the Company's stock price by approximately 8.86% on April

12, 2018 was the direct result of the nature and extent of the revelations made to the market

regarding the financial and operational problems facing EFCO and Apogee that had been

concealed or misrepresented by Defendants.   The drop would have been more substantial had

Defendants disclosed the true extent of the financial and operational issues facing EFCO and

Apogee.   Apogee's stock price remained inflated following April 12, 2018 because

Defendants continued to conceal the full impact of their fraudulent scheme from investors.

304.   The timing and magnitude of the Company's stock price decline on April 12,

2018 negated any inference that the losses suffered by Plaintiffs were caused by changed

market conditions, macroeconomic or industry factors, or Company-specific facts unrelated

to Defendants' fraudulent conduct.  As illustrated by the chart below, the S&P SmallCap 600

Index was up 0.54% on April 12, 2018, versus the prior day's close, while the Russell 2000

Index was also up 0.69% compared to the prior day's close:



### C.    September 18, 2018 Disclosure

305.    Information concerning problems in the Glass Segment was revealed to

investors when, before the NASDAQ opened on September 18, 2018, as detailed in ¶¶202-

205, Apogee issued a press release providing an update on Apogee's and the Glass

Segment's 2Q18 results and Apogee's FY19 guidance.  Apogee also hosted a conference call

at 8:00 a.m., Central Time on September 18, 2018, during which Defendants discussed the

update on Apogee's and the Glass Segment's 2Q18 results and Apogee's FY19 guidance.  In

these statements, Defendants disclosed previously concealed information concerning the

Glass Segment, and that Apogee was revising downward Apogee's FY19 guidance as a

result of the problems in the Glass Segment.

306.    As a result of the information revealed to the market, Apogee's stock dropped approximately 11.90% ($5.94), falling from a close of $48.22 per share on September 17, 2018, to a close of $42.48 on September 18, 2018, on unusually high trading volume of over 1.8 million shares.  The market's negative reaction to the Company's September 18, 2018 revelations is demonstrated in the following stock chart:



307.    The decline in the Company's stock price by approximately 11.90% on September 18, 2018 was the direct result of the nature and extent of the revelations made to the market regarding the financial and operational problems facing Apogee that had been concealed or misrepresented by Defendants.

308.    The timing and magnitude of Apogee's stock price decline on September 18, 2018 negated any inference that the losses suffered by Plaintiffs were caused by changed

market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.  As illustrated by the chart below, the S&P SmallCap 600 Index was up 0.26% on September 18, 2018, versus the prior day's close, while the Russell 2000 Index was up 0.44% compared to the prior day's close:



### D.     December 20, 2018 Disclosure

309.    Additional news regarding the problems with EFCO was revealed to investors the morning of December 20, 2018, when, as detailed in ¶¶219-220, Apogee hosted a conference call at 8:00 a.m., Central Time, during which Defendants discussed Apogee's fiscal results for 3Q19, as well as the financial and operational issues facing EFCO and Apogee.

310.    As a result of the information released to the market, Apogee's stock dropped approximately 13.27% ($4.09), falling from a close of $30.82 per share on December 19,

2018, to a close of $26.73 per share on December 20, 2018, on unusually high trading volume of more than 1.06 million shares.  The market's negative reaction to the Company's December 20, 2018 news is demonstrated in the following stock chart:



**Apogee Enterprises, Inc.**
Stock Price & Trading Volume
December 18-20, 2018

311.   The decline in the Company's stock price by approximately 13.27% on December 20, 2018 was the direct result of the nature and extent of the revelations made to the market regarding the financial and operational problems facing EFCO and Apogee that had been concealed or misrepresented by Defendants.  The drop would have been more substantial had Defendants disclosed the true extent of the financial and operational issues facing EFCO and Apogee.  Apogee's stock price remained inflated following December 20, 2018 because Defendants continued to conceal the full impact of their fraudulent scheme from investors.

312.    The timing and magnitude of the Company's stock price decline on December

20, 2018 negated any inference that the losses suffered by Plaintiffs were caused by changed

market conditions, macroeconomic or industry factors, or Company-specific facts unrelated

to Defendants' fraudulent conduct.  As illustrated by the chart below, the S&P SmallCap 600

Index was down 1.45% on April 12, 2018, versus the prior day's close, while the Russell

2000 Index was also down 1.71% compared to the prior day's close:



### E.    April 11, 2019 Disclosure

313.    Additional information regarding the problems with EFCO and charges

Apogee was taking on EFCO's legacy projects was revealed to investors before the

NASDAQ opened on April 11, 2019, when, as detailed in ¶¶226-229, Apogee issued a press

release containing certain of Apogee's results for 4Q19 and FY19, as well as information

concerning certain charges Apogee was taking with regard to EFCO. Apogee also hosted a

conference call at 8:00 a.m., Central Time on April 12, 2018, during which Defendants

discussed Apogee's results for 4Q19 and FY19, as well as certain charges Apogee was taking with regard to EFCO.

314.    As a result of the information released to the market on April 11, 2019, Apogee's stock dropped approximately 6.25% ($2.43), falling from a close of $38.83 per share on April 10, 2019, to a close of $36.40 per share on April 11, 2019, on unusually high trading volume of more than 1.44 million shares.  The market's negative reaction to the Company's April 11, 2019 revelations is demonstrated in the following stock chart:



315.    The decline in the Company's stock price by approximately 6.25% on April 11, 2019 was the direct result of the nature and extent of the revelations made to the market regarding the financial and operational problems facing EFCO and Apogee that had been concealed or misrepresented by Defendants.

316.    The timing and magnitude of the Company's stock price decline on April 11, 2019 negated any inference that the losses suffered by Plaintiffs were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.  As illustrated by the chart below, the S&P SmallCap 600 Index was down 0.17% on April 11, 2019, versus the prior day's close, while the Russell 2000 Index was down 0.15% compared to the prior day's close:



## XI.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

317.    A Class-wide presumption of reliance is appropriate in this action under the fraud-on-the-market doctrine.  As a result of Defendants' materially false and misleading statements, the Company's publicly traded securities traded at artificially inflated prices during the Class Period on a market that was open, well-developed, and efficient at all times. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's

publicly traded securities relying upon the integrity of the market price of those securities and the market information relating to Apogee, and have been damaged thereby.

318.   At all relevant times, the market for the Company's securities was an efficient market for the following reasons, among others:

(a)   The Company's stock met the requirements for listing and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)   As a regulated issuer, Apogee regularly made public filings with the SEC, including SEC Forms 8-K, 10-Q, and 10-K, and related press releases;

(c)   Apogee regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, and other similar reporting services;

(d)   Apogee was followed by several securities analysts employed by major brokerage firms, such as Goldman Sachs Group Inc., Craig-Hallum Capital Group LLC, D.A. Davidson & Co., and CJS Securities, Inc., among others, who authored research reports that were distributed to the brokerage firms' sales force and the public at large, and/or issued trading recommendations and advice with respect to Apogee's stock.   These reports, recommendations, and advice were publicly available and entered the public marketplace; and

(e)    The market for the Company's securities promptly digested current information regarding Apogee and reflected such information in the price of the Company's common stock.

319.    Under these circumstances, all purchasers of the Company's securities during the Class Period suffered similar injury through their purchase of the Company's securities at artificially inflated prices.

320.    At the times they purchased or otherwise acquired the Company's securities, Plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not reasonably have discovered those facts.

## COUNT I

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder (Against All Defendants)

321.    Lead Plaintiffs incorporate ¶¶1-320 as though fully set forth herein.

322.    This claim is brought against Defendants Apogee, Puishys and Porter.

323.    During the Class Period, the Defendants named herein disseminated or approved the materially false and misleading statements specified above, which they knew or recklessly disregarded were misleading in that they misrepresented and/or omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

324.    Defendants violated §10(b) of the 1934 Act, 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5, in that they:

(a)    employed devices, schemes and artifices to defraud;

- 122 -

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices and a course of business that operated as a fraud or deceit upon the purchasers and/or acquirers of Apogee common stock.

325.    Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Apogee securities.  Lead Plaintiffs and the Class would not have purchased and/or acquired Apogee securities at the prices they paid, or at all, if they had been aware that the prices at which those Apogee securities were trading or offered had been inflated by Defendants' misleading statements and/or omissions.

326.    As a direct and proximate cause of Defendants' wrongful conduct, Lead Plaintiffs and other members of the Class suffered damages in connection with their purchases and/or acquisition of Apogee securities during the Class Period.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### (Against Defendants Puishys and Porter)

327.    Plaintiffs repeat and reallege the allegations set forth above in ¶¶1-320 though fully set forth herein.  This claim is asserted against the Individual Defendants.

328.    The Individual Defendants acted as controlling persons of Apogee within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in, and/or awareness of, the Company's operations, and/or intimate knowledge of the Company's fraudulent practices and the

- 123 -

Company's actual results and future prospects, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. The Individual Defendants were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

329.    In addition, the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein and exercised the same.

330.    As set forth above, Apogee and the Individual Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their controlling positions, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's publicly-traded common stock during the Class Period, as evidenced by the stock price declines discussed above, when the artificial inflation was removed from the price of Apogee's stock.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs, on their own behalf and on behalf of the Class, pray for relief and judgement as follows:

A.      Certifying this action as a class action and Lead Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure.

B.      Awarding compensatory damages in favor of Lead Plaintiffs and the Class against all Defendants, jointly and severally, in an amount to be proven at trial, including interest thereon;

C.      Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorney's fees and expert fees; and

D.      Awarding such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Lead Plaintiffs hereby demand a trial by jury.

DATED:  April 26, 2019              ROBBINS GELLER RUDMAN
                                      & DOWD LLP
                                    SPENCER A. BURKHOLZ (*admitted pro hac vice*)
                                    CHRISTOPHER D. STEWART (*admitted pro hac vice*)


                                    _____
                                          s/ SPENCER A. BURKHOLZ
                                         SPENCER A. BURKHOLZ

                                    655 West Broadway, Suite 1900
                                    San Diego, CA  92101
                                    Telephone:  619/231-1058
                                    619/231-7423 (fax)
                                    spenceb@rgrdlaw.com
                                    cstewart@rgrdlaw.com

                                    Lead Counsel for Lead Plaintiffs

ROBBINS GELLER RUDMAN
  & DOWD LLP
SABRINA E. TIRABASSI
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
stirabassi@rgrdlaw.com

Lead Counsel for Lead Plaintiff

ZIMMERMAN REED LLP
CAROLYN G. ANDERSON, MN 275712
BRIAN C. GUDMUNDSON, MN 336695
JUNE P. HOIDAL, MN 033330X
1100 IDS Center, 80 South 8th Street
Minneapolis, MN  55402
Telephone: 612/341-0400
612/341-0844 (fax)
Carolyn.Anderson@zimmreed.com
Brian.Gudmundson@zimmreed.com
June.Hoidal@zimmreed.com

Liaison Counsel for Lead Plaintiffs

CHRISTIANSEN & DEHNER, P.A.
SCOTT R. CHRISTIANSEN
63 Sarasota Center Blvd., Suite 107
Sarasota, FL  34240
Telephone:  941/377-2200
941/377-4848 (fax)
scott@cdpension.com

KLAUSNER, KAUFMAN, JENSEN
  & LEVINSON
ROBERT D. KLAUSNER
7080 NW 4th Street
Plantation, FL  33317
Telephone:  954/916-1202
954/916-1232 (fax)
bob@robertdklausner.com

Additional Counsel for Lead Plaintiffs

## CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

CITY OF CAPE CORAL MUNICIPAL FIREFIGHTERS' RETIREMENT PLAN ("Plaintiff") declares:

1.  Plaintiff has reviewed a complaint and authorized its filing. Plaintiff has authorized the filing of a motion for appointment as lead plaintiff.

2.  Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.  Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.  Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

Security              Transaction              Date              Price Per Share

*See* attached Schedule A.

5.  Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

*Sponn v. Emergent Biosolutions Inc., et al.,* No. 8:16-cv-02625 (D. Md.)

6.  Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this **26** day of April, 2019.

CITY OF CAPE CORAL MUNICIPAL
FIREFIGHTERS' RETIREMENT PLAN

By: _____

Damon Alimonti, Chairman

APOGEE

## SCHEDULE A

### SECURITIES TRANSACTIONS

Stock

| Date Acquired | Amount of Shares Acquired | Price |
|---------------|---------------------------|-------|
| 08/14/2018    | 4,270                     | $49.73 |

| Date Sold   | Amount of Shares Sold | Price |
|-------------|-----------------------|-------|
| 02/04/2019  | 4,270                 | $33.95 |

<u>CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS</u>

CITY OF CAPE CORAL MUNICIPAL POLICE OFFICERS' RETIREMENT PLAN ("Plaintiff") declares:

1. Plaintiff has reviewed a complaint and authorized its filing.  Plaintiff has authorized the filing of a motion for appointment as lead plaintiff.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|---|---|---|---|

*See* attached Schedule A.

5. Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

*Costas v. Ormat Technologies, Inc., et al.*, No. 3:18-cv-00271 (D. Nev.)

6. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 24 day of April, 2019.

CITY OF CAPE CORAL MUNICIPAL
POLICE OFFICERS' RETIREMENT PLAN

By: _____
  Christopher Ellis, Chairman

By: _____
  David Toumey, Secretary

APOGEE

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Stock**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 08/14/2018 | 4,190 | $49.73 |

| Date Sold | Amount of Shares Sold | Price |
|---|---|---|
| 02/04/2019 | 4,190 | $33.95 |

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on April 26, 2019, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ SPENCER A. BURKHOLZ
SPENCER A. BURKHOLZ

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  spenceb@rgrdlaw.com

# Mailing Information for a Case 0:18-cv-03097-NEB-SER Mayer v. Apogee Enterprises, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Carolyn G Anderson**
  carolyn.anderson@zimmreed.com,karen.colt@zimmreed.com

- **Garrett D Blanchfield , Jr**
  g.blanchfield@rwblawfirm.com,k.schulte@rwblawfirm.com

- **Spencer A. Burkholz**
  spenceb@rgrdlaw.com

- **Brian C Gudmundson**
  brian.gudmundson@zimmreed.com,heidi.cuppy@zimmreed.com,leslie.harms@zimmreed.com

- **June Pineda Hoidal**
  june.hoidal@zimmreed.com,julianne.vannorman@zimmreed.com

- **Kirsten E Schubert**
  schubert.kirsten@dorsey.com,hilgers.sheri@dorsey.com

- **Christopher Dennis Stewart**
  cstewart@rgrdlaw.com

- **Thomas P Swigert**
  swigert.tom@dorsey.com,zmuda.tiffany@dorsey.com

- **Vanessa J Szalapski**
  szalapski.vanessa@dorsey.com,breymeier.dianna@dorsey.com

- **Sabrina E Tirabassi**
  stirabassi@rgrdlaw.com

- **Roberta A Yard**
  r.yard@rwblawfirm.com,k.schulte@rwblawfirm.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)