# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

|  |  |
|---|---|
| IN RE APOGEE ENTERPRISES, INC. SECURITIES LITIGATION | Case No. 18-CV-3097 (NEB/BRT)<br><br>ORDER ON DEFENDANTS' MOTION TO DISMISS |

---

Defendant Apogee Enterprises, Inc. acquired EFCO Corporation in 2017. Over the next two years, Apogee periodically disclosed challenges it was having with the business it inherited from EFCO. In April 2019, Apogee announced that it would take a $45.7 million charge, due in large part to the problems with EFCO. The plaintiffs, who were shareholders in Apogee, filed this putative class action asserting that Apogee and two of its executive officers (together, "Defendants") committed securities fraud. The shareholders allege that Defendants repeatedly misrepresented the status and nature of Apogee's business during the class period, primarily by hiding the extent of the problems with the ECFO business. Defendants moved to dismiss the Amended Complaint for failure to state a claim under the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u–4. For the reasons that follow, the Court grants the motion to dismiss.

## BACKGROUND

### I.     Procedural History

The original complaint in this case was filed in November 2018 as a putative class action for violations of federal securities laws. [ECF No. 1.] In February 2019, the City of

1

Cape Coral Municipal Firefighters' Retirement Plan and the City of Cape Coral Municipal Police Officers' Retirement Plan were appointed as lead plaintiffs. [ECF No. 21.]

The Amended Complaint ("Complaint") was filed in April 2019. [ECF No. 28 ("AC").] It alleges a class period between May 1, 2017 (approximately the time Apogee announced it was purchasing EFCO) and April 10, 2019 (the day before the announcement of the $45.7 million charge). It includes excerpts from public statements made by Apogee on May 1, June 12, June 22, July 12, August 23, and September 19, 2017, as well as April 12, June 28, July 12, September 18, and December 20, 2018, with the full final disclosure on April 11, 2019, when Apogee took the $45.7 million charge. In broad strokes, the Complaint alleges that during its due diligence of EFCO, Apogee realized that EFCO "suffered from significant problems," but failed to disclose those problems to investors, instead engaging in a scheme to conceal their full extent. (AC ¶¶ 4–5.) Plaintiffs bring claims for securities fraud under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder, and claims against the Individual Defendants for violations of Section 20(a) of the Exchange Act. 15 U.S.C. § 78j(b), 17 C.F.R. § 240.10b–5, 15 U.S.C. § 78t(a).

The difficulty in reciting the facts alleged in the Complaint illustrates one of its central legal problems; it seems Plaintiffs have included almost every public statement made by Apogee in the class period as violative of the Exchange Act. Nonetheless, the Court below sets forth the events from the class period alleged in the Complaint—which

it takes as true for purposes of ruling on the motion to dismiss—regarding Apogee's business, the EFCO acquisition, and Defendants' public statements.

## II. Apogee

Apogee is a Minnesota publicly traded corporation that designs and develops glass and metal products such as storefront entrances, window, and wall products, as well as architectural glass products. (AC ¶¶ 2, 31.) Defendant Joseph F. Puishys is the Chief Executive Officer and President of Apogee; defendant James S. Porter is its Chief Financial Officer and Executive Vice President (together, "Individual Defendants"). (*Id.* ¶¶ 32–33.) Apogee's business operates in four segments; the two relevant here are Architectural Framing and Architectural Glass.

Throughout the class period, Apogee made several disclosures to investors. When doing so, Apogee referred to "4 levels of visibility" into its project pipeline, which included: (1) Apogee's order "backlog" (*e.g.*, signed contracts and firm orders); (2) its project commitments (*e.g.*, work awarded, contract negotiations, soon to be on the backlog); (3) projects verbally awarded or committed to Apogee; and (4) bidding activity not yet awarded or committed. (*Id.* ¶¶ 49–59, 222, 272.)[1] Defendants claimed to monitor these four areas closely.

---

[1] Except where otherwise noted, the Court has removed emphases from quotations of the Amended Complaint.

### III. EFCO Acquisition

In April 2017, Apogee entered into a stock purchase agreement to purchase EFCO from Pella Corporation. (AC ¶ 64.) EFCO produces architectural aluminum window, curtainwall, storefront and entrance systems for small and mid-size commercial construction projects. (*Id*. ¶ 9.) Before the acquisition, the Individual Defendants participated in Apogee's due diligence of EFCO. (*Id*. ¶ 62.) The Complaint describes the due diligence as "an independent investigation, examination, analysis and verification of the business, assets, liabilities, operations and financial condition," including visits with EFCO and meetings with EFCO representatives.[2] (*Id*. ¶¶ 65–66, *see also* ¶¶ 267–68 (same).) Defendants also "analyzed the projects and work at EFCO business to determine which

---

[2] Apogee's April 28, 2018 Form 10K notes:

> While we have a disciplined approach to assessing potential acquisition targets, *conducting due diligence activities*, and negotiating appropriate acquisition terms, there are risks inherent in completing acquisitions, including:
> - diversion of management's attention from existing business activities;
>   . . .
> - adverse impact on overall profitability if the acquired business does not achieve the return on investment projected at the time of acquisition; and
> - inaccurate assessment of additional post-acquisition capital investments, undisclosed, contingent or other liabilities, problems executing backlog of material supply or installation projects underway at time of acquisition, unanticipated costs, and an inability to recover or manage such liabilities and costs.
>
> If one or more of these risks arises in a material manner, our operating results could be negatively impacted.

[ECF No. 37-1 at 9–10 (emphasis added).]

of EFCO's work would fit into Apogee's classification of 'backlog'" after the acquisition. (*Id*. ¶ 68.)

The Complaint hinges on allegations that during this due diligence process, Defendants learned of multiple problems with EFCO that they concealed during the class period. (*Id*. ¶¶ 62, 70.) One problem was the weakening of EFCO's order activity in the months leading up to the class period, due to rumors of the potential sale. (*Id*. ¶¶ 71–72.) Plaintiffs claim that "Defendants knew or should have known this significant weakening in EFCO's sales pipeline would adversely affect EFCO's and Apogee's future revenue and operating results" following the acquisition. (*Id*.¶¶ 72, 109(e), 141.)

Another problem was EFCO's underestimation of the costs of certain large construction projects that Apogee acquired in the EFCO transaction, which Apogee called "legacy projects." (*Id*. ¶¶ 73–75.) Before the acquisition, "Pella attempted to expand EFCO's reach into the large construction project market by contracting [for] certain large projects . . . for which EFCO had significantly underestimated the actual costs necessary to complete those projects."[3] (*Id*.) Plaintiffs maintain that Defendants admitted to "learn[ing] in due diligence" of problems with EFCO's legacy projects.

---

[3] The only legacy project identified in the Complaint is the $70 million Vista Tower project, which began construction in August 2016. (AC ¶ 74.) In May 2018 (nearly one year after Apogee acquired EFCO), EFCO's then-president explained that EFCO had won the Vista Tower project under a Pella strategy to break out of their core competencies in mid-sized construction, and that EFCO had no experience in that large curtainwall projects market. (*Id*.) "EFCO did not fully understand the complexities of the [Vista Tower] project when it took it on, and therefore underbid it." (*Id*.)

## IV. Defendants' Statements during the Class Period

### A. May—July 2017: Purchase of EFCO

On May 1, 2017, Apogee announced the agreement to purchase EFCO for approximately $195 million. (AC ¶¶ 60, 98.) In a conference call for analysts and investors, Porter represented that Defendants "expect . . . at least $100 million in backlog" from EFCO's business. (*Id*. ¶ 68.) Puishys explained that "Apogee expects EFCO to add $200 million to 225 million" to revenue, and that they "expect the operating margins of EFCO to be approximately mid-single-digit" in fiscal year 2018 ("FY18").[4] (*Id*. ¶¶ 105–08.) Plaintiffs maintain that Defendants also made false and misleading statements lauding the benefits of the EFCO acquisition. (*See id*. ¶ 109.)

On June 12, 2017, Apogee announced that it had officially acquired 100 percent of EFCO stock, and that the acquisition would add $200–220 million to Apogee's revenues. (*Id.* ¶¶ 78, 111–12.) The June 12 press release reported that Puishys "see[s] significant margin enhancement opportunities as we leverage Apogee's scale and build on initiatives already being implemented by EFCO's strong management team." (*Id*. ¶ 113.)

On June 22, 2017, Apogee announced its financial results for the first quarter of 2018, stating that EFCO's annual revenues were more than $250 million, and that "end markets remain strong based on visibility from our businesses and external metrics, giving us confidence in [FY18] and beyond." (*Id*. ¶¶ 115–16; *see also id*. ¶ 121 (same).)

---

[4] Apogee's fiscal year ends on the Saturday closest to the last day of February. (AC ¶ 48.)

During an analyst call, Puishys noted that "[w]ith our visibility, we feel very good about multiyear growth." (*Id*. ¶ 121.) Similarly, Porter stated that Apogee's FY18 outlook is "based on our performance trends and the visibility we have in our market," and that "[w]e feel good that our internal visibility and backlog, awards and bidding, combined with the external market metrics, support our outlook for sustained growth." (*Id*. ¶ 122.)

On July 12, 2017, Apogee reiterated its guidance for the June 22 consolidated results. (*Id*. ¶¶ 125–26.)

### B. August 23, 2017: Defendants lower EFCO's anticipated revenue and operating margin; stock falls

On August 23, 2017, Defendants downgraded EFCO's FY18 revenue and operating margin guidance and Apogee's consolidated guidance. (AC ¶¶ 80, 128–33.) Apogee reduced EFCO's FY18 revenue from $200–220 million to $200 million. (*Id*. ¶¶ 81, 129, 134.) Apogee stated that EFCO revenues and margins would be "slightly lower than initially anticipated" "due to revised cost estimates" on some EFCO projects. (*Id*. ¶ 129.) During an analyst call, Puishys also attributed this reduction to "market distraction and disruption" related to Apogee's acquisition of EFCO and claimed to have seen orders return to normalized rates. (*Id*. ¶¶ 81, 134.) Puishys explained that when the sale process of EFCO became public in the fourth quarter of 2016,

> [w]e certainly saw distraction from the [EFCO] management team and the due diligence process was intense for the management team. It turned into some pause in the ordering process from customers. So by the time we closed, the pipeline had been weakened and therefore, the bookings in the first couple of months were very, very soft. And frankly, were soft in the

months leading up to the final closing of the transaction. This shouldn't be a surprise in the real world when a company is being sold.

(*Id.* ¶ 140.) Porter stated that "period where we saw the most disruption" was a "couple of months before we actually announced the signing of the transaction." (*Id.* ¶ 141.)

Also in August, Apogee reduced EFCO's FY18 operating margin outlook from mid-single-digits down to 2–3% based on "unexpected project costs" on some of EFCO's legacy projects. (*Id.* ¶¶ 82, 129 (same), 135 (same), 137 (same).) During the analyst call, Puishys described EFCO's "cost estimating on some of the larger projects" as "the biggest issue," (*id.* ¶ 140), explaining that "[a]s we got into the business, we identified a discrete number of projects where the resources required to successfully execute the projects were underestimated. We've got our arms around this . . . ." (*Id.* ¶ 135, 137.) Puishys expected to "see a little bit of a step improvement" in fiscal year 2019 ("FY19"), and anticipated that the legacy projects would "start[] to wind down" with "a couple of projects" carrying through FY19, but becoming a declining piece of the business. (*Id.* ¶¶ 137, 139.)

On the same call, Puishys stated that "[w]e feel especially good about Apogee's top and bottom line prospects for growth in [FY19], and we expect double-digit revenue growth and triple-digit operating margin improvement for [FY19]" based on its order pipeline, bidding, and backlog booked for FY19. (*Id.* ¶ 147; *see id.* ¶¶ 84 (same), 132 (same).) That day, Apogee stock dropped 12.76% to $41.01. (*Id.* ¶ 143.)

### C. September 19, 2017: Apogee maintains FY18 guidance: "[T]he trend has been very good."

On September 19, 2017, Apogee announced second quarter 2018 results and maintained the FY18 and FY19 guidance. (AC ¶¶ 84, 150–55.) During a call for analysts, Puishys noted that "[o]ur backlog and pipeline give us solid visibility to [FY19] and beyond . . . . We feel good that our internal visibility from backlog, awards and bidding, combined with external market metrics, support our outlook for sustained growth." (*Id.* ¶ 156.) In response to a question about EFCO's pipeline of orders, Puishys explained that "from October of last year until June, when the sale was announced," EFCO's sales organization did not know where EFCO was going to end up, and "[t]hat distraction took its toll. We certainly were aware of that." (*Id.* ¶ 157.) He noted that "we're beginning to see really good improvement in our order patterns, something [Porter] and I look at literally every day, and [the] trend has been very good." (*Id.*)

### D. December 21, 2017: Apogee lowers FY18 guidance due to slower second half for Glass segment

On December 21, 2017, Apogee announced its third quarter 2018 results, including that it was lowering its FY18 guidance due to a slower second half for its Glass segment, higher health care costs, and competitive pressures in Glass segment. (AC ¶¶ 161–62, 165.) Defendants stated that EFCO was "off to a great start," and that they "continue[d] to anticipate double-digit organic revenue growth and triple-digit basis point improvement in operating margin" in FY19. (*Id.* ¶¶ 16, 84, 163, 167.)

### E. April 12, 2018: Apogee discloses 4Q18 and FY19 results; stock falls

On April 12, 2018, Apogee announced its fourth quarter 2018 and FY19 results. (AC ¶¶ 87, 170.) Apogee disclosed that: (1) it was "approximately 18 months behind and starting from a lower point in our EFCO [operating] margin improvement process," impacting Apogee's margins in FY18 and FY19; (2) EFCO was only expected to "breakeven" in FY19; (3) EFCO's FY18 operating margin was .3% (85–90% lower than the projected 2–3% operating margin); and (4) EFCO operated at a negative 12.9% operating margin in the fourth quarter of 2018, incurring a $5.3 million loss. (*Id*. ¶¶ 16, 87–88, 175–76.) Apogee also withdrew its outlook of a triple-digit basis point improvement for its FY19 operating margin. (*Id*. ¶¶ 89, 171, 176.)

During the April 12 earnings call, an analyst asked for some clarity on why profit expectations were not matching up to original thoughts. (*Id*. ¶ 177.) Puishys responded:

> [P]rimarily the large projects they embarked on a couple of years prior to or during the couple of years before [Pella] divested the company[,] they got out from their skies [*sic*] in areas that they weren't familiar with on large curtainwall projects. *They in hindsight underestimated the cost and execution complexities of that as we've got more involved in the business in the second half of calendar year 2017. We realized that the problems were more substantial than we learned in due diligence* that's our fault.

[ECF No. 37-19 at 11 (emphasis added); *see* AC ¶ 177.] Puishys "fe[lt] we've uncovered all the surprises." (AC ¶ 177.) When asked whether the risk was now appropriately reflected, Puishys responded that he believed so, explaining that Defendants "had more surprises than we wanted . . . . [W]e believe we've now identified everything that we

could with [EFCO]. It was a challenge." (*Id*. ¶ 179.) He further explained that EFCO "got out in front of their skis. We didn't pick up how far out they were. We now know. I believe we are – our [FY19] guidance reflects the full risk that [EFCO] had." (*Id.* ¶ 179.) Apogee's stock price dropped 8.8% to $38.70 that day. (*Id.* ¶ 181.)

### F. *June 28, 2018: Apogee announces 1Q19 results*

On June 28, 2018, Apogee announced its first quarter 2019 results, and raised its FY19 consolidated revenue, operating margin goals and earnings per share ("EPS") based on its Glass segment. (AC ¶¶ 95, 183, 191–95.) During an analyst call, Puishys noted that that the Glass segment and another division within the Framing segment were experiencing significant strength in orders, and that Defendants were "taking steps to manage any potential downside as well." (*Id.* ¶ 185.) Regarding the Glass segment, he stated, "[o]rder activity was very strong, especially toward the end of the quarter" and that he had "confidence that the glass business will grow in the remainder of the year." (*Id.* ¶ 186.) In response to a question about quantifying the increase in backlog in dollar terms, Puishys noted, "the bigger problem we had in [the Glass segment] was trying to hire enough people to make the product." (*Id.* ¶ 189; *see id.* ¶ 190 (alleging "Defendants stated Apogee was . . . 'at full employment'").) Puishys "remind[ed] everyone that our visibility, which is critical to our forecast here," included booked backlog and awards not yet in backlog, which "continue to be very positive." (*Id.* ¶ 194; *see id.* ¶ 195.)

When asked about EFCO, Puishys stated:

[W]e had a couple of projects that were particularly troublesome, one of which is virtually complete; and the second one is exiting the engineering stage, and we now go into full-scale production. So I feel good about both these projects, and believe we are substantially completed through the hurdles . . . . [F]or the most part, the [EFCO] problematic projects are behind us.

(*Id.* ¶ 196.)

On July 12, 2018, Apogee reaffirmed its guidance from June 28, 2018. (*Id.* ¶¶ 199–200.)

### G. September 18, 2018: Apogee announces 2Q19 results; stock falls

On September 18, 2018, Apogee announced its second quarter 2019 results, reporting lower than expected second quarter results and reducing its FY19 guidance. (AC ¶¶ 96–97, 204, 213.) Defendants explained that the Glass segment had faced challenges to meet significant demand in that quarter, including an "avalanche" of orders, difficulty hiring and training new staff, as well as "significantly increased labor costs, lower productivity, and higher cost of quality," and challenges to "ramp-up production to meet the higher than expected, short lead-time customer demand." (*Id.* ¶¶ 96, 203, 205, 208; *see id.* ¶ 210.) During an analyst call, Puishys explained:

We had been talking about the wave was coming. You would think we would have been better prepared, and it's unfortunate that it caught us by surprise, the magnitude, and then it started to snowball . . . . [W]e are working out from under it. We've seen improvement. The main issue [in the Glass segment] was in June, where the avalanche hit . . . . The avalanche of orders have [*sic*] driven up the lead times, and we're fighting to get those back in the next 90 to 120 days.

(*Id.* ¶ 208.)

Regarding EFCO's legacy projects, Puishys confirmed that one project was nearly complete, and the other project will be in production for two years, for which they "expect low margins, but it is expected to be profitable." (*Id*. ¶ 214.) Puishys stated that the second project[5] was "just basically starting," and that "[g]etting to this [production] stage has been a battle. We're not quite there, but we're almost there." *(Id. ¶ 216.)* In response to a question about whether EFCO's profitability would be "slow and steady" or "spike," Puishys maintained that it would be "slow and steady." (*Id*. ¶ 215.) Defendants expected EFCO to be profitable in second half of the year, with slim margins. (*Id*. ¶¶ 213–16.) Apogee's stock fell 11.9% to $42.48 that day. (*Id.* ¶ 217.)

### H. December 20, 2018: Apogee announces Q319 results; stock falls

On December 20, 2018, Apogee announced its third quarter 2019 results and reduced its FY19 guidance "to reflect lower volumes in [the Framing segment] and operational improvement efforts in [the Glass segment] which are now expected to extend into fiscal 2020." (AC ¶¶ 219–21.) During the analyst call, Porter explained that "the [EFCO] business will be a little bit negative in earnings for this fiscal year" based on "lower volumes in the third quarter and visibility we expect it in the fourth quarter." (*Id.* ¶ 223.) Apogee's stock fell 13.29% to $26.73 that day. (*Id.* ¶ 224.)

---

[5] The Amended Complaint indicates that this second project was the Vista Tower project. (AC ¶ 250 n.4 (alleging that crews began installation of the curtainwall on the Vista Tower project in October 2018).)

*I.   April 11, 2019: Apogee announces a $45.7 million pre-tax charge; stock falls*

On April 11, 2019, Apogee announced its fourth quarter 2019 and FY19 results. (*Id.* ¶ 226.) Among other things, it announced $45.7 million in pre-tax charges relating to the EFCO acquisition, including a $42.6 million charge to cover the remaining costs of EFCO's legacy projects and alleviate impact on future financial results. (*Id.* ¶¶ 92, 227–29.) The charges included adjustments for profits recognized during the first three quarters of FY19 on EFCO's legacy projects. (*Id.* ¶ 93, 229; *see id.* ¶ 233.) During the analyst call, Puishys stated,

> as we previously discussed, we also inherited a few legacy projects with the EFCO acquisition that have presented substantial issues. We started the installation on the last and significantly largest of these projects late in calendar year 2018 and made substantial progress towards completion in the fourth quarter. The charges we announced this morning are expected to cover the remaining costs related to these legacy projects, and we expect to be substantially complete on these projects by third quarter of this year.

(*Id.* ¶ 231.) Porter explained that the charges included "an increased estimate of the cost to complete the projects and claims related to project delays and other disputes." (*Id.* ¶¶ 92, 232 (same).) Apogee's stock fell 6.25% to $36.40 that day. (*Id.* ¶ 235.)

**V.   The Complaint**

The Complaint alleges that Defendants made materially false and misleading statements during the class period. It also alleges that Defendants filed materially false and misleading financial statements in violation of Generally Accepted Accounting Principles ("GAAP") and Securities and Exchange Commission ("SEC") regulations by

failing to recognize anticipated EFCO's legacy project cost overruns and losses prior to the fourth quarter of FY19. (*See, e.g.,* AC ¶¶ 250–51.) Count I alleges that Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5, by disseminating or approving materially false and misleading statements which they knew or recklessly disregarded were misleading. Count II alleges that the Individual Defendants violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), because by virtue of their positions of control at Apogee, they influenced and controlled Apogee's decision-making, including the content and dissemination of its allegedly false and misleading statements. The Complaint alleges a putative class of all persons or entities who purchased or acquired Apogee common stock between May 1, 2017 and April 10, 2019 (the "class period"). (AC ¶ 286.)

The Retirement Plans, the lead plaintiffs in this action ("Plaintiffs"), purchased Apogee stock on August 14, 2018, and sold it on February 4, 2019. (AC Exs. at 133, 135.) The Complaint alleges that Plaintiffs acquired Apogee stock at artificially inflated prices during the class period and suffered economic losses when the facts about EFCO's impact on Apogee were disclosed. (AC ¶ 30.)

## ANALYSIS

### I.      Securities Exchange Act §§ 10(b) and 20(a), and Rule 10b–5

Section 10(b) of the Exchange Act and SEC Rule 10b–5 prohibit fraudulent conduct in the sale and purchase of securities. *See* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5. Section

10(b) makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). "Rule 10b–5 implements [Section 10(b)] by making it unlawful to . . . make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." *Rand-Heart of N.Y., Inc. v. Dolan*, 812 F.3d 1172, 1176 (8th Cir. 2016) (citation and quotation marks omitted). Section 20(a) of the Exchange Act imposes secondary liability on every person "who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder . . . ." 15 U.S.C. § 78t(a).

## II.    Pleading Standard for Securities Fraud under Section 10(b) and Rule 10b-5

In a private securities-fraud action, to survive a motion to dismiss, Plaintiffs must plausibly plead a claim to relief under Section 10(b) and Rule 10b–5 when accepting all alleged facts as true. *In re Target Corp. Sec. Litig.*, 275 F. Supp. 3d 1063, 1070 (D. Minn. 2017) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, (2007)). The PSLRA goes beyond the ordinary pleading requirements described in Rules 8(a)(2) and 9(b) of the Federal Rules of Civil Procedure. *In re 2007 Novastar Fin. Inc., Sec. Litig.*, 579 F.3d 878, 882 (8th Cir. 2009). Under the PSLRA's heightened pleading requirements, a complaint must: (1) "specify each false statement or misleading omission and explain

why the omission was misleading;" and (2) "state 'with particularity' facts giving rise to a 'strong inference' that the defendant acted with the scienter required for the cause of action." *In re Navarre Corp. Sec. Litig.*, 299 F.3d 735, 741–42 (8th Cir. 2002) (quoting *Fl. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 654 (8th Cir. 2001)). These two heightened pleading requirements are intended to end the practice of pleading "fraud by hindsight." *Id.* at 742 (citation omitted). As the Eighth Circuit has explained, "[c]orporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonabl[y] available to them." *Id.* at 743 (citation omitted).

Defendants argue that the Complaint fails to allege fraud with particularity and fails to give rise to a strong inference of scienter. In considering these arguments, the Court considers the Complaint in its entirety, as well as documents incorporated into the Complaint by reference, and matters of which a court may take judicial notice.[6] *Tellabs*, 551 U.S. at 323.

### A. *Pleading Misstatements with Particularity*

Under the PSLRA's heightened pleading standard, Plaintiffs must "plead the existence of any facts or further particularities that, if true, demonstrate that the defendants had access to, or knowledge of, information contradicting their public statements when they were made." *Navarre*, 299 F.3d at 742. The "circumstances of the

---

[6] Defendants attached as exhibits to their motion SEC filings, press releases and call transcripts referenced in the Amended Complaint. [*See* ECF Nos. 37, 37-1–37-24.] Plaintiffs did not object to the Court's consideration of these exhibits.

fraud must be stated with particularity, including such matters as the time, place and contents of false representations, . . . [t]his means the who, what, when, where, and how." *Pub. Pension Fund Grp. v. KV Pharm. Co.*, 679 F.3d 972, 980 (8th Cir. 2012) (citing *In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 890 (8th Cir. 2002)). Courts are to disregard "catch-all" or "blanket" assertions not meeting the particularity requirements. *Ferris, Baker Watts, Inc. v. Ernst & Young, LLP*, 395 F.3d 851, 853 (8th Cir. 2005). "[I]f no reasonable investor could conclude public statements, taken together and in context, were misleading, then the issue is appropriately resolved as a matter of law." *K-tel*, 300 F.3d at 897.

Defendants maintain that they are unable to discern from the Complaint which statements are false or misleading. According to Defendants, the Complaint's lengthy quotes from various disclosures amount to an "everything but the kitchen sink" approach to pleading, without any specificity as to which statements are allegedly false. *E.g. Novastar*, 579 F.3d at 882–83 (reproducing, either in their entirety or lengthy excerpts from, press releases, SEC filings, and transcripts of conference calls made by defendants "does not satisfy the PSLRA's requirement of pleading with sufficient particularity because it does not identify 'what' statements were allegedly false or misleading" where plaintiffs gave no indication "as to what specific statements within these communications are alleged to be false or misleading"); *Walsh v. Rigas*, No. 17 CIV. 4089 (NRB), 2019 WL 294798, at *10 (S.D.N.Y. Jan. 23, 2019) (noting that "an 'everything but the kitchen sink' approach to pleading" is not cognizable under Rule 10b–5 or Section 10(b)). The 330-

paragraph, 125-page—and often repetitive—Complaint includes many excerpts from Apogee's press releases, SEC reports, and conference calls with analysts and investors, organized chronologically. Then, for each relevant date, the Complaint includes a paragraph alleging generally that the "statements referenced above . . . were materially false and misleading because they failed to disclose and misrepresented the following adverse facts detailed herein which were known to Defendants or recklessly disregarded by them" as follows. (*See, e.g.*, AC ¶¶ 109, 124, 148, 169, 182, 197, 218.)

In determining whether the Complaint alleges false or misleading statements with particularity, the Court focuses on the statements identified in these paragraphs. To the extent the Complaint includes statements not identified in these paragraphs, the Court finds them to be merely contextual, or "catch-all" or "blanket" assertions not meeting the particularity requirements. *Ferris*, 395 F.3d at 853; *see Target*, 275 F. Supp. 3d at 1071 n.4 ("To the extent that Plaintiffs do not allege or argue why certain statements were false or misleading, the Court finds that Plaintiffs do not meet the PSLRA's standards with respect to those statements or waive the argument that the statements are actionable."). (*See* Pls' Mem. at 14 (acknowledging that any additional statements accompanying identified false statements merely "provide context to explain why the asserted omissions should have been made earlier.").)

Defendants focus on May 1, 2017 (the date Defendants announced the EFCO acquisition) as an example, alleging that the Complaint fails to allege "who, what, when, where and how" the following statements made on that date were fraudulent:

- "We also see significant margin enhancement opportunities as we leverage Apogee's scale, operational excellence expertise and supply chain synergies. . ."

- "We are buying a great asset."[7]

- "[W]e expect EFCO will contribute to Apogee's continued strong performance."

- "EFCO will complement and accelerate Apogee's growth strategies."

- The acquisition of EFCO "supports our growth strategies and provides *more revenue stability*."

- "[W]e are confident we can work with the leadership team to expedite their ongoing margin improvement efforts . . ."

- "[W]e see margin enhancement opportunity for EFCO as we leverage Apogee's scale, operational excellence and lean programs and supply chain synergies to build on initiatives . . ."

- Apogee paid "a fair prize [*sic*]" for EFCO and will "continue to make [Apogee] very, very reliable."

- "Apogee expects EFCO to add *$200 million to $225 million* to our fiscal 2018 revenues depending on the timing of closing. We expect this acquisition to generate cash and be accretive to Apogee's EBITDA and earnings per share this fiscal year, excluding onetime transaction costs. We

---

[7] Defendants' statement that they "are buying a great asset" is classic example of nonactionable puffery. *See In re Stratasys Ltd. S'holder Sec. Litig.*, 864 F.3d 879, 882 (8th Cir. 2017) (holding no reasonable investor would rely on "'soft, puffing statements'—which encompass 'optimistic rhetoric' and 'promotional phrase[s] used to champion the company but [] devoid of any substantive information.'"). Because the Court dismisses the Complaint on other grounds, it need not address Defendants' argument that the Complaint contains other instances of puffery.

expect to generate $10 million to $15 million annual synergies and operational efficiencies by fiscal 2020. *We expect the operating margins of EFCO to be approximately mid-single-digit*."

• "[M]y goal is to see it operate similar to our Framing Systems businesses. It's a very similar business. I think EFCO is in their journey to improve. They are probably where our Apogee Framing Systems business were 3 or 4 years ago. I think they will follow the same trajectory. I certainly hope we can help . . . . *I like their trajectory and where they're taking this business*. And I'm very confident we can help them. It is—[Porter] said, *we do not buy companies that are broken or have a weak management team* or have poorly run factories, we're not that pompous to think we're going to turn something like that around. This is a great company."

• "Our goal is to get back to—to get them up to Apogee's nice double-digit operating margins. *Initially, we're expecting mid-single-digit operating margins* and we believe that does include our estimated amortization. *It may move around a little bit, plus or minus, depending on when that asset comes in*."

• "For calendar '16, they had nice double-digit revenue growth. I didn't give the specifics, but they did have nice enhancements to their operating margins and *they're on plan for double-digit growth again this year and some improvement to their op margins*."

(AC ¶¶ 99, 101–08 (emphasis in original); *see* ECF No. 36 ("Defs' Mem.") at 16–18.) The paragraph explaining why the May 1 statements were misleading (Paragraph 109), refers only generally to preceding Paragraphs 99–108, making it difficult to determine which statements are alleged to be false or misleading.[8] Defendants and the Court are left to

---

[8] Plaintiffs do a better job of identifying alleged misstatements in some other complaint paragraphs by quoting them, rather than merely citing to preceding paragraphs. But, as opined below, these paragraphs fail to explain why the statements are misleading with particularity. (*See, e.g.*, AC ¶ 160(b) ("Defendants' FY19 guidance statements that Apogee expected an overall 'triple-digit operating margin improvement for fiscal 2019,' were materially false and misleading when made because they failed to account for the full risk posed by EFCO's problems with its legacy projects.").)

guess if every statement quoted in the referenced ten paragraphs is alleged to be misleading, or only a part of them.

Plaintiffs' basic argument is that the May 1 statements extolled the benefits of the EFCO acquisition, provided financial guidance and promoted margin enhancement opportunities, and provided investors with assurances that the EFCO acquisition supported Apogee's growth trajectory. (Pls' Mem. at 14–15.) According to Plaintiffs, all the May 1 statements were false or misleading because the EFCO acquisition "really would serve to do anything but." (Pls' Mem. at 15.)

Indeed, the thrust of the Complaint appears to be that Defendants learned in due diligence that EFCO had significant problems, purchased EFCO anyway, then hid those problems from investors. Plaintiffs assert as much in their briefs, stating clearly that Defendants "learned [of EFCO's problems with its legacy projects] in due diligence." (*Id*. at 27, brackets in original). As a citation to this altered quotation, Plaintiffs cite to four paragraphs of the Complaint—13, 75, 177, and 278. All four paragraphs quote Defendants (in bold and italics) as stating they "learned in due diligence" of EFCO's problems with its legacy projects. This quotation is to an April 12, 2018 earnings call, in which an analyst asked for "some greater clarity and color on why . . . profit expectations are not . . . matching up to what was originally thought?" (*Id*. ¶ 177.) In response, Puishys explained that before Pella divested EFCO, it had embarked on large curtainwall projects, an area with which Pella was unfamiliar. (*Id*. ¶ 177.) Pella "in hindsight underestimated the cost

and execution complexities" of these projects. (ECF No. 37-19 at 11; *see* AC ¶ 177.) As Defendants "got more involved in the business in the second half of calendar year 2017," they "realized that the problems were more substantial than [they] learned in due diligence." (ECF No. 37-19 at 11; *see* AC ¶ 177.)

While Plaintiffs insist that Puishys's statement is an admission of Defendants' knowledge of the extent of EFCO's problems with the legacy projects in due diligence, it is not. Rather, Puishys explains that they realized the projects were underbid "in hindsight." As Defendants became more involved with EFCO in the second half of calendar year 2017 (thus, after May 2017), they realized the problems were more substantial than they previously thought. The Complaint fails to allege with particularity any facts indicating that Defendants knew the significance of the problems with EFCO's legacy projects on May 1, 2017. Its reliance on this altered quotation does not convert an allegation of fraud by hindsight into actionable fraud. *See Navarre*, 299 F.3d at 743 ("Simply alleging that defendants made a particular statement at a given time . . . and then showing in hindsight that the statement is false misses the [PSLRA's] pleading requirement.").

The allegedly false or misleading statements made on other dates build the same house of cards as the May 1 allegations. The Complaint alleges that Defendants failed to disclose, or misrepresented, facts known to Defendants or recklessly disregarded by them, because they failed to account for the full risk or impact of EFCO's problems with

its legacy projects and weakened sales pipeline when making the statements. (*See, e.g.*, AC ¶¶ 114 ("full risk"), 124 ("full scope"), 127 ("full impact"), 148 ("actual impact," "full risk"), 160 (same), 169 (same), 182 ("full risk"), 197(g) (same), 218 (same), 225 (same).) "Under the [PSLRA,] the complaint must allege 'facts or further particularities that, if true, demonstrate that the defendants had access to, or knowledge of, information contradicting their public statements when they were made.'" *K-tel*, 300 F.3d at 891 (quoting *Navarre*, 299 F.3d at 742). While the Complaint alleges that Defendants relied on "4 levels of visibility" and other internal metrics, it does not provide specific facts or particularities as to what Defendants knew but failed to disclose at the time the allegedly misleading statements were made. *E.g. Cornelia I. Crowell GST Tr. v. Possis Med., Inc.*, 519 F.3d 778, 782 (8th Cir. 2008) (finding complaint "did not provide the level of detail necessary" to support misrepresentation allegations). Rather, the facts alleged raise an inference that as Defendants learned more about problems, they disclosed them to investors. Because the Complaint fails to allege facts that demonstrate that Defendants had access to, or knowledge of, information contradicting their statements when they were made, it fails to meet the PSLRA's heightened pleading standard.

The Complaint also alleges false or misleading statements regarding Apogee's Glass segment. During the June 28, 2018 press release and call, Defendants discussed the strength and prospects of Apogee's Glass segment, raised its FY19 guidance, and updated the Glass segment's business and operational status. (AC ¶¶ 185–96). On that date,

Defendants indicated that the Glass segment was "experiencing significant strength in orders," and that Defendants were "taking steps to manage any potential downside." (*Id*. ¶ 185.) Defendants stated that "the bigger problem we *had* in [the Glass segment] was trying to hire enough people to make the product." (*Id*. ¶ 189 (emphasis added); *see id*. ¶ 190 (alleging "Defendants stated Apogee was . . . 'at full employment'").) Paragraph 197 alleges that Defendants' statements were misleading because the Glass segment was not prepared to handle the significant strength in orders, (*id*. ¶ 197(a), (b), (c) (citing *id*. ¶¶ 96, 207–10)), and the current workforce was not sufficient to handle the order activity. (*Id*. ¶ 197(d).) During the September 18, 2018 analyst call, Puishys acknowledged that Defendants had anticipated a "wave" coming, and expected to be "better prepared," but that the magnitude caught them by surprise and then "started to snowball." (*Id*. ¶ 208.) "The main issue [in the Glass segment] was in June, where the avalanche hit . . . . The avalanche of orders have [*sic*] driven up the lead times, and we're fighting to get those back in the next 90 to 120 days." (*Id*.) He noted that they were "working out from under it" and had seen improvement. (*Id*.)

Defendants do not address whether their alleged misstatements regarding the Glass segment are pleaded with particularity. (*See* AC ¶ 197.) The Court is not convinced that they do. But even if the alleged misstatements meet the particularity requirement, they fail the scienter requirement, as addressed below, and therefore must be dismissed. *See* 15 U.S.C. § 78u4-(b)(3)(A) ("In any private action arising under this chapter, the court

shall, on the motion of any defendant, dismiss the complaint if the requirements of paragraphs (1) and (2) are not met.").[9]

### B. *Scienter*

Plaintiffs also must sufficiently plead scienter, under a standard well-developed in the Eighth Circuit. Under the PSLRA, a complaint must "state 'with particularity' facts giving rise to a 'strong inference' that the defendant acted with the scienter required for the cause of action." *Ferris*, 395 F.3d at 854 (citations omitted). "Scienter means the intent to deceive, manipulate, or defraud." *Navarre*, 299 F.3d at 741. "Scienter requires a showing of reckless or intentional wrongdoing." *Podraza v. Whiting*, 790 F.3d 828, 836 (8th Cir. 2015) (citation and quotation marks omitted). It can be established in three ways: "(1) from facts demonstrating a mental state embracing an intent to deceive, manipulate or defraud; (2) from conduct which rises to the level of severe recklessness; or (3) from allegations of motive and opportunity." *Id.* (citation omitted). "One 'classic' fact pattern giving rise to a strong inference of scienter is that defendants made statements when they knew or had access to information suggesting these public statements to be materially inaccurate." *Navarre*, 299 F.3d at 746 (citing *Green Tree*, 270 F.3d at 665).

---

[9] Defendants also argue that many Complaint allegations are forward-looking statements protected by the PSLRA and the bespeaks caution doctrine. *See Julianello v. K-V Pharm. Co.*, 791 F.3d 915, 920–21 (8th Cir. 2015) (citing 15 U.S.C. § 78u–5(c)(1)); *McDonald v. Compellent Techs., Inc.*, No. 10-CV-1566 (PJS/SER), 2011 WL 13228408, at *7 (D. Minn. Aug. 3, 2011). Because the Court finds that the Complaint fails to meet the PSLRA requirements for pleading with particularity and scienter, the Court does not address this argument.

Plaintiffs do not assert that Defendants had the intent or motive to defraud. Rather, they claim that Defendants' conduct was severely reckless. Without allegations of motive, other allegations tending to show scienter must be "particularly strong" to meet the PSLRA standard. *Green Tree*, 270 F.3d at 660. Recklessness is limited to "*highly unreasonable* omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an *extreme departure* from the standards of ordinary care" that present a danger of misleading investors which is "either known to the defendant or is so obvious that the defendant must have been aware of it." *Green Tree*, 270 F.3d at 654 (emphasis added).

In determining whether alleged facts give rise to a "strong inference of scienter," the court must consider "plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs*, 551 U.S. at 323, 324. "The inference that the defendant acted with scienter need not be irrefutable, *i.e.,* of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id*. at 324. (citation omitted). An inference of scienter must be "more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Id*. "[O]missions and ambiguities count against inferring scienter," but "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Id*. at 326. The Court must ask: "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of

scienter at least as strong as any opposing inference?" *Id.*; *accord N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*, 537 F.3d 35, 45 (1st Cir. 2008) ("[W]here there are equally strong inferences for and against scienter, *Tellabs* now awards the draw to the plaintiff.").

Plaintiffs maintain that strong inference of scienter is raised by: (1) Defendants' statement that they participated in an "intense" due diligence process prior to acquiring EFCO, which involved scrutiny of EFCO's projects; and (2) Defendants' assurances that forecasts were supported by Apogee's "4 levels of visibility." According to Plaintiffs, these statements demonstrate that Defendants had actual knowledge of adverse information which, when considered with other alleged facts, support of finding of scienter. *See Green Tree*, 270 F.3d at 665 (finding scienter allegations sufficient where defendants allegedly published statements with knowledge of specific facts, indicating that crucial information in the statements was based on discredited assumptions); *Freedman v. Saint Jude Med., Inc.*, 4 F. Supp. 3d 1101, 1122 (D. Minn. 2014) (finding scienter allegations sufficient where defendants allegedly possessed information that contradicted or undermined their representations). Plaintiffs contend that the allegations of scienter are further supported by the importance of the EFCO acquisition to Apogee, which increased the Framing segment to 51% of Apogee's net sales in FY18 (up from 35% of net sales in FY17), and the Individual Defendants' personal involvement in the EFCO acquisition. (AC ¶¶ 283–85.) *See In re CenturyLink Sales Practices & Sec. Litig.*, 403 F. Supp.

3d 712, 731 (D. Minn. 2019) ("[I]t is reasonable to assume that top management were 'aware of matters central to that business's operation.'"). Plaintiffs again insist that they do not plead fraud by hindsight, because Defendants admitted that they learned of problems with EFCO legacy projects in due diligence, *i.e.*, before making the allegedly false statements. (Pls' Mem. at 27–28 (citing AC ¶¶ 13, 75, 177, 278).)

Defendants respond to this argument by noting that the Complaint merely alleges facts demonstrating that the Individual Defendants (1) received general and unidentified information regarding Apogee's financials and operations at some point; (2) executed SOX certifications confirming Apogee's SEC statements were truthful; (3) investigated EFCO's business and operations through due diligence and met with EFCO representatives; and (4) had visibility into Apogee's business and external metrics. (AC ¶¶ 262–75.) The Court agrees that these factual allegations do not rise to the level of severe recklessness. *McDonald*, 2011 WL 13228408, at *7 ("Under the PSLRA, it is not sufficient for the facts alleged to give rise to a weak or plausible or even reasonable inference of scienter.").

Rather than allege specific information that Defendants learned in the due diligence process, the Complaint describes the due diligence in general terms: "an independent investigation, examination, analysis and verification of the business, assets, liabilities, operations and financial condition," visits with EFCO, and meetings with EFCO representatives, and "analy[sis of] the projects and work at EFCO to determine

which of EFCO's work would fit into Apogee's classification of 'backlog'" after the acquisition. (AC ¶¶ 65–66, 68, 267–68.) The only legacy project identified in the Complaint is the Vista Tower project, which began in August 2016. (*Id*. ¶ 74.) In May 2018 (one year after the acquisition announcement), EFCO's then-president acknowledged that "EFCO did not fully understand the complexities of the [Vista Tower] project when it took it on, and therefore underbid it." (*Id*.) The Complaint does not provide any particularities as to the extent of the underbidding, or Defendants' awareness of whether EFCO was in over its head. In the September 2018 analyst call, Puishys noted that the Vista Tower project was "just basically starting" and would be in production for two years. (*Id*. ¶¶ 214, 216.) These allegations fail to allege facts or further particularities about what Defendants knew about the full extent of the EFCO problems, or when. Rather, taken as a whole, the facts pled in the Complaint tend to show that Defendants disclosed what they knew of problems with EFCO as they learned them.

As noted above, the Complaint alleges that during the April 12, 2018 analyst call, Puishys stated that Defendants did not learn of the extent of problems with EFCO until the second half of calendar year 2017, *i.e.*, after due diligence. (AC ¶ 177.) Puishys stated that EFCO legacy projects' problems "were more substantial than we learned in due diligence" (*id*.), and that "[i]t was a challenge" to identify the problems with the projects, (*id*. ¶ 179). He also stated that EFCO "in hindsight" had underestimated costs needed to complete EFCO's legacy projects. (ECF No. 37-19 at 11; *see* AC ¶¶ 73, 109, 135, 177; *see also*

*id.* ¶ 135 (explaining during August 23, 2017 analyst call that "*[a]s we got into the business, we identified a discrete number of [underestimated] projects . . .*") (emphasis added)).[10]

Accepting the Complaint's allegations as true and taking them collectively, they indicate that Defendants learned of problems over time and disclosed them, as opposed to learning of them during due diligence and hiding them. (AC ¶¶ 236–61.) The Complaint does not allege facts indicating that the Individual Defendants knew about the severity of the problems when they made the statements at issue. Perhaps Defendants should have better anticipated the problems with the EFCO legacy projects, its weakened pipeline, and the Glass segment. (*See, e.g.,* AC ¶¶ 177 (admitting "that's our fault" when they realized that the EFCO legacy project problems were more substantial than learned in due diligence); 208 (admitting the Glass segment orders "caught us by surprise").) But "[m]ere negligence does not violate Rule 10b–5." *Ferris*, 395 F.3d at 854 (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 214 (1976)).

The Court concludes that the Complaint fails to allege conduct rising to the level of "an extreme departure from the standards of ordinary care," *Green Tree*, 270 F.3d at

---

[10] Porter also addressed EFCO's slow order pipeline problem "in hindsight." [ECF No. 37-13 at 8 (Aug. 23, 2017 analyst call) at 7–8.] In response to an analyst's question about EFCO's weakened pipeline, Porter explained that there were "a lot of rumors out in the industry a couple of months before we actually announced the signing of the [EFCO acquisition]. And frankly, that's the period where we saw the most disruption *in hindsight,* both in terms of competitors taking advantage of the situation, the customers not knowing who the parent was going to be and the uncertainty associated with that. And so the bidding environment stabilized once we announced . . . Apogee as a parent." (*Id.* at 8 (emphasis added).)

654, and that a reasonable person would not deem the inference of scienter at least as strong as any opposing inference.

### C.  Scienter Based on GAAP Violations

The Complaint alleges Defendants' treatment of the losses relating to the EFCO legacy projects violated GAAP, which Plaintiffs contend support a strong inference of scienter. Standing alone, allegations of GAAP violations are insufficient to raise an inference of scienter. *Ferris*, 395 F.3d at 855. "Only where these allegations are coupled with evidence of corresponding fraudulent intent might they be sufficient." *Id.; see In re MoneyGram Int'l, Inc. Sec. Litig.*, 626 F. Supp. 2d 947, 981 (D. Minn. 2009) (explaining that false Sarbanes-Oxley Act ("SOX") certifications "are probative of scienter only if they are accompanied by 'allegations of particular facts demonstrating how the defendants knew of the scheme at the time they made their statements of compliance, that they knew the financial statements overrepresented the company's true earnings, or that they were aware of a GAAP violation and disregarded it.'") (citation omitted); *In re Buca Inc. Sec. Litig.*, No. 05-CV-1762 (DWF/AJB), 2006 WL 3030886, at *11 (D. Minn. Oct. 16, 2006) ("Although Defendants['] practice . . . violated GAAP, Plaintiffs have failed to establish the requisite fraudulent intent."). Allegations that the GAAP and SEC rules are clear, and that the Individual Defendants signed SOX certifications, do not demonstrate that Defendants knew or recklessly disregarded that Apogee's financial statements did not conform with GAAP. And while a restatement is not a "prerequisite" of alleging fraud,

*CenturyLink*, 403 F. Supp. 3d at 724, "the fact that [Apogee] was not required to restate in financial statements indicates that their [SOX] certifications are not probative of scienter." *Local 295/Local 851 IBT Emp'r Grp. Pension Tr. & Welfare Fund v. Fifth Third Bancorp.*, 731 F. Supp. 2d 689, 725 (S.D. Ohio 2010).

Plaintiffs maintain that "myriad facts" alleged in the Complaint imply that the Individual Defendants would have understood that they violated GAAP by failing to record EFCO's current or estimated future contract losses in the period the losses were evident. (Pls' Mem. at 30–31 (citing *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 279 (3d Cir. 2006)); *see Suprema Specialties*, 438 F.3d at 279–280 ("[A]llegations of [Generally Accepted Auditing Standards] violations, coupled with allegations that significant 'red flags' were ignored, can suffice to withstand a motion to dismiss. Such allegations, of course, must be pled with particularity."). The Complaint alleges that "unfavorable red flags . . . were well known to Defendants beginning with the EFCO due diligence, and mounted through the rest of calendar 2017 and early calendar 2018." (AC ¶ 248.) It continues:

> Apogee violated GAAP by failing to recognize anticipated EFCO cost overruns and losses when they actually became evident in accounting periods prior to fiscal 4Q19. For example, material EFCO cost overruns and likely future losses were evident to Defendants on August 23, 2017, when [Apogee] publicly stated that it had specifically "identified a discrete number of projects" for which EFCO had underestimated the projects' costs, and it had its "arms around" the issue of the projects' costs . . . . Defendants misrepresented the scope of the problems with EFCO's legacy projects throughout the Class Period, which problems continued to mount at Apogee. Thus, Apogee's senior management would still have known in

> 1Q19 that EFCO would suffer significant future cost overruns and losses on EFCO's legacy projects. These legacy projects included the $70 million Vista Tower project, one of the remaining substantial EFCO legacy projects at 4Q19 to which the $42.6 million charge applied, and which EFCO's President admitted had been drastically "underbid" by EFCO.

(AC ¶ 250 & n.4 (citing *id*. ¶¶ 74 (alleging that in a May 16, 2018 article, then-EFCO president stated EFCO "underbid"—rather than "drastically 'underbid'"—the Vista Tower project), 135, 140, 231).) But the Complaint fails to allege facts indicating that Defendants were aware of and intentionally disregarded an appropriate accounting method for a fraudulent purpose. *See Ferris*, 395 F.3d at 856 (affirming dismissal of complaint where "FBW alleges a poor audit, not the intent to deceive, manipulate, or defraud required for securities fraud"); *K-tel*, 300 F.3d at 895 (finding plaintiffs failed to allege facts demonstrating an intent to defraud because "an intent to 'curtail' certain activities based on past losses does not, by itself, raise a red flag that . . . assets need be immediately written off"). The alleged GAAP violations do not support a strong inference of scienter.

Because the Complaint does not satisfy the PSLRA's heighted standard for pleading scienter, the Court grants Defendants' motion to dismiss Count I of the Complaint.[11]

---

[11] Defendants also make arguments for dismissal based on failure to allege loss causation and failure of Lead Plaintiffs to meet statutory standing requirements for any statement made after Plaintiffs' stock purchase and sale. Regarding standing, Defendants do not argue that Plaintiffs have not suffered any injury; rather, they contend that Plaintiffs cannot represent the class based on misrepresentations made on particular dates. Given

## IV. Section 20(a) Claim

Because Plaintiffs fail to state a claim for securities fraud, there can be no secondary liability against the Individual Defendants as "controlling persons." *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 550 n.12 (8th Cir. 1997) ("Because the Plaintiffs presented no actionable claim for violation of Section 11, Section 12(2), Section 10(b), or Rule 10b–5, the claims for controlling person liability were also properly dismissed."). The Section 20(a) claim against the Individual Defendants is therefore dismissed.

## V. Request for Leave to Amend

Plaintiffs' response to Defendants' motion to dismiss includes a request for leave to amend the Complaint to cure any deficiencies. (Pls' Mem. at 40.) The Court denies this request for failure to provide a proposed amended pleading. *See* D. Minn. LR 15.1(b) (requiring a "copy of the proposed amended pleading"); *Novastar*, 579 F.3d at 884–85 (affirming denial of request for leave made in plaintiff's response to motion to dismiss); *McDonald*, 2011 WL 13228408, at *15 (denying a "perfunctory, last-minute request for leave to amend its complaint" in plaintiff's response to motion to dismiss).

## CONCLUSION

Based on the foregoing and on all the files, records, and proceedings herein, IT IS HEREBY ORDERED:

---

the Court's rulings above, these arguments need not be addressed. *See, e.g.*, *Rabbani v. DryShips Inc.*, No. 4:12CV130 RWS, 2012 WL 5395787, at *16 n.11 (E.D. Mo. Nov. 6, 2012) (declining to reach standing issue where plaintiffs failed to state Exchange Act claims).

1.    Defendants' motion to dismiss [ECF No. 34] is GRANTED; and

2.    The Complaint is DISMISSED WITHOUT PREJUDICE.


Dated: March 25, 2020                          BY THE COURT:

                                               s/Nancy E. Brasel
                                               Nancy E. Brasel
                                               United States District Judge